**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON OVERSIGHT AND REFORM,<br>UNITED STATES HOUSE OF REPRESENTATIVES<br>2157 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>                              *Plaintiff*,<br><br>                    v.<br><br>WILLIAM P. BARR, in his official capacity as<br>Attorney General of the United States,<br>United States Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530; and<br><br>WILBUR L. ROSS, JR., in his official capacity as<br>Secretary of Commerce,<br>United States Department of Commerce,<br>1401 Constitution Avenue, N.W.<br>Washington, D.C. 20230,<br><br>                              *Defendants*. | Case No. _____ |

# Exhibit A



**UNITED STATES DEPARTMENT OF COMMERCE**
**The Secretary of Commerce**
Washington, D.C. 20230

To:      Karen Dunn Kelley, Under Secretary for Economic Affairs

From:  Secretary Wilbur Ross

Date:   March 26, 2018

Re:      Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire

Dear Under Secretary Kelley:

As you know, on December 12, 2017, the Department of Justice ("DOJ") requested that the
Census Bureau reinstate a citizenship question on the decennial census to provide census block
level citizenship voting age population ("CVAP") data that are not currently available from
government survey data ("DOJ request").  DOJ and the courts use CVAP data for determining
violations of Section 2 of the Voting Rights Act ("VRA"), and having these data at the census
block level will permit more effective enforcement of the Act.  Section 2 protects minority
population voting rights.

Following receipt of the DOJ request, I set out to take a hard look at the request and ensure that
I considered all facts and data relevant to the question so that I could make an informed decision
on how to respond.  To that end, the Department of Commerce ("Department") immediately
initiated a comprehensive review process led by the Census Bureau.

The Department and Census Bureau's review of the DOJ request – as with all significant Census
assessments – prioritized the goal of obtaining *complete and accurate data*.  The decennial
census is mandated in the Constitution and its data are relied on for a myriad of important
government decisions, including apportionment of Congressional seats among states,
enforcement of voting rights laws, and allocation of federal funds.  These are foundational
elements of our democracy, and it is therefore incumbent upon the Department and the Census
Bureau to make every effort to provide a complete and accurate decennial census.

At my direction, the Census Bureau and the Department's Office of the Secretary began a
thorough assessment that included legal, program, and policy considerations.  As part of the
process, I also met with Census Bureau leadership on multiple occasions to discuss their process
for reviewing the DOJ request, their data analysis, my questions about accuracy and response
rates, and their recommendations.  At present, the Census Bureau leadership are all career civil
servants.  In addition, my staff and I reviewed over 50 incoming letters from stakeholders,
interest groups, Members of Congress, and state and local officials regarding reinstatement of a
citizenship question on the 2020 decennial census, and I personally had specific conversations on

1

the citizenship question with over 24 diverse, well informed and interested parties representing a broad range of views. My staff and I have also monitored press coverage of this issue.

Congress has delegated to me the authority to determine which questions should be asked on the decennial census, and I may exercise my discretion to reinstate the citizenship question on the 2020 decennial census, especially based on DOJ's request for improved CVAP data to enforce the VRA. By law, the list of decennial census questions is to be submitted two years prior to the decennial census – in this case, no later than March 31, 2018.

The Department's review demonstrated that collection of citizenship data by the Census has been a long-standing historical practice. Prior decennial census surveys of the entire United States population consistently asked citizenship questions up until 1950, and Census Bureau surveys of sample populations continue to ask citizenship questions to this day. In 2000, the decennial census "long form" survey, which was distributed to one in six people in the U.S., included a question on citizenship. Following the 2000 decennial census, the "long form" sample was replaced by the American Community Survey ("ACS"), which has included a citizenship question since 2005. Therefore, the citizenship question has been well tested.

DOJ seeks to obtain CVAP data for census blocks, block groups, counties, towns, and other locations where potential Section 2 violations are alleged or suspected, and DOJ states that the current data collected under the ACS are insufficient in scope, detail, and certainty to meet its purpose under the VRA. The Census Bureau has advised me that the census-block-level citizenship data requested by DOJ are not available using the annual ACS, which as noted earlier does ask a citizenship question and is the present method used to provide DOJ and the courts with data used to enforce Section 2 of the VRA. The ACS is sent on an annual basis to a sample of approximately 2.6 percent of the population.

To provide the data requested by DOJ, the Census Bureau initially analyzed three alternatives: Option A was to continue the status quo and use ACS responses; Option B was placing the ACS citizenship question on the decennial census, which goes to every American household; and Option C was not placing a question on the decennial census and instead providing DOJ with a citizenship analysis for the entire population using federal administrative record data that Census has agreements with other agencies to access for statistical purposes.

**Option A** contemplates rejection of the DOJ request and represents the status quo baseline. Under Option A, the 2020 decennial census would not include the question on citizenship that DOJ requested and therefore would not provide DOJ with improved CVAP data. Additionally, the block-group level CVAP data currently obtained through the ACS has associated margins of error because the ACS is extrapolated based on sample surveys of the population. Providing more precise block-level data would require sophisticated statistical modeling, and if Option A is selected, the Census Bureau advised that it would need to deploy a team of experts to develop model-based methods that attempt to better facilitate DOJ's request for more specific data. But the Census Bureau did not assert and could not confirm that such data modeling is possible for census-block-level data with a sufficient degree of accuracy. Regardless, DOJ's request is based at least in part on the fact that existing ACS citizenship data-sets lack specificity and

2

completeness. Any future modeling from these incomplete data would only compound that problem.

Option A would provide no improved citizenship count, as the existing ACS sampling would still fail to obtain *actual*, complete number counts, especially for certain lower population areas or voting districts, and there is no guarantee that data could be improved using small-area modeling methods. Therefore, I have concluded that Option A is not a suitable option.

The Census Bureau and many stakeholders expressed concern that **Option B**, which would add a citizenship question to the decennial census, would negatively impact the response rate for non-citizens. A significantly lower response rate by non-citizens could reduce the accuracy of the decennial census and increase costs for non-response follow up ("NRFU") operations. However, neither the Census Bureau nor the concerned stakeholders could document that the response rate would in fact decline materially. In discussing the question with the national survey agency Nielsen, it stated that it had added questions from the ACS on sensitive topics such as place of birth and immigration status to certain short survey forms without any appreciable decrease in response rates. Further, the former director of the Census Bureau during the last decennial census told me that, while he wished there were data to answer the question, none existed to his knowledge. Nielsen's Senior Vice President for Data Science and the former Deputy Director and Chief Operating Officer of the Census Bureau under President George W. Bush also confirmed that, to the best of their knowledge, no empirical data existed on the impact of a citizenship question on responses.

When analyzing Option B, the Census Bureau attempted to assess the impact that reinstatement of a citizenship question on the decennial census would have on response rates by drawing comparisons to ACS responses. However, such comparative analysis was challenging, as response rates generally vary between decennial censuses and other census sample surveys. For example, ACS self-response rates were 3.1 percentage points less than self-response rates for the 2010 decennial census. The Bureau attributed this difference to the greater outreach and follow-up associated with the Constitutionally-mandated decennial census. Further, the decennial census has differed significantly in nature from the sample surveys. For example, the 2000 decennial census survey contained only eight questions. Conversely, the 2000 "long form" sample survey contained over 50 questions, and the Census Bureau estimated it took an average of over 30 minutes to complete. ACS surveys include over 45 questions on numerous topics, including the number of hours worked, income information, and housing characteristics.

The Census Bureau determined that, for 2013-2016 ACS surveys, nonresponses to the citizenship question for non-Hispanic whites ranged from 6.0 to 6.3 percent, for non-Hispanic blacks ranged from 12.0 to 12.6 percent, and for Hispanics ranged from 11.6 to 12.3 percent. However, these rates were comparable to nonresponse rates for other questions on the 2013 and 2016 ACS. Census Bureau estimates showed similar nonresponse rate ranges occurred for questions on the ACS asking the number times the respondent was married, 4.7 to 6.9 percent; educational attainment, 5.6 to 8.5 percent; monthly gas costs, 9.6 to 9.9 percent; weeks worked in the past 12 months, 6.9 to 10.6 percent; wages/salary income, 8.1 to 13.4 percent; and yearly property insurance, 23.9 to 25.6 percent.

001315

The Census Bureau also compared the self-response rate differences between citizen and non-citizen households' response rates for the 2000 decennial census short form (which did not include a citizenship question) and the 2000 decennial census long form survey (the long form survey, distributed to only one in six households, included a citizenship question in 2000). Census found the decline in self-response rates for non-citizens to be 3.3 percent greater than for citizen households. However, Census was not able to isolate what percentage of decline was caused by the inclusion of a citizenship question rather than some other aspect of the long form survey (it contained over six times as many questions covering a range of topics). Indeed, the Census Bureau analysis showed that for the 2000 decennial census there was a significant drop in self response rates overall between the short and long form; the mail response rate was 66.4 percent for the short form and only 53.9 percent for the long form survey. So while there is widespread belief among many parties that adding a citizenship question could reduce response rates, the Census Bureau's analysis did not provide definitive, empirical support for that belief.

**Option C**, the use of administrative records rather than placing a citizenship question on the decennial census, was a potentially appealing solution to the DOJ request. The use of administrative records is increasingly part of the fabric and design of modern censuses, and the Census Bureau has been using administrative record data to improve the accuracy and reduce the cost of censuses since the early 20th century. A Census Bureau analysis matching administrative records with the 2010 decennial census and ACS responses over several more recent years showed that using administrative records could be more accurate than self-responses in the case of non-citizens. That Census Bureau analysis showed that between 28 and 34 percent of the citizenship self-responses for persons that administrative records show are non-citizens were inaccurate. In other words, when non-citizens respond to long form or ACS questions on citizenship, they inaccurately mark "citizen" about 30 percent of the time. However, the Census Bureau is still evolving its use of administrative records, and the Bureau does not yet have a complete administrative records data set for the entire population. Thus, using administrative records alone to provide DOJ with CVAP data would provide an incomplete picture. In the 2010 decennial census, the Census Bureau was able to match 88.6 percent of the population with what the Bureau considers credible administrative record data. While impressive, this means that more than 10 percent of the American population – some 25 million voting age people – would need to have their citizenship imputed by the Census Bureau. Given the scale of this number, it was imperative that another option be developed to provide a greater level of accuracy than either self-response alone or use of administrative records alone would presently provide.

I therefore asked the Census Bureau to develop a fourth alternative, **Option D**, which would combine Options B and C. Under Option D, the ACS citizenship question would be asked on the decennial census, and the Census Bureau would use the two years remaining until the 2020 decennial census to further enhance its administrative record data sets, protocols, and statistical models to provide more complete and accurate data. This approach would maximize the Census Bureau's ability to match the decennial census responses with administrative records. Accordingly, at my direction the Census Bureau is working to obtain as many additional Federal and state administrative records as possible to provide more comprehensive information for the population.

4

It is my judgment that Option D will provide DOJ with the most complete and accurate CVAP data in response to its request. Asking the citizenship question of 100 percent of the population gives each respondent the opportunity to provide an answer. This may eliminate the need for the Census Bureau to have to impute an answer for millions of people. For the approximately 90 percent of the population who are citizens, this question is no additional imposition. And for the approximately 70 percent of non-citizens who already answer this question accurately on the ACS, the question is no additional imposition since census responses by law may only be used anonymously and for statistical purposes. Finally, placing the question on the decennial census and directing the Census Bureau to determine the best means to compare the decennial census responses with administrative records will permit the Census Bureau to determine the inaccurate response rate for citizens and non-citizens alike using the entire population. This will enable the Census Bureau to establish, to the best of its ability, the accurate ratio of citizen to non-citizen responses to impute for that small percentage of cases where it is necessary to do so.

**Consideration of Impacts**  I have carefully considered the argument that the reinstatement of the citizenship question on the decennial census would depress response rate. Because a lower response rate would lead to increased non-response follow-up costs and less accurate responses, this factor was an important consideration in the decision-making process. I find that the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose outweigh fears about a potentially lower response rate.

Importantly, the Department's review found that limited empirical evidence exists about whether adding a citizenship question would decrease response rates materially. Concerns about decreased response rates generally fell into the following two categories – distrust of government and increased burden. First, stakeholders, particularly those who represented immigrant constituencies, noted that members of their respective communities generally distrusted the government and especially distrusted efforts by government agencies to obtain information about them. Stakeholders from California referenced the difficulty that government agencies faced obtaining any information from immigrants as part of the relief efforts after the California wildfires. These government agencies were not seeking to ascertain the citizenship status of these wildfire victims. Other stakeholders referenced the political climate generally and fears that Census responses could be used for law enforcement purposes. But no one provided evidence that reinstating a citizenship question on the decennial census would materially decrease response rates among those who generally distrusted government and government information collection efforts, disliked the current administration, or feared law enforcement. Rather, stakeholders merely identified residents who made the decision not to participate regardless of whether the Census includes a citizenship question. The reinstatement of a citizenship question will not decrease the response rate of residents who already decided not to respond. And no one provided evidence that there are residents who would respond accurately to a decennial census that did not contain a citizenship question but would not respond if it did (although many believed that such residents had to exist). While it is possible this belief is true, there is no information available to determine the number of people who would in fact not respond due to a citizenship question being added, and no one has identified any mechanism for making such a determination.

5

A second concern that stakeholders advanced is that recipients are generally less likely to respond to a survey that contained more questions than one that contained fewer. The former Deputy Director and Chief Operating Officer of the Census Bureau during the George W. Bush administration described the decennial census as particularly fragile and stated that any effort to add questions risked lowering the response rate, especially a question about citizenship in the current political environment. However, there is limited empirical evidence to support this view. A former Census Bureau Director during the Obama Administration who oversaw the last decennial census noted as much. He stated that, even though he believed that the reinstatement of a citizenship question would decrease response rate, there is limited evidence to support this conclusion. This same former director noted that, in the years preceding the decennial census, certain interest groups consistently attack the census and discourage participation. While the reinstatement of a citizenship question may be a data point on which these interest groups seize in 2019, past experience demonstrates that it is likely efforts to undermine the decennial census will occur again regardless of whether the decennial census includes a citizenship question. There is no evidence that residents who are persuaded by these disruptive efforts are more or less likely to make their respective decisions about participation based specifically on the reinstatement of a citizenship question. And there are actions that the Census Bureau and stakeholder groups are taking to mitigate the impact of these attacks on the decennial census.

Additional empirical evidence about the impact of sensitive questions on survey response rates came from the SVP of Data Science at Nielsen. When Nielsen added questions on place of birth and time of arrival in the United States (both of which were taken from the ACS) to a short survey, the response rate was not materially different than it had been before these two questions were added. Similarly, the former Deputy Director and COO of the Census during the George W. Bush Administration shared an example of a citizenship-like question that he believed would negatively impact response rates but did not. He cited to the Department of Homeland Security's 2004 request to the Census Bureau to provide aggregate data on the number of Arab Americans by zip code in certain areas of the country. The Census Bureau complied, and Census employees, including the then-Deputy Director, believed that the resulting political firestorm would depress response rates for further Census Bureau surveys in the impacted communities. But the response rate did not change materially.

Two other themes emerged from stakeholder calls that merit discussion. First, several stakeholders who opposed reinstatement of the citizenship question did not appreciate that the question had been asked in some form or another for nearly 200 years. Second, other stakeholders who opposed reinstatement did so based on the assumption that the data on citizenship that the Census Bureau collects through the ACS are accurate, thereby obviating the need to ask the question on the decennial census. But as discussed above, the Census Bureau estimates that between 28 and 34 percent of citizenship self-responses on the ACS for persons that administrative records show are non-citizens were inaccurate. Because these stakeholder concerns were based on incorrect premises, they are not sufficient to change my decision.

6

Finally, I have considered whether reinstating the citizenship question on the 2020 Census will lead to any significant monetary costs, programmatic or otherwise. The Census Bureau staff have advised that the costs of preparing and adding the question would be minimal due in large part to the fact that the citizenship question is already included on the ACS, and thus the citizenship question has already undergone the cognitive research and questionnaire testing required for new questions. Additionally, changes to the Internet Self-Response instrument, revising the Census Questionnaire Assistance, and redesigning of the printed questionnaire can be easily implemented for questions that are finalized prior to the submission of the list of questions to Congress.

The Census Bureau also considered whether non-response follow-up increases resulting from inclusion of the citizenship question would lead to increased costs. As noted above, this estimate was difficult to assess given the Census Bureau and Department's inability to determine what impact there will be on decennial census survey responses. The Bureau provided a rough estimate that postulated that up to 630,000 additional households may require NRFU operations if a citizenship question is added to the 2020 decennial census. However, even assuming that estimate is correct, this additional ½ percent increase in NRFU operations falls well within the margin of error that the Department, with the support of the Census Bureau, provided to Congress in the revised Lifecycle Cost Estimate ("LCE") this past fall. That LCE assumed that NRFU operations might increase by 3 percent due to numerous factors, including a greater increase in citizen mistrust of government, difficulties in accessing the Internet to respond, and other factors.

Inclusion of a citizenship question on this country's decennial census is not new – the decision to collect citizenship information from Americans through the decennial census was first made centuries ago. The decision to include a citizenship question on a national census is also not uncommon. The United Nations recommends that its member countries ask census questions identifying both an individual's country of birth and the country of citizenship. *Principals and Recommendations for Population and Housing Censuses (Revision 3)*, UNITED NATIONS 121 (2017). Additionally, for countries in which the population may include a large portion of naturalized citizens, the United Nations notes that, "it may be important to collect information on the method of acquisition of citizenship." *Id.* at 123. And it is important to note that other major democracies inquire about citizenship on their census, including Australia, Canada, France, Germany, Indonesia, Ireland, Mexico, Spain, and the United Kingdom, to name a few.

The Department of Commerce is not able to determine definitively how inclusion of a citizenship question on the decennial census will impact responsiveness. However, even if there is some impact on responses, the value of more complete and accurate data derived from surveying the entire population outweighs such concerns. Completing and returning decennial census questionnaires is required by Federal law, those responses are protected by law, and inclusion of a citizenship question on the 2020 decennial census will provide more complete information for those who respond. The citizenship data provided to DOJ will be more accurate with the question than without it, which is of greater importance than any adverse effect that may result from people violating their legal duty to respond.

7

To conclude, after a thorough review of the legal, program, and policy considerations, as well as numerous discussions with the Census Bureau leadership and interested stakeholders, I have determined that reinstatement of a citizenship question on the 2020 decennial census is necessary to provide complete and accurate data in response to the DOJ request.  To minimize any impact on decennial census response rates, I am directing the Census Bureau to place the citizenship question last on the decennial census form.

Please make my decision known to Census Bureau personnel and Members of Congress prior to March 31, 2018.  I look forward to continuing to work with the Census Bureau as we strive for a complete and accurate 2020 decennial census.

CC:    Ron Jarmin, performing the nonexclusive functions and duties of the Director of the Census Bureau

      Enrique Lamas, performing the nonexclusive functions and duties of the Deputy Director of the Census Bureau

001320

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

*Defendants*.

Case No. _____

# Exhibit B

# Hearing with Commerce Secretary Ross

_____

# HEARING

BEFORE THE

# COMMITTEE ON WAYS AND MEANS

# U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

SECOND SESSION

_____

MARCH 22, 2018

_____

## Serial No.  115-FC09

_____

*Secretary Ross.  Well, as I mentioned, if we get an individual request from an individual company that is truly representative of an industry-wide problem, we can deal with it on a broader basis.  The powers delegated under the proclamation are quite broad.

As to beverage cans themselves, as you are aware, it is my view that these tariffs, even forgetting the exclusions and exemptions, will have a trivial effect, a fraction of one penny on a can of Campbell's soup, on a can of Budweiser, on a can of Coca Cola.  And it is similarly small increments on many other things.

So that doesn't answer all the problems, but I think we need to put it into perspective.  The total metal content of a can is two or three pennies, depending on the can size and the particular material used.  So putting a tariff on a portion of that, it really is relatively small in the overall scheme of things.

*Chairman Brady.  Thank you, Mr. Meehan.

Ms. Chu, you are recognized.

*Ms. Chu.  Secretary Ross, I am going to drastically change the topic here, and ask a question that has been asked of my office nearly every day, and that is about the census.

The Census Bureau, of course, is under your purview, but it has been reported that the Department of Commerce is considering asking -- adding a citizenship question to the 2020 Census.  And there is a lot of fear by immigrant stakeholders that adding this question will create a lot of fear, that many immigrants will fail to respond to the entire questionnaire, fearing that their legal status will come under scrutiny.  There are many that argue that the numbers reported from the census will be more inaccurate, and that it will be more difficult to provide benefits and resources for low-income communities who are afraid to be counted.

In fact, I have heard from many entities, including the LA County Board of Supervisors who unanimously wrote to Congress, urging opposition to the inclusion of the citizenship question, highlighting that LA County already faces great challenges in counting minorities, immigrants, and hard-to-survey populations.

And in the 2010 Census, more than 113,000 Latino children in California and 47,000 Latino children in LA County were not counted, according to one survey that was done.

So these inaccuracies make it hard and difficult for our government to administer important federal safety net programs, such as WIC, SNAP, and TANF.  Can you tell me whether the Department of Commerce plans to include the citizenship question in the 2020 Census?

*Secretary Ross.  Department of Justice, as you know, initiated the request for inclusion of the citizenship question.  We have been talking on the phone and received written correspondence from quite a lot of parties on both sides of that question.  There are many, many sub-questions about accuracy, about suppression of responses that we are taking into account.

We have not made a final decision as yet, because it is a very important and very complicated question.  We will make a decision by March 31st, which is the date on which we are required to report to the Congress the final questions for the 2020 decennial census.

*Ms. Chu.  And I understand that this question has not been tested, which is usually the tradition with the Census Bureau also.  I wanted to know whether you have factored in the additional cost of adding this question, this untested question.

*Secretary Ross.  The cost is one of the considerations.  The comparison with the American Community Survey and annual sampling, which does ask the question, is another consideration.  There are probably 15 or 20 different, very complicated issues involved in the request.  Because it is from the Department of Justice, we are taking it very seriously, and we will issue a fulsome documentation of whatever conclusion we finally come to.

*Chairman Brady.  Thank you.  Mr. Secretary and members, we have two minutes left in the first of four votes.  This is an important hearing.  We will reconvene, Mr. Secretary, immediately after votes.  Thank you for your patience.

The committee stands recessed until immediately after votes.

[Recess.]

*Chairman Brady.  The committee will come to order.

Thank you, Mr. Secretary, for your patience during the vote series.  We will resume with the questioning by Mrs. Noem.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

                              *Plaintiff*,

              v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

                              *Defendants*.

Case No. _____

# Exhibit C

Political Transcript Wire; Lanham [Lanham]21 Mar 2018.

Full Text

HOUSE APPROPRIATIONS COMMITTEE, COMMERCE, JUSTICE, SCIENCE, AND RELATED AGENCIES SUBCOMMITTEE HEARING ON F.Y. 2019 DEPARTMENT OF COMMERCE BUDGET

MARCH 20, 2018

SPEAKERS: REP. JOHN CULBERSON, R-TEXAS, CHAIRMAN

REP. ROBERT B. ADERHOLT, R-ALA.

REP. JOHN CARTER, R-TEXAS

REP. MARTHA ROBY, R-ALA.

REP. STEVEN M. PALAZZO, R-MISS.

REP. HAROLD ROGERS, R-KY.

REP. EVAN H. JENKINS, R-W.VA.

REP. RODNEY FRELINGHUYSEN, R-N.J., EX OFFICIO

REP. JOSE E. SERRANO, D-N.Y., RANKING MEMBER

We've changed all that. We meet with the G.C. We meet with the subcontractors on quite a regular basis and have some, as the diplomats would say, frank and open discussions with them.

CULBERSON: Thank you very much.

Mr. Serrano.

SERRANO: Thank you, Mr. Chairman.

Secretary Ross, I know, from your testimony, that you take the administration of the census very seriously. And part of that duty is to administer it in a nonpolitical and nonpartisan way. Is that correct?

ROSS: Yes, sir.

SERRANO: Should political parties and campaign politics ever factor into what is asked of every household in the country on the census?

ROSS: No political party has asked us to do anything on the census. We have had a request, as everyone is aware, from the Department of Justice, to add a citizenship question to the 2020 census.

SERRANO: Thank you.

The reason I ask you the first questions is because I was very disappointed to see yesterday that the Republican Party campaign to reelect the president put out an appalling e-mail specifically noting that the president wants a new citizenship question added to the census and seeking campaign supporters to weigh in if they are, quote, "on his side." Unquote.

Do you disavow this campaign e-mail? As the president or anyone else in the White House directed you to add this or a similar question to the 2020 census?

ROSS: I'm not familiar with the e-mail. I'm not part of the Republican campaign committee. So, I have not seen it. I have heard about it, this morning.

We are responding solely to the Department of Justice's request, not to any campaign request, not to any other political party request. We are listening to stakeholders. Many have written to us. Some have come in to talk with me.

And we have initiated a whole series of phone calls to stakeholders on both sides of the question. We will come to a conclusion prior to March 31st which, as I understand it, is the date by which we must submit the questions to the Congress.

We will comply with that date and we are going very, very carefully and very thoroughly analyzing all aspects of the requests and its implications for the census were it to be approved and were it not to be approved.

SERRANO: Thank you.

I'm not a lawyer and certainly not a constitutional lawyer.

ROSS: Neither am I, sir. I'm a civilian.

SERRANO: Okay.

But the Constitution is pretty clear to me, even though I'm not a lawyer, to count the people within the states not the citizens. And some federal agencies bring fear to people that are here as immigrants who were not born here. And the purpose of the census should be to increase the count every 10 years, make it better. And this question troubles us a lot.

Mr. Secretary, on March -- staying on that line. On March in 2017, the department sent to Congress a list of subjects planned for the 2020 census.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

*Defendants*.

Case No. _____

# Exhibit D

11/24/2019    Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census | House Committ…

Case 1:19-cv-03557-RDM   Document 1   Filed 11/26/19   Page 19 of 53



(/)

About (/about)

Subcommittees (/subcommittees)

Hearings (/legislation/hearings)

News (/news)

Contact (/contact)

Tip Line (/contact/tip-line)

🔍

# Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census

Mar 27, 2018   | Press Release

Washington, D.C. (Mar. 27, 2018)—Today, Rep. Elijah E. Cummings, the Ranking Member of the House Committee on Oversight and Government Reform, issued the following statement in response to reports that the Census Bureau is planning to add a question about citizenship to the 2020 Census:

> **"People across the country—including in red, blue, and purple states—need to understand that if their communities are undercounted, they could lose critical funds for highways, education, healthcare, and an array of other federal programs.  The Trump Administration's plan to insert a new, untested question on citizenship will increase costs for American taxpayers and decrease the accuracy of the census itself.**

> **"I personally spoke with Secretary Ross about this issue, and I am very disappointed that he appears to be disregarding the views of Republican and Democratic experts—including six former Census Directors (https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/DOJ%20census%20ques%20request-**

**Former%20Directors%20ltr%20to%20Ross.pdf)—and is instead rushing ahead with a politically-motivated decision that will jeopardize the full, fair, and accurate count our Constitution demands. The Oversight Committee has jurisdiction over the Census, and I call on Chairman Gowdy to hold hearings as soon as possible on this issue, as well as other troubling examples of politicization at the Census Bureau under President Trump.”**

Cummings also released a letter (https://democrats-oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/DOJ%20census%20ques%20request-Former%20Directors%20ltr%20to%20Ross.pdf) today strongly opposing the move that was sent to Commerce Secretary Wilbur Ross from six former Census Directors spanning Republican and Democratic Administrations from 1973 to 2017. According to this letter:

**“Adding a citizenship question without a testing opportunity in a contemporary, census-like environment will invalidate the results and lessons learned from the End-to-End test. Key assumptions underlying estimates of self-response, staffing needs, local office sites, and communication strategies will no longer be sound, calling into question cost projections that we know you have worked hard to validate and update. In addition, the Census Bureau would need to modify data capture and processing systems, language assistance and enumerator training materials, and web-based instructions for completing the census in the time remaining before the 2020 Census starts—all without the benefit of field testing. …**

**“It is highly risky to ask untested questions in the context of the complete 2020 Census design. There is a great deal of evidence that even small changes in survey question order, wording, and instructions can have significant, and often unexpected, consequences for the rate, quality, and truthfulness of response. The effect of adding a citizenship question to the 2020 Census on data quality and census accuracy, therefore, is completely unknown. Also of import, overcoming unexpected obstacles that arise as 2020 Census operations unfold would add to the cost, without assurances that such efforts would yield a more accurate outcome.**

**“In summary, we believe that adding a citizenship question to the 2020 Census will considerably increase the risks to the 2020 enumeration. Because we share your goal of a ‘full, fair, and accurate census,’ as the Constitution requires, we urge you to consider a prudent course of action in response to the Justice Department’s untimely and potentially disruptive request.”**

The letter was sent by the following six former Census Directors:

Vincent P. Barabba (1973-1976; 1979-1981)

Martha Farnsworth Riche (1994-1998)

Kenneth Prewitt (1998-2001)

Steven H. Murdock (2008-2009)

Robert M. Groves (2009-2012)

John Thompson (2013-2017)

**Background:**

- ***Loss of Federal Funding:*** Hundreds of billions of dollars in federal funding are driven annually by Census data. According to one recent study (https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Reamer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FMAP-based%20Programs%2003-19-18.pdf), 37 states lost on average more than $1,000 for every person missed in the last Census. This means that improperly counted communities could lose critical dollars for highway planning and construction, education, and healthcare programs.

11/24/2019    Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census | House Commit…

Case 1:19-cv-03557-RDM   Document 1   Filed 11/26/19   Page 21 of 53

- *Decrease in Accuracy:*  Recent research (https://www2.census.gov/cac/nac/meetings/2017-11/Memo-Regarding-Respondent-Confidentiality-Concerns.pdf) by the Census Bureau found that individuals currently have an "'unprecedented' level of concern" over the confidentiality of their personal data.  The citizenship question will exacerbate this distrust, particularly in vulnerable and traditionally undercounted communities. The Bureau has already concluded the testing phase for the 2020 Census and presented its proposed census subjects to Congress last year.  Census questions are supposed to undergo an extensive screening process constituting years of focus groups and field tests to ensure a high response rate coupled with effective data collection.

- *Increase in Costs:*  This move will increase the overall cost to the American taxpayers by decreasing initial response rates and creating the need for costly follow-up activities.

- *Widespread Opposition:*  Six former Census Directors, 19 state Attorneys General, more than 160 mayors, 170 civil rights organizations, and various other stakeholders have raised serious concerns with the addition of a citizenship question to the Census.

115th Congress

(//twitter.com/share?url=https://oversight.house.gov/news/press-releases/cummings-issues-statement-calling-for-hearings-on-trump-administration-plan-to&text=Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census https://oversight.house.gov/news/press-releases/cummings-issues-statement-calling-for-hearings-on-trump-administration-plan-to via @OversightDems)

Share

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiff*,

          v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

                    *Defendants*.

Case No. _____

# Exhibit E

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5074
MINORITY  (202) 225–5051
http://oversight.house.gov

April 4, 2018

The Honorable Wilbur Ross
Secretary
Department of Commerce
1401 Constitution Avenue N.W.
Washington, D.C.  20230

Dr. Ron Jarmin, Ph.D.
Acting Director
U.S. Census Bureau
4600 Silver Hill Road
Washington, D.C. 20233

Dear Secretary Ross and Acting Director Jarmin:

On March 26, 2018, the Department of Commerce announced that the Census Bureau would be adding a question on citizenship to the 2020 Decennial Census.  In a memo outlining the rationale for this decision, Secretary Ross wrote that the Census Bureau "expressed concern" that adding a citizenship question to the census "would negatively impact the response rate for non-citizens."[1]

We understand that officials from the Department of Commerce and the Census Bureau will be briefing Committee Members on this issue on April 11, 2018.  In order to more fully understand the concerns raised by the Census Bureau with this decision, we request that both of your agencies provide the following documents before our briefing on April 11, 2018:

(1)     all documents and communications relating to any concerns expressed by the Census Bureau regarding the addition of a citizenship question;

(2)     all analyses, including drafts, relating to the potential impact that adding a citizenship question would have on response rates;

(3)     all communications between or among officials from the Department of Commerce, the Census Bureau, and any other office or entity inside or outside of the government regarding the addition of a citizenship question; and

(3)     all documents, communications, and analyses relating to cost increases that could result from the addition of a citizenship question.

---

[1] Memorandum from Secretary Wilbur Ross, Department of Commerce, to Karen Dunn Kelley, Under Secretary for Economic Affairs, Department of Commerce, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* (Mar. 26, 2018) (online at www.commerce.gov/sites/commerce.gov/files/2018-03-26_2.pdf).

The Honorable Wilbur Ross and Dr. Ron Jarmin, Ph.D.
Page 2

If you have any questions about this request, please contact Katie Teleky with the
Committee staff at (202) 225-5051. Thank you for your prompt attention to this request.

Sincerely,

Elijah E. Cummings
Ranking Member

Carolyn B. Maloney
Member

Eleanor Holmes Norton
Member

William Lacy Clay
Member

Gerald E. Connolly
Vice-Ranking Member

Jimmy Gomez
Member

cc:     The Honorable Trey Gowdy, Chairman,
        Committee on Oversight and Government Reform

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

*Defendants*.

Case No. _____

# Exhibit F

TREY GOWDY, SOUTH CAROLINA
CHAIRMAN

ONE HUNDRED FIFTEENTH CONGRESS

ELIJAH E. CUMMINGS, MARYLAND
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

Majority  (202) 225–5074
Minority  (202) 225–5051
http://oversight.house.gov

May 01, 2018

Mr. John Gore
Acting Assistant Attorney General
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Dear Mr. Gore:

On December 12, 2017, the Department of Justice (DOJ) sent a letter to Acting Census Bureau Director Ron Jarmin requesting that the Census Bureau add a citizenship question to the 2020 Decennial Census. DOJ alleged that decennial census citizenship data is "critical to the Department's enforcement of Section 2 of the Voting Rights Act." DOJ argued that it "needs a reliable calculation of the citizen voting-age population in localities where voting rights violations are alleged or suspected."[1]

Despite DOJ's assertions, the justification for the addition of a citizenship question remains unclear. In a briefing on April 11, 2018, Acting Director Jarmin informed members of the Committee on Oversight and Government Reform that the Census Bureau simply accepted DOJ's request at face value and conducted no analysis to determine whether the justification was valid. DOJ has not deemed it "critical" to include a citizenship question on the decennial census to enforce voter protections since the Voting Rights Act was enacted in 1965, and it is unclear what circumstances have changed.

To help understand the substance of DOJ's justification and the process by which its request was made, we request that you provide the following documents in the custody, control, or possession of the Department of Justice by May 7, 2018, so Members can have the opportunity to review them prior to the Committee's scheduled hearing on May 8, 2018:

1.      all documents and communications relating or referring to the addition of a citizenship question to the census;

---

[1] Letter from Arthur E. Gary, General Counsel, Justice Management Division, Department of Justice, to Ron Jarmin, Acting Director, Census Bureau (Dec. 12, 2017) (online at www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf).

Mr. John Gore, Acting Assistant Attorney General
Page. 2

2.      documents and communications sufficient to show who was involved in this
        request and the role of each individual who was involved;

3.      all documents and communications within the Department of Justice and with
        outside entities regarding the request to add a citizenship question to the census,
        including but not limited to the White House, the Commerce Department, the
        Republican National Committee, the Trump Campaign, or Members of Congress;

4.      all documents and communications relating or referring to the need to add a
        citizenship question to the census in order to enforce the Voting Rights Act;

5.      a list of all instances in which the lack of a citizenship question on the decennial
        census negatively impacted DOJ's Voting Rights Act enforcement efforts; and

6.      a list of all voting rights enforcement actions taken by the Department of Justice
        since January 20, 2017.

If you have any questions about this request, please contact Max Whitcomb with
Representative Maloney's staff at (202) 225-7944 or Katie Teleky with Ranking Member
Cummings' staff at (202) 225-5051.

Thank you for your consideration of this request.

Sincerely,

Carolyn B. Maloney
Co-chair of the House Census Caucus

Elijah E. Cummings
Ranking Member

Eleanor Holmes Norton
Member

Wm. Lacy Clay
Member

Stephen F. Lynch
Member

Jim Cooper
Member

Mr. John Gore, Acting Assistant Attorney General
Page. 3

Gerald E. Connolly
Vice-Ranking Member

Robin L. Kelly
Member

Brenda L. Lawrence
Member

Bonnie Watson Coleman
Member

Raja Krishnamoorthi
Member

Jamie Raskin
Member

Jimmy Gomez
Member

Peter Welch
Member

Matt Cartwright
Member

Mark DeSaulnier
Member

Stacey E. Plaskett
Member

John Sarbanes
Member

cc:     Members of the House Committee on Oversight and Government Reform

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

*Defendants*.

Case No. _____

# Exhibit G

ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225-5051
MINORITY   (202) 225-5074
http://oversight.house.gov

**MEMORANDUM**

**November 12, 2019**

**To:**   **Members of the Committee on Oversight and Reform**

**Fr:**   **Acting Chairwoman Carolyn B. Maloney**

**Re:**   **Update on Investigation of Census Citizenship Question Since House Held Attorney General Barr and Commerce Secretary Ross in Contempt of Congress**

Before he passed away, Chairman Elijah E. Cummings directed Committee staff to continue investigating the Trump Administration's false rationale for adding a citizenship question to the 2020 Census. He strongly believed that the Constitution requires the Census to be conducted in a professional, nonpartisan manner, and he was extremely troubled by the Trump Administration's efforts to politicize the Census and impair its accuracy. He was particularly disturbed by the repeated false statements that Administration officials made to Congress, the courts, and the country. In the face of the Administration's unprecedented obstruction and baseless legal arguments, Chairman Cummings believed that Congress must press forward to protect the integrity of the Census and to inform Congress' legislative options going forward. He believed that these are among Congress' most fundamental responsibilities under the Constitution.[1]

This memorandum provides Committee Members with an update on the Committee's investigation since the House of Representatives voted to hold Attorney General William Barr and Commerce Secretary Wilbur Ross in contempt for refusing to produce documents in response to bipartisan subpoenas issued by the Committee.

Rep. Cummings began investigating the Administration's effort to add a citizenship question soon after Commerce Secretary Wilbur Ross first publicly announced it on March 26, 2018. Secretary Ross claimed repeatedly—in sworn testimony to Congress, in public statements, and in court filings—that he was adding the citizenship question "solely" at the request of the Department of Justice (DOJ) to help enforce the Voting Rights Act (VRA). This explanation made little sense because DOJ had never needed such data before to enforce the VRA. As the Supreme Court later concluded, and as the contemporaneous record demonstrates, that

---

[1] The Constitution expressly grants Congress the authority to determine the manner in which the Census is conducted, and House Rules place oversight and legislative responsibility for the Census with this Committee. The Committee also has broad authority to investigate "any matter" at "any time."

explanation was false—a "contrived" and "pretextual" diversion from the true rationale for the decision.

The Constitution requires the Census to count every person—not just citizens. Congressional districts are based on total population, and many federal programs allocate funding based on total population.  At the time Secretary Ross announced his decision, experts warned that adding a citizenship question would harm the accuracy of the Census, thereby undermining the explicit goal of the Constitution to obtain a national count of all persons. Secretary Ross and others denied repeatedly that their effort was related in any way to legislative redistricting or apportionment.

In the exercise of its authority to oversee the administration of the Census, the Committee requested key documents and testimony from the Department of Commerce and DOJ.  Both Departments refused to comply, claiming that they could not do so while there was litigation pending regarding the citizenship question.  Because the Supreme Court had previously rejected this rationale for refusing to comply as baseless, the Committee voted on a bipartisan basis to issue subpoenas to both Departments for certain key documents.  Even in the face of these subpoenas, however, Secretary Ross and Attorney General Barr continued to insist that the Committee had to wait to receive these documents until the Supreme Court ruled on the citizenship question case.

On June 27, 2019, the Supreme Court ruled that the Administration could not go forward with its plan to add a citizenship question because it violated the law and because the VRA rationale offered by the Administration was not the true reason for the attempted addition.

Even after the Supreme Court ruled, however, Secretary Ross and Attorney General Barr continued to defy the Committee's bipartisan subpoenas and refused to produce key documents. As a result of the Administration's obstruction, the House of Representatives voted on July 17, 2019, to hold both Attorney General Barr and Secretary Ross in contempt of Congress.

Since the contempt vote, neither the Commerce Department nor DOJ has produced any documents responsive to the subpoenas, and neither has attempted to resolve outstanding questions regarding the Administration's broad "protective" assertion of privilege over all remaining responsive documents.

Despite the refusal of the Commerce Department and DOJ to cooperate, the Committee has continued its investigation over the past several months, obtaining documents and information from other sources.  The Committee's investigation seeks to determine why the Administration fought so hard to add a citizenship question that experts warned would impair the accuracy of the Census, why the Administration provided a false narrative to Congress, the courts, and the public, and who else was involved in these actions.

Because the Committee's requests for documents have gone unfulfilled, however, the Committee is unable to complete its investigation.  The documents that the Committee has subpoenaed go to the heart of the Committee's investigative interests:  they reflect the reasons and process for developing the citizenship question, the coordination between the Commerce

Department and DOJ to create the "pretextual" rationale, and the involvement of internal and outside parties in implementing the question.

The Committee's investigation is urgent because it may lead to legislative reforms to safeguard the 2020 Census and to prevent similar maladministration in the future. Although the citizenship question will not be added to the 2020 Census, its attempted adoption has raised a number of live concerns relating to potential political influences on the nonpartisan Census process, the Commerce Department's willingness to compromise an accurate enumeration, and both the Commerce Department's and DOJ's willingness to misrepresent their actions in connection with the Census.

Depending on the Committee's findings regarding the processes that led to the addition of the citizenship question, Congress may need to direct the Commerce Department's use of resources relating to the Census, require enhanced disclosures or oversight, cabin the authority and powers granted under the Census Act, or take other responsive actions. However, the Committee cannot effectively remediate issues affecting the 2020 Census without first understanding how and why Census procedures and disclosures were compromised with respect to the citizenship question.

The investigation has also raised serious questions about whether agency officials had an unconstitutional motive for their actions and whether they might now be taking further surreptitious action to achieve that same result. Evidence obtained by the Committee indicates that the Administration may have been trying to stop immigrants from being counted in the Census or in legislative districts, which one Republican operative concluded would be "advantageous to Republicans and Non-Hispanic Whites."

Many Trump Administration officials who pushed for the citizenship question are still in place today and may be overseeing components of the upcoming 2020 Census. It is this Committee's responsibility to exercise its oversight authority to ensure that the Trump Administration acts to further the Census's constitutional goals—not to hinder them. As Chairman Cummings explained in connection with the contempt vote, the Committee is responsible for ensuring that the Census is "run by nonpartisan experts based on their professional experience—not manipulated by political appointees as part of a political influence and interference operation."[2]

---

[2] Committee on Oversight and Reform, *Committee Votes on Bipartisan Basis to Hold Barr and Ross in Contempt* (June 12, 2019) (online at https://oversight.house.gov/news/press-releases/committee-votes-on-bipartisan-basis-to-hold-barr-and-ross-in-contempt).

## I.   BACKGROUND

On March 26, 2018, Secretary Ross announced that he was adding a citizenship question to the 2020 Census in response to a request from DOJ on December 12, 2017.[3]  DOJ's request claimed that the citizenship question was needed to help enforce the VRA.[4]  Secretary Ross testified that he was adding the question "solely" at the request of DOJ to enforce the VRA.[5]

On March 27, 2018—the day after Secretary Ross' announcement—then-Ranking Member Cummings called for the Committee to investigate this decision.[6]  In April and May 2018, he sent letters to the Department of Commerce and DOJ seeking documents.[7]  In June and August 2018, Committee Democrats wrote to Secretary Ross, requesting responses to questions regarding the Secretary's misleading testimony.  Neither Department produced any of the documents responsive to these requests.

When Democrats took control of the House in 2019, the Committee requested documents from the Department of Commerce on January 8, 2019, and from DOJ on February 14, 2019.[8]  Both Departments obstructed and delayed the Committee for months despite repeated attempts to accommodate their interests.  On April 2, 2019, following a bipartisan vote, the Committee

---

[3] Letter from Secretary Wilbur Ross, Jr., Department of Commerce, to Karen Dunn Kelley, Under Secretary for Economic Affairs, Department of Commerce (Mar. 26, 2018) (online at www.documentcloud.org/documents/4426785-commerce2018-03-26-2.html).

[4] Letter from Arthur E. Gary, General Counsel, Justice Management Division, Department of Justice, to Ron Jarmin, Director, Census Bureau (Dec. 12, 2017) (online at www.documentcloud.org/documents/4340651-Text-of-Dec-2017-DOJ-letter-to-Census.html).

[5] House Committee on Appropriations, Subcommittee on Commerce, Justice, Science, and Related Agencies, *FY19 Budget Hearing: Department of Commerce,* 115th Cong. (Mar. 20, 2018).

[6] Committee on Oversight and Government Reform Democrats, *Cummings Issues Statement Calling for Hearings on Trump Administration Plan to Add Citizenship Question to Census* (Mar. 27, 2018) (online at https://oversight.house.gov/news/press-releases/cummings-issues-statement-calling-for-hearings-on-trumpadministration-plan-to).

[7] Letter from Ranking Member Elijah E. Cummings et al., Committee on Oversight and Government Reform, to Secretary Wilbur L. Ross, Jr., Department of Commerce, and Dr. Ron Jarmin, Ph.D., Acting Director, Census Bureau (Apr. 4, 2018) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2018-04-04.%20EEC%20Maloney%20Norton%20Clay%20Connolly%20&%20Gomez%20to%20Commerce%20re.Cens_...
.pdf ); Letter from Ranking Member Elijah E. Cummings et al., Committee on Oversight and Government Reform, to John Gore, Acting Assistant Attorney General, Department of Justice (May 1, 2018) (online at https://maloney.house.gov/sites/maloney.house.gov/files/2018-05-01.%20Dem.Members%20to%20DOJ-Gore%20re.Citizenship%20Question-2020%20Decennial%20Census.pdf).

[8] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Secretary Wilbur L. Ross, Jr., Department of Commerce (Jan. 8, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-01-08.EEC%20to%20Ross-DOC%20re%20Citizenship%20Question.pdf); Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore, Principal Deputy Assistant Attorney General, Department of Justice (Feb. 14, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-02-14.EEC%20to%20Gore-DOJ%20re%20Transcribed%20Interview%20Request_1.pdf).

issued subpoenas to compel Attorney General Barr and Secretary Ross to produce key documents.[9]

The Committee also issued a subpoena to a DOJ official, John Gore, ordering his deposition.  Mr. Gore refused to appear, with DOJ stating that "the Attorney General has determined that Mr. Gore will not appear" unless DOJ counsel was permitted to participate—in direct violation of the Committee's longstanding, bipartisan rules governing depositions.[10]  DOJ also claimed that the deposition of Mr. Gore "could compromise the integrity of ongoing litigation in the Supreme Court."[11]

On June 12, 2019, the Committee voted on a bipartisan basis to hold Secretary Ross and Attorney General Barr in contempt for withholding the subpoenaed documents.[12]

The same day, the White House asserted executive privilege over each of the priority documents identified in the Committee's subpoenas.[13]  In addition, the White House made a "protective assertion of executive privilege" over **all other documents** responsive to the

---

[9] Committee on Oversight and Reform, *Business Meeting* (Apr. 2, 2019) (online at https://oversight.house.gov/news/press-releases/committee-approves-subpoenas-in-security-clearance-and-census-investigations).

[10] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf); *see also* Rule 15(e) of the Committee on Oversight and Reform, 116th Cong. ("Witnesses may be accompanied at a deposition by counsel to advise them of their rights. No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's counsel. Observers or counsel for other persons, or for agencies under investigation, may not attend.").

[11] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf).  As described later in this memorandum, the Committee followed up with Mr. Gore on September 20, 2019, to clarify his position following the Supreme Court's decision in the census matter.  In response, Mr. Gore's attorney reiterated that Mr. Gore was bound by the Attorney General's decision. Letter from John D. Adams to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Sept. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/9-27-2019%20Ltr.pdf).

[12] Committee on Oversight and Reform, *Business Meeting* (June 12, 2019) (online at https://oversight.house.gov/legislation/markups/a-resolution-recommending-that-the-house-of-representatives-find-the-attorney); Committee on Oversight and Reform, *Resolution Recommending That The House Of Representatives Find William P. Barr, Attorney General Of The United States, And Wilbur L. Ross, Jr., Secretary Of Commerce, In Contempt Of Congress For Refusal To Comply With Subpoenas Duly Issued By The Committee On Oversight And Reform*, 116th Cong. (2019) (H. Rept. 116-125).

[13] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 12, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-12%20Census%20Documents%20Notification%20of%20Assertion%20-%20Cummings_AS%20DISTRIBUTED_1.pdf).

Committee's subpoenas, including "tens of thousands of additional pages of documents" that the Administration had "identified as responsive to the subpoena" and "had been planning to produce." The Administration claimed that this "protective" assertion was necessary to protect "ongoing litigation," even though the Supreme Court had ruled repeatedly that ongoing litigation is not a legitimate reason to withhold information from Congress.[14] The Administration also claimed this blanket assertion of privilege was needed to give the President "the ability to make a final decision whether to assert privilege following a full review of these materials"—despite the fact that the Administration had already been withholding these documents for several months.[15]

On June 27, 2019, the Supreme Court ruled that Secretary Ross could not add the citizenship question based on his "contrived" rationale. The Court found that "the decision to reinstate a citizenship question cannot be adequately explained in terms of DOJ's request for improved citizenship data to better enforce the VRA." The Court further found that "the evidence tells a story that does not match the explanation the Secretary gave for his decision" and that "the VRA enforcement rationale—the sole stated reason—seems to have been contrived."[16]

Even after the Supreme Court ruled, however, Secretary Ross and Attorney General Barr refused to produce the key documents subpoenaed by the Committee. As a result, Chairman Cummings issued a statement warning: "I urge Attorney General Barr and Secretary Ross to change course and produce the documents we have subpoenaed on a bipartisan basis, so the House is not forced to hold them in contempt of Congress."[17]

On the evening of July 17, 2019, just prior to the House of Representatives' contempt vote, Attorney General Barr and Secretary Ross sent a letter to Speaker Nancy Pelosi opposing the vote, but offering no documents.[18] That same day, the House of Representatives voted to

---

[14] *See Hutcheson v. United States*, 369 U.S. 599 (1962) ("But surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, Sinclair v. United States, supra, at 295, or when crime or wrongdoing is disclosed, McGrain v. Daugherty, 273 U.S. 135, 179-180."); *Sinclair v. United States*, 279 U.S. 263 (1929) ("It may be conceded that Congress is without authority to compel disclosure for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.").

[15] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 12, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-12%20Census%20Documents%20Notification%20of%20Assertion%20-%20Cummings_AS%20DISTRIBUTED_1.pdf).

[16] *Department of Commerce v. New York,* 139 S. Ct. 2551 (2019).

[17] *Cummings Issues Statement on Executive Order on the Census,* Committee on Oversight and Reform (July 12, 2019) (online at https://oversight.house.gov/news/press-releases/cummings-issues-statement-on-executive-order-on-the-census).

[18] Letter from Secretary Wilbur L. Ross, Jr., Department of Commerce, and Attorney General William P. Barr, Department of Justice, to Speaker Nancy Pelosi, House of Representatives (July 17, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-07-

hold Attorney General Barr and Secretary Ross in criminal contempt of Congress.[19]

Over the past three months, the White House has refused to narrow its baseless, blanket "protective" assertion of executive privilege, which it claimed was necessary to give the President time to "make a final decision whether to assert privilege following a full review of these materials." Secretary Ross and Attorney General Barr have also refused to produce any additional documents in response to the Committee's subpoenas.

The Administration has had ample opportunity to finalize any good faith privilege claims. The Administration's failure to do so confirms that it has abused privilege doctrines to undermine Congressional authority.

## II.   THE COMMITTEE'S ONGOING INVESTIGATION

Despite the Administration's obstruction, the Committee has continued to seek to determine why the Administration labored for two years to add the citizenship question, how internal procedures at the Departments of Commerce and Justice failed to prevent the addition of the question, why and how the Administration hid the true purpose of this effort behind a false rationale, who else within and outside of the Administration was involved with these efforts, and whether these concerns pose ongoing risks to an accurate and nonpartisan Census.

The Committee must complete its investigation in order to protect the integrity of the 2020 Census, to prevent the improper use of citizenship data being gathered pursuant to an Executive Order issued by President Trump on July 11, 2019, and to ensure that the Executive Branch does not seek to politicize the Census further. Because the Census Bureau has already begun major field operations for the 2020 Census,[20] and the Census is scheduled to occur by April 1, 2020,[21] any legislative reforms to safeguard this Census must be considered immediately. This effort is also urgent because many of the same Administration officials who pushed for the illegal citizenship question are still in place today and may be involved with executing various components of the 2020 Census.

### A.   Protecting the Integrity of the 2020 Census

The Administration has withheld information that the Committee needs to conduct effective oversight and to assess the need for legislative reforms with respect to the 2020 Census. The 2020 Census begins in Alaska on January 21, 2020, and in the rest of the country on April 1, 2020.[22] The Census is vitally important to communities across the United States because it will

_____

17%20Barr%20and%20Ross%20to%20Pelosi.pdf).

[19] H. Res. 497.

[20] Census Bureau, *U.S. Census Bureau Announces the Start of First Major Field Operation for 2020 Census* (Aug. 12, 2019) (online at www.census.gov/newsroom/press-releases/2019/ad-can-launch.html).

[21] Census Bureau, *Census Day, One Year and Counting:  April 1, 2019* (Apr. 1, 2019) (online at www.census.gov/newsroom/stories/2019/census-day.html).

[22] *Why the U.S. Census Starts in Alaska's Most Remote, Rural Villages,* National Public Radio (Jan. 21,

determine the allocation of hundreds of billions of dollars in federal funds and the apportionment of every seat in the House of Representatives.[23]

As part of this effort, key tasks will be overseen by the Department of Commerce.  For example, the Census Bureau is preparing for the first phase of its communications campaign, which is essential to increasing participation among minority and hard-to-count populations that are traditionally less likely to respond.[24]  This effort is particularly important because the Administration's previous efforts to add the citizenship question may have already discouraged some communities from participating.[25]

The Census Bureau is also building technology systems that are supposed to protect personal information.  Dr. Steven Dillingham, the Director of the Census Bureau, testified on July 24, 2019, that Census participants "must trust that we will protect the data they provide."[26]

The Census Bureau also plans to hire more than 500,000 temporary employees by April 1, 2020, to help people navigate online census forms and conduct follow-up to ensure that individuals, including hard-to-count populations, are fully counted.[27]

On July 24, 2019, the Subcommittee on Civil Rights and Civil Liberties held a hearing with the Director of the Census Bureau entitled, "Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count 'We the People' in 2020."  In his opening statement, Subcommittee Chairman Jamie Raskin stated:

Although the move to impose the citizenship question has been rejected by the courts as arbitrary and capricious, I fear that it may still be endangering the 2020 count.  The Bureau must take aggressive steps to repair the damage caused by the Administration's

---

2019) (online at www.npr.org/2019/01/21/686963414/why-the-u-s-census-starts-in-alaskas-most-remote-rural-villages).

[23] Census Bureau, *Uses of Census Bureau Data in Federal Funds Distribution* (Sept. 2017) (online at www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf).

[24] Census Bureau, *Census Barriers, Attitudes, and Motivators Study Survey and Focus Groups Report Findings Presentation* (Feb. 1, 2019) (online at www2.census.gov/programs-surveys/decennial/2020/program-management/pmr-materials/02-01-2019/pmr-cbams-comm-2019-02-01.pdf?#).

[25] *Local Groups:  'Damage Has Already Been Done' By Census Citizenship Question,* National Public Radio (July 4, 2019) (online at www.npr.org/local/309/2019/07/04/738660741/local-groups-damage-has-already-been-done-by-census-citizenship-question).

[26] Committee on Oversight and Reform, Subcommittee on Civil Rights and Civil Liberties, *Hearing on Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count "We the People" in 2020* (July 24, 2019) (online at https://oversight.house.gov/legislation/hearings/beyond-the-citizenship-question-repairing-the-damage-and-preparing-to-count-we).

[27] *The Census Bureau Needs to Hire Half a Million Workers for the 2020 Count,* National Public Radio (Jan. 28, 2019) (online at www.npr.org/2019/01/28/689237309/census-bureau-conducts-massive-recruiting-effort-for-2020-head-count).

ill-considered campaign.[28]

Congress has a constitutional responsibility to oversee the Executive Branch and to pass laws that will promote an accurate enumeration.[29]  In this case, there is clear and substantial evidence of procedural defects relating to the Census and serious misconduct by senior government officials, but the Committee is being blocked from determining the scope and nature of those issues.

The Committee is concerned that the accuracy of the Census could be impaired if, for example, responsible government entities continue to disclose inaccurate information, the Census is vulnerable to ongoing politicization, or individuals who engaged in deliberate misconduct are involved in executing key functions relating to the Census.  The subpoenaed documents are crucial to determining how these issues facilitated the prior maladministration and whether they pose continuing risks.  Among other evidence, the Administration has withheld Secretary Ross' unredacted emails with his staff regarding his campaign to add the citizenship question—which may shed light on the Department of Commerce's internal procedures—as well as communications involving DOJ, the Commerce Department, and the White House related to the development of the false rationale of VRA enforcement.

### B.     Investigating the False Rationale for the Citizenship Question

Contrary to Secretary Ross' claim that he added the citizenship question "solely" at the request of DOJ to help enforce the VRA, evidence obtained by the Committee suggests that the Administration's purpose may have been an unconstitutional effort to exclude immigrants for purposes of legislative redistricting and apportionment.

The evidence shows that the Administration engaged in a concerted effort to add a citizenship question months before DOJ sent its letter in December 2017.  President Trump and top White House advisors discussed adding a citizenship question just days after taking office, and Secretary Ross began a secret campaign to add a citizenship question soon after he joined the Administration in February 2017.  Secretary Ross enlisted other Department of Commerce officials in his efforts, including his Chief of Staff, his General Counsel, and the Director of Policy, and these officials communicated with other agencies.  Secretary Ross personally asked Attorney General Jeff Sessions to request the citizenship question.  Secretary Ross and other officials then actively concealed their efforts.

---

[28] Committee on Oversight and Reform, Subcommittee on Civil Rights and Civil Liberties, *Hearing on Beyond the Citizenship Question:  Repairing the Damage and Preparing to Count "We the People" in 2020* (July 24, 2019) (online at https://oversight.house.gov/legislation/hearings/beyond-the-citizenship-question-repairing-the-damage-and-preparing-to-count-we).

[29] *See* U.S. Const., art. I, § 2; *United States v. Rumely*, 345 U.S. 41 (1953) (Congress has the authority to inform the public about the conduct of federal officials as they administer government); *Watkins v. United States*, 354 U.S. 178 (1957) ("The public is, of course, entitled to be informed concerning the workings of its government."); *id* (the informing function allows "Congress to inquire into and publicize corruption, maladministration or inefficiency in agencies of the Government").

This evidence also indicates that Administration and Transition Team officials had been in contact with a Republican gerrymandering expert, Thomas Hofeller, who wrote a secret study in 2015 concluding that adding a citizenship question would be "advantageous to Republicans and Non-Hispanic Whites." Rather than helping to enforce to the VRA, Mr. Hofeller argued that adding a citizenship question to the 2020 Census was a necessary step to excluding immigrants from legislative redistricting.[30]

Similarly, in April 2017, Secretary Ross spoke with Kris Kobach at the direction of Steve Bannon. Mr. Kobach later wrote to Secretary Ross urging him to add a citizenship question, writing that it was "essential" to address "the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."[31]

Over the last several months, the Committee has continued to investigate these issues, and the Committee's efforts have uncovered new information. However, the Administration's obstruction has hindered the Committee's ability to conduct a full and thorough investigation.

On June 18, 2019, the Committee requested documents from Mark Neuman, a member of President Trump's Transition Team who had direct contact with Mr. Hofeller regarding the citizenship question.[32] In 2017, Mr. Neuman advised Secretary Ross on the citizenship question and had extensive contact with senior Commerce Department officials, including Peter Davidson, the Commerce Department's General Counsel; James Uthmeier, an advisor to the Secretary and the General Counsel; and Earl Comstock, the Director of the Office of Policy and Strategic Planning.[33]

The Committee's June 18, 2019, letter requested Mr. Neuman's communications about the citizenship question with Mr. Hofeller, Mr. Gore, the Transition Team, the Trump Administration, and others.[34]

On July 2, 2019, Mr. Neuman produced previously undisclosed documents to the Committee. These documents confirmed that he had direct communications about the citizenship question with Mr. Hofeller, as well as with Dale Oldham, a Republican gerrymandering attorney who was Mr. Hofeller's business partner.

---

[30] Thomas Hofeller, *The Use of Citizen Voting Age Population in Redistricting* (2015) (online at https://assets.documentcloud.org/documents/6111284/May-31-2019-Unredacted-Exhibits.pdf).

[31] Email from Kris Kobach, Kansas Secretary of State, to Secretary Wilbur L. Ross, Jr., Department of Commerce (July 14, 2017) (online at https://apps.npr.org/documents/document.html?id=4500011-1-18-Cv-02921-Administrative-Record#document/p776/a428457).

[32] Deposition of A. Mark Neuman, Civ. No. 8:18-cv-01041-GJH (D. Md. Oct. 28, 2018).

[33] *See, e.g.,* Email from Mark Neuman to Earl Comstock, Director, Office of Policy and Strategic Planning, Department of Commerce (Apr. 14, 2017).

[34] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Mark Neuman (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-06-18.EEC%20to%20Neuman%20re%20Census%20REDACTED.pdf).

For example, on August 30, 2017, Mr. Neuman sent an email asking Mr. Hofeller to review language for a letter Mr. Neuman was drafting to request the addition of a citizenship question.  The letter was addressed from DOJ to the Director of the Census Bureau and argued that data from a citizenship question was needed to ensure "compliance with requirements of the Voting Rights Act and its application in legislative redistricting."[35]  The language that Mr. Neuman sent to Mr. Hofeller comprised part of that draft letter.  It stated:

> We understand that the Bureau personnel may believe that ACS [American Community Survey] data on citizenship was sufficient for redistricting purposes.  We wanted the Bureau to be aware that two recent Court cases have underscored that ACS data is not viable and/or sufficient for purposes of redistricting.[36]

Mr. Neuman wrote:  "Please make certain that this language is correct.  Dale doesn't return my calls."[37]  The same day, Mr. Hofeller replied:  "Dale Just read it, and says it is fine as written."[38]

On October 6, 2017, Mr. Neuman sent his draft letter—including the language approved by Mr. Hofeller and Mr. Oldham—to Mr. Gore at DOJ via text message.[39]

Around the same date, Mr. Neuman met with Mr. Gore.  Documents previously obtained by the Committee show that Mr. Neuman provided a "readout of his meeting" to Mr. Davidson, who then briefed Secretary Ross.[40]  Mr. Davidson then sent a text message to Mr. Neuman referring to Secretary Ross, stating, "He appreciated the update and your help."[41]

---

[35] Draft Letter from Department of Justice to John H. Thompson, Director, Census Bureau (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/HOGR-Census-02122019-001371.pdf).

[36] Email from Mark Neuman to Thomas Hofeller (Aug. 30, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.08.30%20Email%20from%20Mark%20Neuman%20to%20Thomas%20Hofeller%20%281%29.pdf).

[37] Id.

[38] Email from Thomas Hofeller to Mark Neuman (Aug. 30, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.08.30%20Email%20from%20Thomas%20Hofeller%20to%20Mark%20Neuman.pdf).

[39] Text Message from Mark Neuman to John Gore (Oct. 6, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Text%20from%20Mark%20Neuman%20to%20John%20Gore.pdf).

[40] Email from General Counsel Peter Davidson, Department of Commerce, to Secretary Wilbur Ross, Department of Commerce (Oct. 8, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Email%20from%20Peter%20Davidson%20to%20Wilbur%20Ross%20about%20DOJ%20Letter%20status%20-%20AR%202482%20%281%29.pdf).

[41] Text Message from General Counsel Peter Davidson, Department of Commerce, to Mark Neuman (Oct. 8, 2017) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2017.10.08%20Text%20from%20Mark%20Neuman%20to%20Peter%20Davidson.pdf).

Mr. Neuman's text messages with Mr. Gore and Mr. Davidson were not produced to the Committee by DOJ or the Department of Commerce.

In addition, on June 18, 2019, the Committee requested documents from Christa Jones, the Chief of Staff at the Census Bureau, after news reports indicated that she had direct communications with Mr. Hofeller as far back as 2015.[42] According to an email obtained by a news organization, Ms. Jones emailed Mr. Hofeller from her personal email address in 2015 regarding the Census Bureau's effort to "evaluate and compare different census content … prior to making final decisions about the content in the 2020 Census." She wrote to Mr. Hofeller: "This can also be an opportunity to mention citizenship as well."[43]

In response to the Committee's request for certain documents and communications from January 2014 through June 2019, Ms. Jones and the Department of Commerce produced to the Committee a limited set of redacted emails from Ms. Jones' official and personal accounts. These productions were incomplete. Neither the Department nor Ms. Jones produced emails from earlier than 2018, even though Ms. Jones worked at the Census Bureau for many years and communicated with Mr. Hofeller in 2015 and earlier.

Ms. Jones appeared for a transcribed interview on July 31, 2019. In that interview, she stated that she had known Mr. Hofeller for many years and that he had raised the topic of adding a citizenship question during a conversation in 2014. Ms. Jones recalled that Mr. Hofeller expressed interest in using the citizenship question for "the Republican redistricting effort." She recalled telling Mr. Hofeller that a citizenship question "would have a negative impact on the response rate to the census, and that the Census Bureau would be concerned about the impacts to the nonresponse follow-up and the differential undercount."[44]

Ms. Jones explained that in 2015, she contacted Mr. Hofeller about the "opportunity to mention citizenship" in response to a request for comments from the Census Bureau because she was aware of his interest in the issue as a leader in the "Republican redistricting community."[45]

Ms. Jones told Committee staff that she also knew Mr. Hofeller's partner, Dale Oldham, for many years, and that he had advocated for a citizenship question for purposes of redistricting and apportionment "[p]robably more times than I can remember."[46]

---

[42] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Christa Jones, Chief of Staff, Office of the Director, Census Bureau (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-18.EEC%20to%20Jones-Census%20Bureau%20re%20Census.pdf).

[43] Email from Christa Jones to Thomas Hofeller (Jan. 7, 2015) (online at https://apps.npr.org/documents/document.html?id=6154258-January-2015-Emails-From-Christa-Jones-To-Thomas#document/p2/a507303).

[44] Committee on Oversight and Reform, Transcribed Interview of Christa Jones (July 31, 2019).

[45] *Id.*

[46] *Id.*

Ms. Jones stated that she was not involved in efforts at the Department of Commerce to add a citizenship question to the 2020 Census and that when she learned of these efforts from news reports in December 2017, she felt "concern for the census and the Census Bureau" because the citizenship question was a "late design change" that could hurt response rates and lead to a differential undercount.[47]

### C.     Evaluating the President's Executive Order

On July 11, 2019, President Trump announced that the Administration would follow the Supreme Court's decision and refrain from adding the citizenship question to the 2020 Census. However, he also issued a new Executive Order requiring the Census Bureau to collect citizenship data through other means.

According to the Executive Order, the purpose of collecting this information is, in part, to allow "States to design State and local legislative districts based on the population of voter-eligible citizens."[48]  When announcing the Executive Order, the President explained that the citizenship information was "relevant to administering our elections."  He also noted, "Some states may want to draw state and local legislative districts based upon the voter-eligible population."[49]

The President's Executive Order and his announcement appear to contradict multiple, repeated statements from Secretary Ross and other Administration officials claiming that they never had any plans to seek citizenship information for the purpose of legislative apportionment.

For example, during the Committee's hearing on March 14, 2019, Chairman Cummings had the following exchange with Secretary Ross:

| | |
|---|---|
| Chairman: | And it is your testimony today, sir, that your interest in the citizenship question had nothing to do with counting undocumented immigrants for apportionment purposes? |
| Secretary Ross: | No, sir, it did not.[50] |

On September 6, 2019, the Census Bureau stated that an interagency working group had already been formed and that it would announce a plan for the release of additional

---

[47] *Id.*

[48] The White House, *Executive Order on Collecting Information about Citizenship Status in Connection with the Decennial Census* (July 11, 2019) (online at www.whitehouse.gov/presidential-actions/executive-order-collecting-information-citizenship-status-connection-decennial-census/).

[49] The White House, *Remarks by President Trump on Citizenship and the Census* (July 11, 2019) (online at www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/).

[50] Committee on Oversight and Reform, *Hearing with Commerce Secretary Wilbur L. Ross, Jr.* (Mar. 14, 2019) (online at https://oversight.house.gov/legislation/hearings/commerce-secretary-wilbur-l-ross-jr).

administrative citizenship data on March 31, 2020—the day before Census Day.[51]

If the Administration is now attempting to do what it claimed repeatedly it had no intention of doing, these actions raise serious questions about the true purposes behind the Executive Order and the implementation of the 2020 Census itself.

### D.     Impact of Obstruction on Potential Legislative Efforts

The Committee may consider a wide range of legislative reforms based on information it is seeking as part of its investigation.  In order to protect the 2020 Census, such reforms must be considered, voted on, and implemented well in advance of Census Day on April 1, 2020.  The Committee's efforts, however, are being hampered by the Trump Administration's refusal to produce the documents under subpoena, thereby limiting the information Congress may consider as part of its work.

For example, depending on what the documents reveal concerning the process for soliciting and evaluating input with respect to the citizenship question, Congress could enhance current requirements for reporting new Census questions and topics to Congress; add requirements for testing new Census questions or prohibit certain types of questions; require disclosure when Census questions or other actions relating to the Census are proposed by third parties; require disclosures of the identities of outside individuals, entities, or government agencies and officials that the Commerce Department consults in connection with the Census; or make disclosure requirements judicially enforceable.[52]

Depending on what the documents reveal concerning the source and extent of political influences on the development of the citizenship question, Congress could prohibit the Commerce Department from taking steps based solely on outside entities' requests, prohibit the Census Bureau from collecting or releasing data from the Department of Homeland Security, increase penalties for unlawful use of Census data, or prohibit the collection or release of citizenship data for legislative apportionment purposes.[53]  If the evidence demonstrates severe malfeasance and deception, Congress could revisit the Census Act's broad delegation of authority to the Secretary of Commerce.

Depending on what the documents reveal regarding the Commerce Department's efforts to further the accuracy of the enumeration, Congress could consider legislation to ensure the Census Bureau hires the workers needed for an accurate count, including requiring certain language thresholds.  Congress also could mandate the hiring of additional personnel, require

---

[51] Census Bureau, *Census Bureau Citizenship Data Research and Product Development* (Sept. 6, 2019) (online at www.documentcloud.org/documents/6386176-Census-Bureau-Citizenship-Data-Research-and.html#document/p7/a523902).

[52] *See, e.g.,* H.R. 732 (prohibiting the Department of Commerce from making changes to the decennial census without adequate testing and notice to Congress); H.R. 1734 (prohibiting questions regarding "citizenship, nationality, or immigration status" on "any decennial census," excluding the American Community Survey).

[53] *See, e.g.,* H.Amdt. 401 to H.R. 3055 (providing that "no Census Bureau funds may be used in violation of the Bureau's confidentiality policies"); S. 2068 (prohibiting the Census Bureau from "including citizenship data in the legislative redistricting data prepared by the Bureau").

more interagency resource-sharing, or require consultation with career Census Bureau officials at various stages of proposed procedural changes.

Based on the extent of damage caused by the Administration's actions, Congress may determine that additional funding or legislative direction is necessary to carry out a robust and effective communications plan to encourage participation in the 2020 Census. Legislation could increase funding for communications, require that the Census Bureau launch a media campaign in languages other than English, or require the Bureau to use additional media platforms to reach hard-to-count populations.

To be effective, many of these steps must be implemented quickly. The Committee therefore seeks to review and assess evidence that will help the Committee understand what steps are necessary.

## III.   ADDITIONAL OBSTRUCTION BY THE TRUMP ADMINISTRATION

In addition to withholding key documents that have been subpoenaed by the Committee, the Trump Administration is also blocking the production of documents from the Transition Team and continuing to refuse to allow DOJ official John Gore to be deposed.

### A.   <u>White House Blocking Transition Team Documents</u>

On June 18, 2019, the Committee sent a request for documents to the Transition Team with a due date of July 2, 2019.[54] The letter followed admissions from several former Transition Team members that they discussed adding a citizenship question during the Trump campaign and transition.

For example, Mark Neuman testified in separate proceedings that he had discussions on this topic during the transition, including with Thomas Hofeller.[55]

In addition, former Kansas Secretary of State Kris Kobach, who advised both the campaign and the Transition Team on immigration policy, told Committee staff in an interview, "I certainly discussed the issue with people during the campaign." He also said it was "possible" he had such discussions during the transition.[56]

Gene Hamilton, another former member of the Transition Team and now a senior immigration advisor in the Trump Administration, told Committee staff that Mr. Kobach contacted him in "early November of 2016" to discuss proposals regarding the citizenship

---

[54] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Ken Nahigian, Trustee and Executive Director, Trump for America, Inc. (June 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-18.EEC%20to%20Nahigian-Transition%20Team%20re%20Census.pdf).

[55] Deposition of A. Mark Neuman, Civ. No. 8:18-cv-01041-GJH (D. Md. Oct. 28, 2018).

[56] Committee on Oversight and Reform, Transcribed Interview of Kris Kobach (June 3, 2019).

question.[57]

The Committee's June 18, 2019, letter sought all Transition Team documents and communications relating to the citizenship question, including those involving Mr. Hofeller, Mr. Kobach, Mr. Hamilton, Mr. Neuman, and others.

The Transition Team identified responsive documents prior to the July 2, 2019, deadline. These documents were due more than four months ago, but the Transition Team has not produced a single one to the Committee.  When Committee staff followed up, the Transition Team stated that the documents had been sent to the White House Counsel's Office for review for "potential Executive Branch equities or confidentiality interests."[58]

The White House has had these documents since July, but has refused to clear any of them for production—even though the Committee's request is for documents from the period **before** President Trump took office.  Neither the Transition Team nor the White House has cited any valid legal authority to withhold transition documents from the Committee.  To the contrary, a federal court that recently examined the applicability of executive privilege over Trump Transition Team materials confirmed that "no court has ever recognized that this privilege applies before a president takes office."[59]

## B.    DOJ Blocking Deposition with John Gore

After the Supreme Court issued its ruling in *Department of Commerce v. New York*, the Committee continued to seek a deposition with John Gore pursuant to the Committee's April 2, 2019, subpoena, but Mr. Gore has continued to refuse to appear at the instruction of Attorney General Barr.

Chairman Cummings first wrote to DOJ to request a voluntary transcribed interview of Mr. Gore on February 14, 2019.[60]  During the interview on March 7, 2019, DOJ counsel directed Mr. Gore not to answer more than 150 questions about the addition of the citizenship question. Department counsel cited "ongoing litigation" and "other executive branch confidentiality interests."[61]

---

[57] Committee on Oversight and Reform, Transcribed Interview of Gene Hamilton (May 30, 2019).

[58] Email from Thomas Basile, Counsel for Statecraft PLLC, to Committee Staff, Committee on Oversight and Reform (Aug. 14, 2019).

[59] *Fish v. Kobach*, No. 16-2105-JAR-JPO, 2017 U.S. Dist. LEXIS 72051 (D. Kan. May 10, 2017).

[60] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore, Principal Deputy Assistant Attorney General, Department of Justice (Feb. 14, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-02-14.EEC%20to%20Gore-DOJ%20re%20Transcribed%20Interview%20Request_1.pdf).

[61] Committee on Oversight and Reform, Transcribed Interview of John Gore (Mar. 7, 2019).

Over the next month, the Committee sought to have Mr. Gore return voluntarily to answer the questions he refused to answer during his interview with the Committee.[62]  However, DOJ declined to make Mr. Gore available.[63]

On April 2, 2019, the Committee voted on a bipartisan basis to authorize a subpoena compelling Mr. Gore to testify.[64]  However, prior to the deposition, DOJ wrote to the Committee that Attorney General Barr personally directed Mr. Gore not to comply with the subpoena and not to appear for the deposition, citing opposition to the Committee's longstanding rule prohibiting agency counsel from attending depositions.[65]

In response, on April 10, 2019, the Committee wrote to Attorney General Barr that he appeared to be "instructing Mr. Gore to defy a duly authorized congressional subpoena approved by the Committee on a bipartisan basis," as well as the Committee's rules.  However, the Committee offered to accommodate DOJ's interests in protecting any valid privilege by making a separate room available at the Committee's offices for DOJ counsel during the deposition and permitting Mr. Gore or his counsel to request a break to consult with DOJ counsel.[66]  The Committee also agreed to postpone the deposition at the request of Mr. Gore's personal counsel.

On April 24, 2019, DOJ wrote a letter reiterating the Attorney General's instruction to Mr. Gore to defy the Committee's subpoena.[67]  On April 25, 2019, Mr. Gore failed to appear for his deposition.

---

[62] Email from Staff, Committee on Oversight and Reform, to Staff, Department of Justice (Mar. 7, 2019).

[63] Email from Staff, Department of Justice, to Staff, Committee on Oversight and Reform (Mar. 22, 2019).

[64] *Committee Approves Subpoenas in Security Clearance and Census Investigations*, Committee on Oversight and Reform (Apr. 2, 2019) (online at https://oversight.house.gov/news/press-releases/committee-approves-subpoenas-in-security-clearance-and-census-investigations).

[65] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-9%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573.pdf); *see also* Rule 15(e) of the Committee on Oversight and Reform, 116th Cong. ("Witnesses may be accompanied at a deposition by counsel to advise them of their rights. No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's counsel. Observers or counsel for other persons, or for agencies under investigation, may not attend.").

[66] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to Attorney General William P. Barr, Department of Justice (Apr. 10, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-04-10%20EEC%20to%20Barr-DOJ%20re%20Gore%20Deposition.pdf).

[67] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Apr. 24, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-4-24%20HOGR%27s%20subpoena%20to%20John%20Gore%20%28CRT%29%20-%20Cummings%20%234235573_0.pdf).

On June 6, 2019, DOJ once again refused to allow Mr. Gore to sit for a deposition consistent with Committee rules.[68]

After the Supreme Court decision, on September 20, 2019, the Committee sent another letter to Mr. Gore seeking compliance with the bipartisan subpoena issued on April 2, 2019, for a deposition.  The letter noted the Supreme Court's ruling and explained that the Committee's investigation is "urgent in light of the ongoing preparations for the 2020 Census."[69]

On September 27, 2019, Mr. Gore's attorney responded that Mr. Gore "remains unable to be deposed."  The letter explained that the "Justice Department has confirmed to Mr. Gore that Attorney General Barr maintains his prior instruction" prohibiting Mr. Gore from complying with the Committee's subpoena due to the Attorney General's disagreement with longstanding Committee rules prohibiting agency counsel at depositions.[70]

***

As Chairman Cummings recognized, ensuring an accurate, nonpartisan enumeration is among Congress' most fundamental responsibilities under the Constitution.  Despite ongoing obstruction by Attorney General Barr, Secretary Ross, and other Administration officials, the Committee's urgent investigation into the manipulation of the 2020 Census continues.  Committee Members will continue to receive updates on the progress of this investigation to inform Congress' legislative work.

---

[68] Letter from Stephen E. Boyd, Assistant Attorney General, Department of Justice, to Chairman Elijah E. Cummings, Committee on Oversight and Reform (June 6, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-06-06%20Letter%20from%20DOJ%20to%20COR%2006-19%20%281%29.pdf ).

[69] Letter from Chairman Elijah E. Cummings, Committee on Oversight and Reform, to John Gore (Sept. 20, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019-09-20.EEC%20to%20Gore-DOJ%20re%20Deposition%20Compliance.pdf).

[70] Letter from John D. Adams to Chairman Elijah E. Cummings, Committee on Oversight and Reform (Sept. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/9-27-2019%20Ltr.pdf).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

*Defendants*.

Case No. _____

# Exhibit H

| From: | Comstock, Earl (Federal), ▮▮▮▮▮▮▮▮ |
|---|---|
| Sent: | 5/2/2017 2:19:11 PM |
| To: | Wilbur Ross ▮▮▮▮ |
| CC: | Herbst, Ellen (Federal) ▮▮▮▮▮▮ |
| Subject: | Re: Census |

I agree Mr Secretary.

On the citizenship question we will get that in place. The broad topics were what were sent to Congress earlier this year as required. It is next March -- in 2018 -- when the final 2020 decennial Census questions are submitted to Congress. We need to work with Justice to get them to request that citizenship be added back as a census question, and we have the court cases to illustrate that DoJ has a legitimate need for the question to be included.  I will arrange a meeting with DoJ staff this week to discuss.

Earl


Sent from my iPhone

> On May 2, 2017, at 10:04 AM, Wilbur Ross ▮▮▮▮▮▮▮ wrote:
>



▮▮▮▮▮▮▮ Worst of all they emphasize
that they have settled with congress on the questions to be asked.  I am mystified why nothing have been
done in response to my months old request that we include the citizenship question. Why not? ▮▮▮▮

> Sent from my iPhone

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND REFORM,
UNITED STATES HOUSE OF REPRESENTATIVES
2157 Rayburn House Office Building
Washington, D.C. 20515,

        *Plaintiff*,

      v.

WILLIAM P. BARR, in his official capacity as
Attorney General of the United States,
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530; and

WILBUR L. ROSS, JR., in his official capacity as
Secretary of Commerce,
United States Department of Commerce,
1401 Constitution Avenue, N.W.
Washington, D.C. 20230,

        *Defendants*.

Case No. _____

# Exhibit I



**U.S. Department of Justice**

Office of Legislative Affairs

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

April 9, 2019

The Honorable Elijah E. Cummings
Chairman
Committee on Oversight and Reform
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

We write in response to the Committee's April 2, 2019 subpoena to John Gore, Principal Deputy Assistant Attorney General for the Department's Civil Rights Division. The subpoena seeks Mr. Gore's testimony for a deposition on April 11, 2019, concerning the Secretary of Commerce's decision to restore the citizenship question to the 2020 Census.

On March 7, 2019, Mr. Gore appeared voluntarily for a transcribed interview on the same topic. Committee staff questioned him for several hours, and he answered hundreds of questions. Department counsel participated in the interview and instructed Mr. Gore not to answer particular questions that sought information concerning confidential Executive Branch deliberations that are protected under well-established law. The Department's interest in protecting such subject matter is particularly acute given that much of this information was withheld from public disclosure by the district courts considering challenges to the inclusion of the citizenship question on the 2020 Census and that such disclosure could compromise the integrity of ongoing litigation in the Supreme Court.

The Committee now has subpoenaed Mr. Gore to return to answer the questions that he could not answer at his interview. But the subpoena will not change his responses. Because the Department will instruct him to decline to respond to the same categories of questions to which he declined to respond during the Committee's March 7 interview, we question the value of Mr. Gore's appearing before the Committee for an additional time and would ask the Committee to reconsider whether the deposition would really further the Committee's oversight needs. This is particularly true where the Department has produced, and will continue to produce, a substantial volume of documents to the Committee.

Should the Committee wish to go forward with the deposition, we will expect that Department counsel again appear and represent him. Because of concerns that go to the heart of the relationship between our two co-equal Branches, we strongly object to the Committee's

The Honorable Elijah E. Cummings
Page Two

effort to bar Department counsel from Mr. Gore's deposition. In accordance with the
constitutionally mandated accommodation process, the Executive Branch has been working in
this and numerous oversight contexts to accommodate congressional information needs in a
manner consistent with the constitutional and statutory responsibilities of the Executive Branch.
But the Committee now seeks to undermine the Executive Branch's ability to protect its interests
by excluding agency counsel from its depositions. In this case, Committee staff has informed the
Department that the Committee intends to apply Committee Rule 15(e) to Mr. Gore's deposition.
That rule prohibits "[o]bservers or counsel" from the Department from attending the deposition.
We do not understand the basis for such a rule. Mr. Gore would be appearing to testify in his
official capacity about Department matters. There is no legitimate legislative purpose served by
requiring Mr. Gore to appear without counsel for the Department, particularly given that he
appeared with Department counsel for his transcribed interview.

        The Committee's exclusion of agency counsel from a compelled deposition would
unconstitutionally infringe upon the prerogatives of the Executive Branch. The exclusion would
conflict with the long-standing oversight practice in congressional interviews under which
agency counsel represents the agency and the witness in his official capacity. Indeed,
Department counsel has already appeared at the staff interview of Mr. Gore in this very matter
without objection from the Committee. It is standard practice for Department counsel to
accompany Department officials who are testifying in civil or other matters, including
congressional oversight interviews, depositions, and hearings. The need for such Department
representation is obvious. When a witness testifies in his official capacity, he is asked to provide
Department information. The Department has a strong interest in ensuring that the questioning is
limited to the proper scope, the information provided on its behalf is accurate and complete, and
any ambiguity or confusion is promptly resolved. In addition, the Department representative can
follow up on questions that may be raised in the course of the interview that the official cannot
answer. As an employer, moreover, the Department has an interest in providing support to its
officials when they are called to Congress to testify about their work-related activities.

        Most importantly, Department counsel must be present at depositions of the
Department's officials to protect the constitutional equities of the Executive Branch. The
Department, like other agencies, has a fundamental interest in ensuring that its officials are not
pressed into revealing privileged information, such as internal deliberations, attorney-client
communications, or national security information, *see United States v. Nixon*, 418 U.S. 683, 705-
06 (1974); *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725,
731 (D.C. Cir. 1974), or pressed into responding to inquiries that are beyond Congress's
oversight authority, *see Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959). There is no
legitimate legislative interest served by prohibiting Department counsel from attending
congressional depositions, and such a rule would impermissibly infringe on the President's
constitutional authority to supervise the Executive Branch's dissemination of information to
Congress and to protect information within the scope of executive privilege. This concern is

The Honorable Elijah E. Cummings
Page Three

heightened with respect to Mr. Gore's deposition because of the ongoing litigation in the
Supreme Court.

The Department recognizes Congress's oversight responsibilities and stands ready to
cooperate with the Committee's inquiry in any way it can, consistent with the Department's
constitutional and statutory obligations.  But barring Department representatives from
Committee depositions undermines, rather than enhances, such oversight, and unconstitutionally
encroaches on fundamental Executive Branch interests.  As a result, the Attorney General has
determined that Mr. Gore will not appear at the April 11 deposition unless a Department
representative may accompany him.

We reiterate our request that the Committee reconsider the need for this deposition, given
that the Committee has access to Mr. Gore's transcribed interview on the very subject, that Mr.
Gore will not be permitted to disclose information concerning confidential Executive Branch
deliberations, and that the Committee has received, and will continue to receive, numerous
documents concerning the underlying subject matter.  Should the Committee nonetheless wish to
proceed on April 11, we would ask you to confirm that Department counsel will be permitted to
attend and represent Mr. Gore at the deposition.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

cc:     The Honorable Jim Jordan
        Ranking Member