**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| COMMITTEE ON OVERSIGHT AND REFORM, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> *Plaintiff*, <br><br> v. <br><br> WILLIAM P. BARR, in his official capacity as Attorney General of the United States, *et al.*, <br> *Defendants*. | No. 19-cv-3557 (RDM) |

## PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Local Civil Rule 7(h), and this Court's December 13, 2019 Minute Order, Plaintiff Committee on Oversight and Reform, United States House of Representatives ("Committee") moves for expedited summary judgment on all counts of the Complaint because there is no genuine issue of material fact and the Committee is entitled to judgment as a matter of law.

In support of this motion, the Committee submits the accompanying (1) memorandum of law, (2) statement of material facts as to which there is no genuine dispute, (3) declaration of Todd. B. Tatelman, and (4) proposed order granting summary judgment.

Respectfully submitted,

*/s/ Douglas N. Letter* _____
Douglas N. Letter (DC Bar No. 253492)
 *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
 *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
 *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)

*Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
*Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

David A. O'Neil (DC Bar No. 1030615)
Anna A. Moody (DC Bar No. 1047647)
Laura E. O'Neill (DC Bar No. 1033764)
Nathaniel Johnson (DC Bar No. 241433) (*D.D.C.
    admission application pending*)
DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave. NW
Washington, DC  20004
Telephone: (202) 383-8000

*Counsel for Plaintiff the Committee on Oversight
    and Reform, U.S. House of Representatives*

December 17, 2019

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND
    REFORM, UNITED STATES HOUSE
    OF REPRESENTATIVES

               *Plaintiff*,

    v.

WILLIAM P. BARR, in his official capacity
    as Attorney General of the United States,
    *et al.*,

              *Defendants*.

No. 19-cv-3557 (RDM)

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR EXPEDITED**
**SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ 1

INTRODUCTION .............................................................................................................. 5

FACTS ............................................................................................................................... 7

I.  Secretary Ross, Acting in Concert with Trump Administration Officials, Decided to Add the Citizenship Question Shortly After He Took Office ....................................... 8

    A.  The Trump Campaign and Transition Team Discussed Adding a Citizenship Question ........................................................................................ 8

    B.  Secretary Ross Decided to Add the Citizenship Question Early in His Tenure and Pressed His Staff to Implement That Decision ............................... 9

II.  Secretary Ross and Commerce Department Staff Repeatedly Misled the Public, Congress, and the Courts .......................................................................................... 15

III.  Defendants Have Obstructed the Committee's Investigation and Refused to Comply with Valid Committee Subpoenas ................................................................ 19

    A.  The Commerce Department Has Refused to Produce Key Documents Required by the Ross Subpoena ......................................................................... 20

    B.  DOJ Has Refused to Produce Key Documents Required by the Barr Subpoena ............................................................................................................ 25

IV.  The House Held Defendants in Contempt ............................................................... 28

V.  The Committee Has Continued Its Investigation and Uncovered Corroborating Information, Reinforcing the Committee's Concerns ................................................ 31

ARGUMENT .................................................................................................................... 33

I.  The Court Has Authority to Decide This Case ........................................................ 34

    A.  The Court Has Subject Matter Jurisdiction ...................................................... 34

    B.  The Committee Has Standing ........................................................................... 34

II.  The Subpoenas Are Valid, Binding, and Judicially Enforceable ............................ 36

    A.  The Committee's Investigation Furthers Fundamental Constitutional Oversight and Legislative Objectives ............................................................... 37

    B.  The Subpoenas Seek Documents Necessary to Complete the Investigation ...................................................................................................... 39

III.  There Is No Valid Justification for Defying the Subpoenas ................................... 42

    A.  Defendants' Assertion of Executive Privilege Was Overbroad and Does Not Implicate Any Constitutionally-Based Interest ................................. 42

    B.  Common-Law Privileges Are Not Valid Grounds for Defying Congressional Subpoenas ................................................................................. 46

C.   The Asserted Common Law Privileges Do Not Apply Here ...................................... 49

D.   Defendants Cannot Withhold Documents Based on Their Purported
Relevance to Civil Litigation ...................................................................................... 59

CONCLUSION ................................................................................................................................ 60

## TABLE OF AUTHORITIES

**Cases**

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015)................31

*Barenblatt v. United States*, 360 U.S. 109 (1959) ........................................................32

*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981)....................................42

*Clark v. United States*, 289 U.S. 1 (1933) ...................................................................49

*Comm. on Judiciary v. McGahn* ("*McGahn I*"), No. 19-cv-2379, 2019 WL 6312011
    (D.D.C. Nov. 25, 2019)......................................................................30, 31, 33

*Comm. on Judiciary v. McGahn* ("*McGahn II*"), No. 19-cv-2379, 2019 WL 6463406
    (D.D.C. Dec. 2, 2019)................................................................................52, 53

*Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. July 31, 2008)................30, 31, 32, 33

*Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013)........30, 31, 33

*Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665
    (D.D.C. Aug. 20, 2014)..............................................................................43, 50

*Comm. on Oversight & Gov't Reform v. Lynch*, 156 F. Supp. 3d 101 (D.D.C. 2016) ...........35, 43

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)................................................ *passim*

*DL v. District of Columbia*, 194 F. Supp. 3d 30 (D.D.C. 2016) ....................................53

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ............................................32

*Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582 (D.C. Cir. 1978) ...........................52

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)..........................................................52

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ........................................................53

*Hannah v. Larche*, 363 U.S. 420 (1960)........................................................................45

*Haskins v. Stanton*, 794 F.2d 1273 (7th Cir. 1986)........................................................53

*Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ................................................56

*In re Kellogg Brown & Root, Inc.*, 796 F.3d 137 (D.C. Cir. 2015) ...............................54

*In re Lindsey* ("*Lindsey I*"), 148 F.3d 1100 (D.C. Cir. 1998)..................................48, 51

*In re Lindsey* ("*Lindsey II*"), 158 F.3d 1263 (D.C. Cir. 1998)....................................................51

*In re Provident Life & Accident Co.*, No. 1-90-219, 1990 U.S. Dist. LEXIS 21067 (E.D. Tenn. 1990) ...........................................................................................................................45

*In re Sealed Case* ("*Espy*"), 121 F.3d 729 (D.C. Cir. 1997).................................................*passim*

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982)..........................................................43, 48, 49

*In re Subpoena Duces Tecum Served on Off. of Compt. of Currency*, 145 F.3d 1422 (D.C. Cir. 1998) ......................................................................................................................47

*In re Subpoena Served Upon Compt. of Currency et al.*, 967 F.2d 630 (D.C. Cir. 1992)............49

*Jordan v. U.S. Dep't of Justice*, 591 F.2d 753 (D.C. Cir. 1978)....................................................43

*Judicial Watch Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004)............................54

*Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125 (D.C. Cir. 2000)......................................39, 43

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................................52

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ........................................................................32, 56

*Murphy v. U.S. Dep't of Army*, 613 F.2d 1151 (D.C. Cir. 1979)..................................................53

*New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019).....................*passim*

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975)...................................................................47

Order, *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (S.D.N.Y. 2018), Docket No. 361....................................................................................................................................48

*Sinclair v. United States*, 279 U.S. 263 (1929) ...........................................................................56

*Trump v. Deutsche Bank AG*, 943 F.3d 627 (2d Cir. 2019).....................................................51, 52

*U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998) ....................................................................................................................................31

*United States v. Nixon*, 418 U.S. 683 (1974).........................................................40, 41, 43, 54

*United States v. Am. Tel. & Tel. Co.* ("*AT&T*"), 551 F.2d 384 (D.C. Cir. 1976) .........................30

*United States v. Burr*, 25 F. Cas. 187 (C.C.D. Va. 1807) ...........................................................54

*Watkins v. United States*, 354 U.S. 178 (1957).............................................................................32

*Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768 (D.C. Cir. 1988) .................................43

**Constitution and Statutes**

U.S. Const. Art. I ............................................................................................... *passim*

U.S. Const. Art. III ........................................................................................... 29, 31

U.S. Const. Art. VI ................................................................................................ 42

28 U.S.C. § 1331 .................................................................................................... 30

**Other Authorities**

165 Cong. Rec. 98 (daily ed. June 12, 2019) ......................................................... 25

165 Cong. Rec. H5977 (daily ed. July 17, 2019) ................................................... 26

A. Mark Neuman Dep., *Kravitz v. Dep't of Commerce*, No. 18-cv-1041 (D. Md. Oct. 28, 2018) ................................................................................................................ 4, 5

Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Att'ys, 31 Op. O.L.C. 1 (June 27, 2007) ........................................................................ 39

Assertion of Exec. Privilege for Docs. Concerning Conduct of Foreign Affs. with Respect to Haiti, 20 Op. Att'y Gen. 5 (Sept. 20, 1996) ................................................... 39

Assertion of Exec. Privilege Over Commc'ns. Regarding EPA's Ozone Air Quality Stds. and CA's Greenhouse Gas Waiver Request, 32 Op. O.L.C. 1 (June 19, 2008) ..... 39

Assertion of Exec. Privilege Regarding White House Counsel's Off. Docs., 20 Op. Att'y Gen. (May 23, 1996) ............................................................................................ 40

Census Bureau, *Census Bureau Citizenship Data Research and Product Development* (Sept. 6, 2019) ..................................................................................................... 29

Compl., *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (S.D.N.Y. Apr. 4, 2018) ........... 13

Cong. Globe, 34th Cong., 3d Sess. 434 (1857) ...................................................... 44

Earl Comstock Dep., *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (S.D.N.Y. Nov. 5, 2018), Docket No. 490-2 ......................................................................... 5

Fed. R. Civ. P. 56 .................................................................................................. 29

H.R. 732 (2019) .................................................................................................... 35

H.R. 1734 (2019) .................................................................................................. 35

H.R. 3055 (2019) .................................................................................................. 35

Hansi Lo Wang, *GOP Redistricting Strategist Played Role in Push for Census Citizenship Question*, NPR (May 30, 2019) ...........................................55

*Int'l Uranium Cartel: Hr'gs Before the Subcomm. on Oversight and Investigations of the H. Comm. on Interstate and Foreign Commerce*, 95th Cong. (1977) ....................................44

Katie Rogers *et al.*, *Trump Says He Will Seek Citizenship Information from Existing Federal Records, Not the Census*, N.Y. Times (July 11, 2019) ..............................................25

Kevin Breuninger & Christina Wilkie, *Trump: "We're fighting all the subpoenas" from House Democrats*, CNBC (Apr. 24, 2019). ..........................................................21

Luther Stearns Cushing, *Elements of the Law & Practice of Legislative Assemblies in the United States of America* (1856) ..............................................................44

Mem. from Ronald Reagan, President, to the Heads of Exec. Dep'ts and Agencies, on Procs. Governing Responses to Cong'l Requests for Info. (Nov. 4, 1982) ......................39, 40

Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019).....................................................9

Restatement (Third) of the Law Governing Lawyers § 74 ...........................................43

Rules of the House of Representatives (116th Cong.).........................................*passim*

*The Latest: WH says it wasn't behind census change*, Associated Press (Mar. 27, 2018)...........55

Tr., Interview with Christa Jones, Comm. on Oversight and Reform (July 31, 2019)..................28

Tr., Interview with Gene P. Hamilton, Comm. on Oversight and Reform (May 30, 2019).......6, 7

Tr., Tel. Interview with Kris Kobach, Comm. on Oversight and Reform (June 3, 2019). ..........4, 6

Tr., Interview with James Uthmeier, Comm. on Oversight and Reform (June 11, 2019)..............8

Tr., Interview with John M. Gore, Comm. on Oversight and Reform (Mar. 7, 2019) .............8, 36

*Writings of James Madison* (G. Hunt ed. 1906) ..........................................................43

## INTRODUCTION

This case results from the unlawful defiance by Defendants Attorney General William P. Barr and Secretary of Commerce Wilbur L. Ross of subpoenas validly issued by Plaintiff, the Committee on Oversight and Reform ("Committee") of the United States House of Representatives.  Those subpoenas are part of an urgent investigation focused on ensuring the integrity of a cornerstone of our democracy:  the Decennial Census, which provides the basis for apportioning seats in Congress and for distributing more than $1.5 trillion in annual federal funds.  With the 2020 Census set to begin in just over a month, the Committee's investigation has not only identified grave concerns about improper partisan influences that threaten the soundness of the census process, but also has highlighted indefensible efforts by Defendants to conceal those influences.  These concerns are especially serious given the Supreme Court's conclusion that Defendants advanced a pretextual rationale in response to legitimate inquiries into what the Commerce Department hoped to accomplish by adding a citizenship question to the 2020 Census.

The House is now urgently trying, in the limited time left, to understand the extent of Defendants' maladministration of the 2020 Census so that it can consider appropriate remedies. Unfortunately, Defendants have continued to hide their actions through the illegal withholding of documents, frustrating the Committee's ability to complete its investigation and discharge its constitutional oversight and legislative responsibilities.

The Committee has brought this suit as a last resort.  The Committee recognizes the plain fact that, normally, far more can be achieved far faster between the Executive and Legislative Branches through negotiations and compromise than through litigation.  The Committee has therefore sought over many months to accommodate Defendants' interests, including by

5

substantially narrowing document requests and prioritizing specific information for production. Defendants have responded by still withholding documents, objecting to long-standing Committee rules, redacting responsive material, and invoking common law privileges that neither apply on these facts nor justify noncompliance with a Congressional subpoena in any event.  After Defendants refused to compromise, the full House voted to hold Defendants in contempt for their obstructive conduct.  Defendants then made an indiscriminate and haphazard "protective" assertion of Executive Privilege and ceased any further productions.

Even at that point, however, the Committee took Defendants at their word that they genuinely intended to undertake an evaluation of whether privilege actually applied to specific documents, and if not, to produce the tens of thousands of pages of responsive material that they have acknowledged identifying.  Defendants have made no such productions, however, and they have not indicated any continued interest in negotiations.  Thus, despite the Committee's desire to achieve results without judicial assistance, the Committee has now reluctantly accepted the reality that litigation is its only practical route, and it has no choice but to seek enforcement of its subpoenas in court.

Summary judgment is warranted here because there are no material facts in dispute, and Defendants' obstruction in the face of duly authorized Congressional subpoenas is unlawful. The Committee's need for the unlawfully withheld documents is concrete and immediate; the Committee must be permitted to review the subpoenaed materials now to conduct necessary Executive Branch oversight and decide on potential remedial legislation, including emergency measures to protect the impending Census.  The stakes could not be more serious.  The Committee respectfully requests that this Court quickly grant its motion for summary judgment,

declare that Defendants are obligated to comply in full with the Committee's subpoenas, and order Defendants to do so immediately.

## FACTS

The material facts in this case are set out in judicial rulings, correspondence, legislative materials, and sworn testimony.  Those undisputed facts show that Defendants have, without valid justification, refused to comply with subpoenas issued as part of a Congressional investigation into the attempt to add a citizenship question to the 2020 Census.  The investigation has identified issues of grave import concerning the integrity of the census process, related agency processes and coordination, and potential ongoing efforts by the Trump Administration to politicize the census and impair its accuracy.

The Committee has learned—and the Supreme Court has confirmed—that Secretary Ross decided early in his tenure to add a citizenship question to the 2020 Census and then directed his staff to manufacture a legal justification for that decision.  That effort failed bureaucratically at every turn until Secretary Ross personally implored the Attorney General to supply him with a legal pretext.  The result—a "request" by the Department of Justice ("DOJ") that the Commerce Department add the citizenship question to aid DOJ's enforcement of the Voting Rights Act— was, as the Supreme Court concluded, pretextual:  It was an explanation "contrived" after the fact to provide a "distraction" from the real reasons for the decision.  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019).  Yet Secretary Ross and his staff repeated the false rationale in statements to Congress, the courts, and the American people.

The Committee has been unable to discern the true reasons for Secretary Ross's attempt. Even though the courts have indicated that Secretary Ross acted in bad faith to conceal his actual rationale, and even though the Committee has gone to great lengths to accommodate Defendants' purported concerns, Defendants have refused to produce critical information required by valid

subpoenas (the "Ross Subpoena," Ex. LLL, and the "Barr Subpoena," Ex. RRR; together, "the Subpoenas").  This conduct is immensely concerning to the Committee, not least because many of the same people who enabled Secretary Ross to engage in his bad faith conduct continue to hold power over the administration of the 2020 Census.  Defendants' obstruction has resulted in an impasse.  Following an invalid "protective" claim of Executive Privilege over any remaining documents, Defendants have ceased all productions in response to the Subpoenas.

I.    **Secretary Ross, Acting in Concert with Trump Administration Officials, Decided to Add the Citizenship Question Shortly After He Took Office**

A.    **The Trump Campaign and Transition Team Discussed Adding a Citizenship Question**

In 2016, members of the Trump campaign considered adding a citizenship question to the Decennial Census.  Former Kansas Secretary of State Kris Kobach, an "informal adviser to the President throughout the campaign," has stated that he "certainly discussed the issue with people during the campaign."  Tr., Tel. Interview with Kris Kobach, Comm. on Oversight and Reform ("Kobach Interview") at 8, 11 (June 3, 2019), https://perma.cc/3CNN-4FQA.

Republican gerrymandering expert Thomas Hofeller played a pivotal role in discussions about the census, including during the transition to the Trump Administration.  A. Mark Neuman Dep. ("Neuman Dep.") at 33, 40–41, *Kravitz v. Dep't of Commerce*, No. 18-cv-1041 (D. Md. Oct. 28, 2018).  Hofeller, now deceased, authored a secret study in 2015 analyzing the potential effects of legislative redistricting on the basis of citizen voting age population.  The study concluded that counting voting-age citizens, rather than total population, for purposes of legislative districts "would be advantageous to Republicans and Non-Hispanic Whites."  Ex. M

at 9.[1]   It also concluded:   "Without a question on citizenship being included on the 2020 Decennial Census questionnaire, the use of citizen voting age population is functionally unworkable."  *Id.* at 8.

Hofeller's views on the census were influential.  Mark Neuman, the Trump Transition Team official responsible for census matters, testified that he spoke multiple times with Hofeller about adding a citizenship question to the 2020 Census.  Neuman Dep. at 40–43.

Shortly after his inauguration, President Trump and his top advisors met in the White House with Kobach to discuss adding a citizenship question.  Tr., Tel. Interview with Kris Kobach, Comm. on Oversight and Reform at 25–26 (June 3, 2019), https://perma.cc/3CNN-4FQA.

**B.     Secretary Ross Decided to Add the Citizenship Question Early in His Tenure and Pressed His Staff to Implement That Decision**

Secretary Ross was sworn in as Commerce Secretary on February 28, 2017, and as the federal courts have already found, he immediately directed his staff to add a citizenship question to the 2020 Census.  Just ten days after the swearing-in, Secretary Ross's Director of Policy, Earl Comstock, wrote to Secretary Ross regarding "Your Question on the Census," explaining that "undocumented residents (aliens)," along with all other "citizens and noncitizens" residing in the United States, "are to be included in the census and thus in the apportionment counts."  Ex. Q at 1.

Secretary Ross's staff nevertheless undertook to implement his decision to add a citizenship question.  Comstock testified under oath that he considered it his task to "find the best rationale" for the decision, recognizing that Secretary Ross's actual rationale "may or may

---

[1]   All exhibits are attached to the Declaration of Todd B. Tatelman in Support of Plaintiff's Motion for Expedited Summary Judgment (Dec. 17, 2019).

not be … a legally-valid basis." Earl Comstock Dep., at 267:5, 11–14, *New York v. U.S. Dep't of Commerce*, No. 18-cv-2921 (S.D.N.Y. Nov. 5, 2018), Docket No. 490-2.  To that end, Comstock attempted to elicit requests for the citizenship question from several executive agencies, including the Department of Homeland Security and DOJ, but none obliged.  Ex. V at 1; Tr., Interview with Gene P. Hamilton, Comm. on Oversight and Reform ("Hamilton Interview") at 12 (May 30, 2019), https://perma.cc/WB2Y-9EMU.

During the same period, Steve Bannon contacted Secretary Ross about adding a citizenship question.  In April 2017—eight months before DOJ sent its request letter—Secretary Ross's assistant wrote that "Steve Bannon has asked that the Secretary talk to someone about the Census."  Ex. R at 1.  Secretary Ross later testified that Bannon had called to ask "if I [Secretary Ross] would consider taking a phone call from an individual called Kris Kobach" who "had a question that he thought should be asked on the census."  Ex. S at 54.  Secretary Ross did in fact speak with Kobach, and Kobach recalled that the conversation had been "at the direction of Steve Bannon."  Ex. T at 1; Kobach Interview at 64.

While Comstock was unsuccessfully trawling for a legal pretext for the Secretary's decision, Secretary Ross grew increasingly impatient.  On May 2, 2017, Secretary Ross emailed various Commerce Department officials to demand that they implement his decision more quickly.  In one such email to Comstock and Commerce Department Chief Financial Officer Ellen Herbst, Ross wrote:  "I am mystified why nothing [has] been done in response to my months old request that we include the citizenship question."  Ex. W at 1.  Comstock responded: "we will get that in place," explaining that "[w]e need to work with Justice to get them to request that citizenship be added back as a census question."  Ex. H at 1.

Kobach, too, continued to press the need for the citizenship question.  On July 14, 2017, he emailed Secretary Ross to follow up "on our telephone discussion from a few months ago." Ex. X at 1.  Kobach wrote that a citizenship question was "essential" to address "the problem that aliens who do not actually 'reside' in the United States are still counted for congressional apportionment purposes."  *Id.*  Kobach included a sample citizenship question, *id.*,[2] and at Kobach's request, Secretary Ross again spoke to him by phone on July 25, 2017, Ex. Y at 1.

Two weeks later, between August 8 and 10, 2017, Secretary Ross exchanged emails with Comstock regarding DOJ's potential assistance.  Secretary Ross pressed Comstock for an update:  "If [DOJ] still ha[s] not come to a conclusion please let me know your contact person and I will call the [Attorney General]."  Ex. AA at 1.  Comstock replied:  "Mr. Secretary—we are preparing a memo and full briefing for you on the citizenship question … Since this issue will go to the Supreme Court we need to be diligent in preparing the administrative record."  Ex. BB at 1.[3]  Secretary Ross responded:  "[W]e should be very careful, about everything, whether or not it is likely to end up in the SC."  *Id.*

Throughout early September, Secretary Ross continued to express frustration about having "received no update … [on] the issue of the census question."  Ex. CC at 1.  Finally, exasperated with DOJ's unwillingness to supply him with a request for the question, on September 16, 2017, Secretary Ross asked for a call directly with then-Attorney General Jeff

---

[2] The sample citizenship question asked noncitizens for the year of their naturalization and their green card or visa status.  Ex. X at 1.

[3] Tellingly, in a subsequent email, James Uthmeier, the Commerce official who alongside Comstock helped draft one of the key documents being withheld from the Committee, indicated his understanding that the data collected from the question could be used "for apportionment" by "Congress (or possibly the President)."  *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 553 (S.D.N.Y. 2019) (quoting Aug. 11, 2017 email from James Uthmeier, Senior Counsel to the General Counsel, Dep't of Commerce, to Earl Comstock, Deputy Chief of Staff and Director of Policy, Dep't of Commerce at 2 (Aug. 11, 2017)).

Sessions.  *See* Ex. FF at 1; *see also* Hamilton Interview at 28–29 (explaining that the Attorney General had spoken directly to Secretary Ross about whether the Department could use citizenship information from the census).  The following day, the Attorney General's Senior Counselor wrote to Secretary Ross's Chief of Staff, reporting that "it sounds like we can do *whatever you all need us to do* and the delay was due to a miscommunication.  *The AG is eager to assist.*"  Ex. FF at 1 (emphasis added).  Secretary Ross's Chief of Staff confirmed that the Attorney General and Secretary Ross had spoken.  *Id.*

At that point, then-Acting Assistant Attorney General John Gore undertook to draft a request on behalf of DOJ.  Gore primarily relied on the advice of political appointees, rather than career officials with experience in handling Voting Rights Act ("VRA") cases.  *New York*, 351 F. Supp. 3d at 555–56.  Gore also had multiple conversations with Davidson and Uthmeier about the citizenship question.  *See, e.g.*, Tr., Interview with John M. Gore, Comm. on Oversight and Reform ("Gore Interview") at 110–11 (Mar. 7, 2019), https://perma.cc/BXT5-KF8C.

Uthmeier had drafted a memorandum ("Uthmeier Memorandum") analyzing legal issues surrounding the citizenship question.  Ex. GG at 1; Tr., Interview with James Uthmeier, Comm. on Oversight and Reform at 75 (June 11, 2019), https://perma.cc/88AW-AB9W; *see also* Ex. HH at 4.  Uthmeier had a copy of the memorandum, along with a personal note, hand delivered to Gore, who later refused to tell Committee staff why Uthmeier told him he wanted to deliver the memorandum by hand and refused to disclose the contents of the note or memorandum.  Ex. HH at 4; Gore Interview at 105–09.

Gore told Committee staff that Davidson informed him that Mark Neuman would contact Gore about the citizenship question.  Gore Interview at 22–25.  Gore spoke to Neuman and subsequently "reviewed some documents and information regarding the census" that Neuman

provided to him.  *Id.* at 25–26.  Among the documents that Neuman provided to Gore was "a draft letter that would request reinstatement of the citizenship question on the census questionnaire."  *Id.* at 26; *see* Ex. II at 1–2.  That draft letter contained language that matched, word-for-word, a document that had been created on August 30, 2017, and was found on the hard drive of Hofeller.  *See* Ex. JJ at 3, 9; *see also* Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, N.Y. Times (May 30, 2019), https://perma.cc/CRA6-WB8C.

This was no coincidence.  On August 30, 2017, Neuman sent an email to Hofeller asking him to review language for a letter that Neuman drafted to request the addition of a citizenship question.  Ex. LL at 1–2.  With the exception of a legal citation, the same language appeared word-for-word in a draft letter that was produced by both Neuman and Gore in the civil litigation.  Ex. JJ at 3, 6–7; Ex. KK at 4, 5–6.  That letter was drafted so that it appeared to be addressed to the Director of the Census Bureau from someone at DOJ—including a proposed "___@doj.gov" email address for the eventual DOJ sender to fill in—and set forth the very pretextual VRA rationale that DOJ eventually supplied.  *Id.*

Meanwhile, Secretary Ross remained impatient.  He personally intervened again on November 27, 2017, writing to Davidson:  "We are out of time.  Please set up a call for me tomorrow with whoever is the responsible person at Justice.  We must have this resolved."  Ex. OO at 1.

On December 12, 2017, DOJ sent the Commerce Department its letter requesting the addition of a citizenship question to the 2020 Census.  Signed by Arthur E. Gary, General Counsel, Justice Management Division of the Department of Justice, the letter ("Gary Letter") asserted without support that the citizenship question would provide data "critical to the

Department's enforcement of Section 2 of the Voting Rights Act and its important protections against racial discrimination in voting." Ex. PP at 1.

Census Bureau officials were immediately skeptical of DOJ's bogus request. On December 22, 2017, Acting Census Bureau Director Ron Jarmin told Gary that the Census Bureau believed it could provide DOJ with the data it requested without adding a citizenship question to the Census, and that *not* adding the question "would result in higher quality data produced at lower cost." Ex. QQ at 1. Census officials proposed a meeting with DOJ to discuss alternative ways to meet DOJ's purported needs, but then-Attorney General Sessions dodged such a meeting. Gore Interview at 148–49.

Secretary Ross similarly rejected the advice of Census Bureau officials and other top experts who advocated against adding a citizenship question. In early 2018, the Census Bureau's chief scientist informed Secretary Ross that the proposed citizenship question would be "very costly, harm[] the quality of the census count, and would use substantially less accurate citizenship status data than are available from administrative sources." Ex. RR at 1; *see also* Ex. SS at 5. Outside experts on the census and the VRA likewise contacted Secretary Ross to inform him that "adding an untested question on citizenship status at this late point in the decennial planning process would put the accuracy of the enumeration and success of the census in all communities at grave risk," Ex. TT at 1, and that "a mandatory question on citizenship ha[d] never been necessary" to enforce the VRA, Ex. UU at 2.

Secretary Ross withheld from the Census Bureau the fact that he had been determined to add a citizenship question since early 2017. *New York*, 351 F. Supp. 3d at 566–67. As the District Court for the Southern District of New York later found, "the degree to which the origins

of the decision were kept from those who worked hard to promptly evaluate DOJ's request was unusual and noteworthy." *Id.* at 567.

## II.     Secretary Ross and Commerce Department Staff Repeatedly Misled the Public, Congress, and the Courts

On March 26, 2018, Secretary Ross issued a memorandum announcing that the 2020 Census would include a citizenship question.  In that memorandum, Secretary Ross stated that consideration of whether to add the citizenship question began with receipt of the Gary Letter in December 2017, and that the decision to add the question was made because of, and in response to, DOJ's articulation of a need to enforce the VRA. Ex. A at 1.

In fact, as the Supreme Court found, the VRA rationale was "contrived," a pretextual "distraction" intended to justify a decision that Secretary Ross had made months earlier for other reasons. *Dep't of Commerce*, 139 S. Ct. at 2575–76; *see New York*, 351 F. Supp. 3d at 570 ("Those efforts make clear that the goal of Secretary Ross and his aides was to launder their request through another agency—that is, to obtain cover for a decision that they had already made—and that the reasons underlying any request from another agency were secondary, if not irrelevant.").

Correspondence between Secretary Ross and Commerce Department staff confirms that Secretary Ross made the decision to add a citizenship question long before he received the Gary Letter.  For example, as early as May 2017, Secretary Ross expressed frustration about the failure of his staff to implement his decision, which he described even then as "months old."  Ex. W at 1.  All of Comstock's subsequent work to obtain a formal request from another agency represented efforts to execute the Secretary's decision and obscure its actual rationale.  Ex. H at 1.  Comstock knew as early as August 9, 2017, that "the [citizenship question] issue [would] go to the Supreme Court," and therefore emphasized in an email to Secretary Ross the need to "be

diligent in preparing the administrative record." Ex. BB at 1. As the District Court for the Southern District of New York observed, "the only reason to believe that 'the issue' would definitely 'go to the Supreme Court' was if Secretary Ross had decided to add the question." *New York*, 351 F. Supp. 3d at 568.

Nevertheless, Secretary Ross and other Commerce Department officials repeated the same false narrative again and again over the course of the following year. At a March 20, 2018, hearing before a House subcommittee, when asked if "the [P]resident or anyone else in the White House [had] directed [him] to add this or a similar question to the 2020 [C]ensus," Secretary Ross falsely testified that the Commerce Department was "responding solely to the Department of Justice's request." Ex. C at 3; *see also New York*, 351 F. Supp. 3d at 571–72 (finding that Ross's testimony to Congress was an attempt to "avoid disclosure of, if not conceal, the real timing and reasons for the decision to add the citizenship question" (citations omitted)). Later in the same hearing, when asked if "the President or anyone in the White House discussed with you or anyone on your team about adding this citizenship question," Secretary Ross answered, "I am not aware of any such [discussion]"—even though Secretary Ross had personally spoken with Senior White House advisor Steve Bannon about the issue in April 2017. *New York*, 351 F. Supp. 3d at 546.

On March 22, 2018, Secretary Ross again provided false testimony before a different House committee. Asked "whether the Department of Commerce plans to include the citizenship question in the 2020 Census," Secretary Ross stated: the "Department of Justice, as you know, initiated the request for inclusion of the citizenship question." Ex. B at 2.

On May 10, 2018, in a hearing before a Senate subcommittee, Senator Patrick Leahy questioned whether a citizenship question was actually "necessary to enforce the Voting Rights

Act."  He asked Secretary Ross:  "[W]hy this sudden interest in that when the department that's supposed to enforce violations doesn't see any problems?"  Secretary Ross responded:  "Well, the Justice Department is the one who made the request of us."  Ex. VV at 27.

The Commerce Department continued to advance this false account when, in April 2018, dozens of plaintiffs sued in the Southern District of New York to challenge the decision to add the citizenship question.  Compl., *New York v. U.S. Dep't of Commerce*, Docket No. 10, No. 18-cv-2921 (S.D.N.Y. Apr. 4, 2018).  To defend the suit, the Commerce Department filed with the Court an Administrative Record that purported to contain the materials Secretary Ross considered in making his decision.  That Administrative Record contained only the Gary Letter, various analyses by the Census Bureau of the request in the Gary Letter, and Secretary Ross's March 26, 2018, memorandum.  *New York*, 351 F. Supp. 3d at 530–46.  The Administrative Record that the Commerce Department initially certified contained no hint that the Secretary had considered, much less decided on, the addition of the citizenship question months before DOJ made its request.  *See id.* at 547–48.

Only at DOJ's "urging" did the Commerce Department thereafter submit to the Court more information that began to reveal the true course of events.  *Dep't of Commerce*, 139 S. Ct. at 2564.  On June 21, 2018, the Commerce Department added to the Administrative Record a one-page "Supplemental Memorandum" signed by Secretary Ross himself, which acknowledged that DOJ's request came only at the Commerce Department's prompting.  *New York*, 351 F. Supp. 3d at 547–48.

The District Court then ordered extra-record discovery resulting in the production of evidence that "reveal[ed] a very different set of events from the one described in the initial Administrative Record, the [March 2018] Ross Memo, and Secretary Ross's congressional

17

testimony." *Id.* at 548.  In fact, as the court found, the new information from the Commerce Department confirmed that "Secretary Ross's first version of events, set forth in the initial Administrative Record, the Ross Memo, and his congressional testimony, was materially inaccurate." *Id.* at 547.

The District Court, in January 2019, concluded that the record revealed a "strong showing of bad faith" and "improper behavior" by Secretary Ross and his staff, *id.* at 662 (quotation marks omitted), noting "the sheer number of ways in which Secretary Ross and his aides tried to avoid disclosure of, if not conceal, the real timing and the real reasons for the decision," *id*. at 572.  The District Court inferred "from the various ways in which Secretary Ross and his aides acted like people with something to hide that they *did* have something to hide." *Id.* at 662 (emphasis in original).

Following the District Court's decision, Secretary Ross testified before the Committee on March 14, 2019.  When asked to clarify whether his "interest in the citizenship question" related to "counting undocumented immigrants for apportionment purposes," Secretary Ross testified, "No, sir, it did not."  Ex. S at 15.  He also reiterated that the Commerce Department and Census Bureau "were responding to" DOJ's request.  *Id.*

In June 2019, the Supreme Court endorsed the District Court's finding of Secretary Ross's bad faith.   Noting that inquiry into "the mental processes of administrative decisionmakers" is permitted only upon a "strong showing of bad faith or improper behavior," the Supreme Court concluded that the district court had been "justified" in invoking that exception given the information that emerged.  *Dep't of Commerce*, 139 S. Ct. at 2573–74.

President Trump later confirmed that the Supreme Court was correct in concluding that the VRA rationale was contrived and pretextual.  When asked the "reason … for trying to get a

citizenship question on the census," President Trump directly contradicted Secretary Ross's testimony, pointing not to the VRA but instead to Congressional districting:  "You need it for Congress, for districting.  You need it for appropriations.  Where are the funds going?  How many people are there?  Are they citizens?  Are they not citizens?"  Ex. WW at 9.

### III.     Defendants Have Obstructed the Committee's Investigation and Refused to Comply with Valid Committee Subpoenas

Since the beginning of this Congress, the Committee on Oversight and Reform has investigated the Administration's efforts to add a citizenship question to the 2020 Census, the processes at the agencies involved in those efforts, and the subsequent false testimony to Congress about those efforts.  In addition to conducting oversight, the Committee is determining whether remedial legislation is required, including to safeguard the impending Census.  Ex. G at 14–15.

The investigation falls squarely within the Committee's authority.  Under the Rules of the House of Representatives, the Committee has legislative jurisdiction over "[p]opulation and demography generally, including the Census," and more broadly over the "[o]verall economy, efficiency, and management of government operations and activities."  Rules of the House of Representatives ("House Rules"), 116th Congress (Jan. 11, 2019), Rule X.1(n)(6), (n)(8); *see also* U.S. Const. Art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings[.]"); U.S. Const. Art. I § 2, cl. 3 (providing Congress with plenary power to conduct the census "in such Manner as [it] shall by Law direct").  And as the House's principal oversight body, the Committee is empowered not only to investigate subjects within its own legislative jurisdiction, *see* House Rule X.2(a), (b)(1), but also "any matter" within the jurisdiction of any of the other standing committees of the House, House Rule X.4(c)(2).  In addition, the Committee "shall review and study on a continuing basis the operation of Government activities at all levels,

including the Executive Office of the President."   House Rule X.3(i).   To "carry[] out any of [these] functions and duties," the Committee may issue subpoenas for documents or testimony "as it considers necessary."   House Rule XI.2(m)(1)(B).

### A.   The Commerce Department Has Refused to Produce Key Documents Required by the Ross Subpoena

On January 8, 2019, the Committee requested documents and information from the Commerce Department regarding the addition of the citizenship question.   *See* Ex. XX at 2–4.[4] The Committee's request targeted several relevant categories of documents, including communications regarding the Census Bureau's concerns about adding the citizenship question, analyses of the impact of the citizenship question, communications with outside and internal parties on the subject of the citizenship question, and documents relating to the budget and timing of the 2020 Census.   *Id.* at 2.   As part of that request, Chairman Cummings sought responses to several written questions and requested Secretary Ross's testimony before the Committee on February 12, 2019.   *Id.* at 1, 3–4.   The Committee's request letter explained that the Committee was focused on "ongoing preparations for the 2020 Census and [Secretary Ross's] decision to add a citizenship question—despite warnings from the Census Bureau that it could seriously harm the accuracy of the count."   *Id.* at 1.   It also expressed "serious concerns about new evidence … [that] appears to contradict [Secretary Ross's] previous testimony to Congress."   *Id.*

---

[4] Several members of the Committee began taking investigative steps in the previous Congress.   On March 27, 2018, the day after Secretary Ross announced the addition of the citizenship question, then-Ranking Member Cummings expressed concern that the "new, untested question on citizenship will increase costs for American taxpayers and decrease the accuracy of the census," as well as concern about "troubling examples of politicization at the Census Bureau."   Ex. D at 2.   The following week, on April 4, 2018, Rep. Cummings issued a document request to the Commerce Department for several categories of documents.   The Commerce Department did not comply.   The Committee subpoenaed a subset of those documents from Secretary Ross in the current Congress.   Ex. E at 1.

The Commerce Department sent a preliminary, incomplete production on January 29, 2019.  Ex. YY at 1.  This and subsequent productions primarily consisted of documents that were already publicly available, heavily redacted, or nonresponsive.  Ex. III at 20.  The Commerce Department did not provide complete responses to the Committee's written questions.  *Id.*

After discussions with the Commerce Department, the Committee agreed to reschedule the Secretary's testimony for March 14, 2019.  *See* Ex. ZZ; Ex. BBB at 2–3.  On March 5, 2019, the Commerce Department sent a letter seeking to delay the Secretary's testimony further.  The letter requested that the Committee postpone the hearing by more than six weeks so that Secretary Ross could have additional time to prepare his testimony and to produce documents.  Ex. AAA at 2–3.

Chairman Cummings responded on March 6, stating that the hearing would remain on March 14 as scheduled, but Chairman Cummings agreed to the Secretary's requests to limit the scope of the hearing, and the Committee prioritized one set of documents: "communications between or among officials from the Department of Commerce, the Census Bureau, and any other office or entity inside or outside of the government regarding the addition of a citizenship question."  The Committee emphasized that these documents were "key to [its] understanding" and that "the Committee must receive [them] in unredacted form."  Ex. BBB at 3.

At the March 14 hearing, despite having agreed in advance to answer the Committee's questions, Secretary Ross refused to describe several discussions with other Executive Branch officials regarding the citizenship question.  Ex. S at 54–55.  He also refused to commit to providing requested documents, ostensibly because of "pending litigation."  *Id.* at 20.  Chairman Cummings offered Secretary Ross five more days to "produce all of the priority documents this committee has requested."  *Id.* at 90.  Chairman Cummings explained, however, that the

Committee would not accept any argument based on ongoing litigation and that if Secretary Ross did not comply, the Committee would have no choice but to consider issuing a subpoena. *Id.* Chairman Cummings emphasized that Committee members "want[ed] to make sure that the census is done properly" and that the Committee needed "to have the documents so that [it] can do [its] job pursuant to the Constitution of the United States." *Id.*

The next day, Committee staff provided a further narrowed list of 11 priority documents and asked for their production, without redactions, by March 19, 2019. Ex. EEE at 1–2. The Committee carefully selected the 11 documents to further its legislative, investigative, and oversight interests with the least possible burden on the Commerce Department. The 11 documents included the Uthmeier Memorandum; a set of eight email chains predating the Gary Letter, and several emails in September 2017 between top Commerce Department officials about the decision to add a citizenship question; an email chain in which Commerce officials and White House officials discuss "notifying Congress on the DOJ request"; and an email chain between high-level Commerce Department officials regarding memoranda on the citizenship question, written in the weeks before Secretary Ross publicly announced the addition of that question. *Id.*

On March 19, 2019, the Commerce Department produced some documents in response to the Committee's prioritization request, but did so with significant redactions, citing the attorney-client privilege, attorney work product protections, and "the confidentiality of deliberative and pre-decisional communications among Executive Branch officials." Ex. CCC at 1. The Commerce Department stated that it did not have access to the Uthmeier Memorandum, that it had produced 10 of the 11 priority documents, and that it had withheld an attachment to one of email chains on the basis of attorney-client privilege. *Id.* at 2. The Commerce Department's

letter did not acknowledge that the 10 documents were significantly redacted, nor did it clarify how the Commerce Department could have no copy of the Uthmeier Memorandum, which Commerce Department officials had drafted in the first instance.

On March 26, 2019, the Commerce Department demanded that the Committee identify "specific, particularized information needs" for each of the requested priority documents.  Ex. FFF at 1.  Although the Committee is under no obligation to meet such a demand, Chairman Cummings replied with a detailed description of the Committee's needs.  Ex. JJJ at 3–4. Chairman Cummings explained that the Committee was seeking "contemporaneous evidence of the real reason that [Secretary Ross] added the citizenship question and the process [Secretary Ross] followed" to do so, and that the Committee's document requests were carefully tailored to focus on Secretary Ross's "instructions to [his] staff" regarding the citizenship question, his "communications on the citizenship question with senior Trump Administration officials and others," the "Department of Commerce's communications with DOJ before and after" the Gary Letter, and Secretary Ross's discussions "leading to the issuance of the pretextual decision memorandum."  *Id.*  The Commerce Department, however, continued to refuse to produce the unredacted priority documents.  Ex. III at 22.

On April 2, 2019, the Committee voted on a bipartisan basis to authorize the Ross Subpoena to compel the production of key documents, including the 11 previously identified key documents and the set of documents Chairman Cumming had requested in his letter of March 6, which were central to understanding how and why the Commerce Department developed and propagated the false VRA rationale.  Ex. KKK; Ex. LLL at 3; Ex. BBB at 3.  As an additional accommodation to the Commerce Department, the Ross Subpoena narrowed the date range for the latter set of documents to January 20, 2017 through December 12, 2017.  *Id.*

Although the Commerce Department produced additional documents, it failed to produce an unredacted copy of any of the 11 key documents.  Many of the documents it did produce were heavily redacted, did not include attachments, or were not responsive to the Ross Subpoena.  Ex. III at 22.

On May 8, 2019, Chairman Cummings again wrote to Secretary Ross, this time requesting a personal meeting to discuss the Commerce Department's actions and "to determine whether there is any way to resolve this impasse before initiating potential enforcement action." Ex. MMM at 1.  On May 20, 2019, Secretary Ross declined to meet with Chairman Cummings, instead repeating the Commerce Department's already fulfilled demand for the "particularized legislative need" for each of the documents and reasserting vague claims of Executive Branch confidentiality interests.  Ex. NNN at 1.

On June 3, 2019, following further unsuccessful attempts at resolution by Committee staff, the Committee notified Secretary Ross that it was scheduling a vote to hold him in contempt for failing to comply with the Ross Subpoena, but offered to postpone the vote if the 11 priority documents were produced without redactions by June 6, 2019.  Ex. OOO at 1, 6.

The Commerce Department produced no additional documents by the June 6 deadline.  In a letter to the Committee that evening, the Commerce Department claimed that holding Secretary Ross in contempt was "premature."  Ex. PPP at 1.  The letter purported to express a commitment to a "good-faith accommodation process," but it offered no new accommodations of any kind and instead adhered to the same privilege assertions the Commerce Department had made over priority documents.  *Id.*

The Commerce Department's actions, moreover, have belied the letter's empty claim that it was "eager to continue … cooperat[ing] with the Committee by producing additional, non-

privileged documents and information." *Id.*  In fact, the Commerce Department has abided by the White House's instruction to "fight[] all the subpoenas."  Kevin Breuninger & Christina Wilkie, *Trump: "We're fighting all the subpoenas" from House Democrats*, CNBC (Apr. 24, 2019), https://perma.cc/43AY-AD3X.  As described below, *see infra* Facts Section IV, the Commerce Department later notified the Committee that the President had asserted a blanket claim of Executive Privilege over all the remaining documents, including "an additional, significant number of documents responsive to the Committee's request" that the Commerce Department acknowledged it possessed and had been "prepared to provide" to the Committee (and therefore that the Commerce Department implicitly acknowledged were not privileged at all).  Ex. QQQ at 1.  The Commerce Department has made no additional productions in response to the Ross Subpoena.  *See* Ex. G at 2.

### B.  DOJ Has Refused to Produce Key Documents Required by the Barr Subpoena

DOJ has also refused to produce documents in response to document requests, and ultimately a subpoena, from the Committee.  *See* Ex. G at 2.[5]

On February 12, 2019, Chairman Cummings requested documents from DOJ.  Ex. SSS at 1–3.[6]  Among other categories of documents, the Committee's letter requested "[a]ll documents and communications within the Department of Justice and with outside entities regarding the request to add a citizenship question to the census, including but not limited to the White House, the Commerce Department, the Republican National Committee, the Trump Campaign, or Members of Congress."  *Id.* at 2.  The letter explained that the request was focused on the

---

[5] The Barr Subpoena demands documents that partially overlap with those demanded by the Ross Subpoena, including the Uthmeier Memorandum and communications between DOJ and the Commerce Department.  *See* Ex. LLL; Ex. RRR.

[6] Representatives Carolyn Maloney, Elijah Cummings and others had sent a similar document request to DOJ in the previous Congress, but DOJ had not complied.  Ex. F.

Committee's need to "understand the substance of DOJ's justification for requesting the addition of a citizenship question to the 2020 Census and the process by which its request was made," *id.* at 1 (quotation marks omitted), and that the Committee had also developed "grave doubts on the veracity of Secretary Ross's testimony and assertions in the December 2017 letter from DOJ to the Census Bureau," *id.* at 2.

In the weeks that followed, the Committee worked to accommodate DOJ. On March 1, the Committee identified a subset of "high-priority" documents to be produced first, including an unredacted copy of the Uthmeier Memorandum and the communications of several Commerce Department and DOJ officials regarding the citizenship question. Ex. TTT at 1.

DOJ did not provide the Uthmeier Memorandum or unredacted copies of the other priority documents. Ex. III at 19. Instead, DOJ produced documents relating to its ongoing litigation, including documents that were heavily redacted and largely publicly available. *Id.*

On March 20, 2019, Committee staff again requested the priority documents, noting that if DOJ did not commit to producing them, "the Committee will have no choice but to consider taking additional steps to ensure compliance." Ex. UUU at 1. DOJ responded two days later, stating only that it would "continue to reevaluate" the Committee's requests. Ex. VVV at 1.

On April 2, 2019, Chairman Cummings sent a letter to DOJ explaining that ongoing litigation does not preclude Congress from investigating an issue. Ex. WWW at 2.

Later that day, after the Committee took a bipartisan vote to compel the production of these documents, the Chairman issued a subpoena to DOJ. Ex. KKK; Ex. RRR. Consistent with the Committee's previous requests, the Barr Subpoena compelled production of the Uthmeier Memorandum and "[a]ll documents and communications … within the Department of Justice and with outside entities regarding the request to add a citizenship question." In a further

accommodation, the Committee narrowed the time frame to cover only January 20, 2017, to December 12, 2017.  Ex. RRR at 3.

Since that time, DOJ has produced documents that are heavily redacted, do not include attachments, and/or are not responsive to the Barr Subpoena.  Ex. III at 23.  DOJ has refused to produce the Uthmeier Memorandum or drafts of the Gary Letter.  *Id.* at 22–23.

In addition, DOJ has not produced privilege logs.   Instead, the cover letters accompanying DOJ's productions contain general disclaimers, stating that DOJ "may have made redactions relating to ongoing investigations, enforcement activities, and certain law enforcement operations, methods or techniques," and "may have made limited redactions to preserve the deliberative, attorney-client, and/or attorney-work product protections."  *See, e.g.*, Ex. XXX at 1.

On June 3, 2019, the Committee notified Attorney General Barr that it was scheduling a vote to hold him in contempt of Congress for failing to comply with the Barr Subpoena but offered to postpone the vote if a subset of the documents—in particular, the Uthmeier Memorandum and all drafts of the Gary Letter—was produced by June 6.  Ex. YYY at 6.

On June 6, DOJ sent a letter to the Committee refusing to produce the documents identified in the Barr Subpoena.  Ex. J at 2.  DOJ's letter asserted that drafts of the Gary Letter were "appropriately withheld based on the deliberative process privilege," and that the Uthmeier Memorandum was "appropriately withheld on attorney-client privilege grounds."  *Id*. at 2 n1. The letter also noted that DOJ had "identified tens of thousands more responsive pages that it [was] in the process of producing" and promised to "continue to produce documents to the Committee as appropriate."  *Id*. at 1–2.  DOJ has since made no further productions in response to the Barr Subpoena.  Like the Commerce Department, DOJ has paid lip service to the value of accommodation while in reality actively disregarding the Committee's subpoena.

**IV.    The House Held Defendants in Contempt**

On June 11, 2019, the evening before the Committee was scheduled to consider the resolution recommending that the House hold both Defendants in contempt of Congress, the Committee received a letter from Assistant Attorney General Stephen E. Boyd stating that "the Attorney General is now compelled to request that the President invoke executive privilege with respect to the materials subject to the" Barr and Ross Subpoenas.  Ex. EEEE at 2.  The letter requested that the Committee "hold the subpoenas in abeyance and delay any vote on whether to recommend a citation of contempt … pending the President's determination of this question." *Id.*  Boyd threatened that, should the Committee "proceed in spite of this request … the Department will be obliged to advise that the President assert executive privilege with respect to certain of the subpoenaed documents, and to make a protective assertion of executive privilege over the remainder of the documents," and would "be forced to reevaluate its current production efforts in ongoing matters." *Id.* at 2–3.

Nevertheless, Chairman Cummings continued to seek accommodation.  On the same day he received the Boyd letter, he wrote to Attorney General Barr to point out that the Committee had given DOJ months to respond to the Barr Subpoena and had promised to postpone the vote if DOJ and the Commerce Department began producing a small subset of high-priority documents. Ex. FFFF at 2–3.  The Chairman offered to delay the contempt vote for Attorney General Barr if he produced, on the following day, the Uthmeier Memorandum and drafts of the Gary Letter, and further offered to delay the contempt vote for Secretary Ross if he produced, on the following day, unredacted copies of the 11 priority documents.  *Id.* at 3.

The next day, the Committee received follow-up letters from Defendants, stating "that the President has asserted executive privilege" over the Uthmeier Memorandum, drafts of the Gary Letter, and the 11 priority documents, and had made a "protective assertion of executive

privilege" over the remainder of the subpoenaed documents, including over an additional, "significant" number of documents responsive to the Committee's requests that the Departments asserted they had been "prepared to provide." Ex. K at 2; Ex. QQQ at 1. DOJ's letter attached a memorandum from Attorney General Barr to President Trump concluding that all of the 11 priority documents, the Uthmeier Memorandum, and drafts of the Gary Letter were subject to the deliberative process privilege. Ex. GGGG at 4.

The Committee voted on June 12, 2019, on a bipartisan basis, to recommend that the House hold Defendants Ross and Barr in contempt of Congress. *See* Ex. HHHH; 165 Cong. Rec. 98 (daily ed. June 12, 2019), https://perma.cc/7Z6R-JS8M. The Committee's report on the contempt vote reiterated that its goal was to "fulfill its duties under the Constitution," including its "constitutional responsibility to conduct oversight of the Executive Branch," and that "the Committee's investigation may lead Congress to pursue legislation" consistent with Congress' authority to carry out the census. Ex. III at 3, 6. The Committee provided "illustrative examples" of remedial legislation, including legislation to "require the disclosure of Census questions proposed by third parties, add further protections regarding the use of Census data by federal agencies or others, mandate additional non-response follow-up procedures to prevent undercounts, [or] alter funding levels for the upcoming Census." *Id.* at 6.

The Supreme Court invalidated the citizenship question on June 27, 2019. *Dep't of Commerce*, 139 S. Ct. 2551; *see supra* Facts Section II. Even then, despite their repeated reliance on ongoing litigation as a purported basis to withhold information, Secretary Ross and Attorney General Barr refused to produce the key subpoenaed documents. *See* Ex. JJJJ.

President Trump announced on July 11, 2019, that the Administration would comply with the Supreme Court's decision. Katie Rogers *et al.*, *Trump Says He will Seek Citizenship*

*Information from Existing Federal Records, Not the Census*, N.Y. Times (July 11, 2019), https://perma.cc/S4ER-32VV.   President Trump nevertheless issued an Executive Order directing collection of citizenship data through other means.  The Order explained that the data would allow "States to design State and local legislative districts based on the population of voter-eligible citizens."  Ex. IIII at 5.  The President stated that "[s]ome states may want to draw state and local legislative districts based upon the voter-eligible population," *Remarks by President Trump on Citizenship and the Census*, White House (July 11, 2019), https://perma.cc/Z2T4-AYWJ—further undermining Secretary Ross's testimony that the rationale for the question was "solely" VRA enforcement.  Ex. C at 3.

In July, Committee staff continued to reach out to DOJ and the Commerce Department in a further effort to find common ground, but Defendants persisted in refusing to produce more documents.  Ex. KKKK at 2.  Defendants instead wrote to Speaker Pelosi to "strongly oppose the pending [contempt] resolution of the Committee on Oversight and Reform."  Ex. L at 1.  Once more, Defendants postured about their "willing[ness] to work towards an appropriate accommodation" but refused to make any actual accommodation offer with respect to the subpoenaed documents.  *Id.*  The full House voted to hold Defendants in contempt on July 17, 2019.  *See* 165 Cong. Rec. H5977 (daily ed. July 17, 2019), https://perma.cc/6VTG-LTKR.

Even after the contempt vote, Chairman Cummings reached out to both Defendants, noting that "a month has now passed, but no 'final decision' [regarding the protective assertion of privilege] has been communicated to the Committee and no additional documents have been produced."  Ex. KKKK at 4.  He stated, however, that the Committee "remains open to further discussions" and that he "strongly urge[d]" the Departments to "reconsider [their] position and comply with the Committee's subpoenas."  *Id.*  Neither Department responded to the Committee.

*See* Ex. G at 2 (reflecting that, as of November 12, 2019, neither Department had resumed productions in response to the Subpoenas or apparently resolved questions regarding the "protective" assertion of privilege).   Defendants' continued defiance of their obligations has resulted in an impasse.

**V.   The Committee Has Continued Its Investigation and Uncovered Corroborating Information, Reinforcing the Committee's Concerns**

Despite Defendants' continued obstruction, the Committee has pressed forward in its investigation and has uncovered new information—including documents and testimony relating to Neuman and Hofeller—that heightens its concerns about the integrity of the census process.

The Committee sent a document request to the Executive Director of the Trump Transition Team on June 18, 2019, seeking all Transition Team documents and communications relating to the citizenship question, including those involving Hofeller, Kobach, Hamilton, Neuman, and others.   Ex. MMMM at 3–4.   The Transition Team identified responsive documents within a matter of days but indicated that White House review for "potential Executive Branch equities or confidentiality interests" was ongoing more than a month later— even though the Committee's request is limited to a period from before President Trump took office. Ex. NNNN at 1; Ex. MMMM at 3.   No documents have been produced to date.   Ex. G at 16.

The Committee also sent a letter on June 18, 2019, to Neuman requesting his communications about the citizenship question with Hofeller and others.   Ex. OOOO at 3.   On July 2, 2019, Neuman produced previously undisclosed documents, including communications between Neuman, Hofeller, and Hofeller's business partner, Dale Oldham.   Ex. G at 10.

In addition, the Committee issued a separate request to Christa Jones, Chief of Staff at the Census Bureau, for documents dating back to January 2014.   Ex. PPPP.   In response, Jones and

the Commerce Department produced a limited set of redacted emails from her official and personal accounts, but these productions were incomplete. *See* Ex. G at 12. For example, they omitted any documents from earlier than 2018, even though Jones' communications in 2015 with Hofeller had been the subject of public reporting. *Id.*; *see also* Tr., Interview with Christa Jones, Comm. on Oversight and Reform ("Jones Interview") at 16–18 (July 31, 2019), https://perma.cc/8UMP-82FA (explaining that Hofeller had for years expressed interest in a citizenship question to assist with "the Republican redistricting effort"). Ms. Jones also testified to the Committee that she was not involved in the Commerce Department's decision to add a citizenship question to the 2020 Census, that she learned of it through news reports, and that she felt "[c]oncern for the census and the Census Bureau" because the citizenship question was a "late design change" that could hurt response rates and lead to a differential undercount. Jones Interview at 52–53.

On July 24, 2019, the Committee's Subcommittee on Civil Rights and Civil Liberties held a hearing regarding 2020 Census preparations. *See* Ex. QQQQ. In this hearing, which included testimony from the director of the Census Bureau, the subcommittee focused on the Bureau's efforts to gather citizenship data, to remediate damage to the accuracy of the count of immigrant populations caused by the effort to add a citizenship question, and to communicate with the public regarding the confidentiality and permissible uses of census data, as well as the Bureau's failure to apply its full budget to remediate chronic undercounting among communities of color. *Id.*

On November 12, 2019, then-Acting Chairwoman Maloney released a memorandum updating Committee members on the status of the investigation. The memorandum explained that the "attempted adoption [of the citizenship question] has raised a number of live concerns

relating to potential political influences on the nonpartisan census process, the Commerce Department's willingness to compromise an accurate enumeration, and both the Commerce Department's and DOJ's willingness to misrepresent their actions in connection with the Census." Ex. G at 3.  It outlined "a wide range of legislative reforms" that the Committee "may consider … based on information it is seeking as part of its investigation," but added that "[t]he Committee's efforts … are being hampered by [Defendants'] refusal to produce the documents under subpoena, thereby limiting the information Congress may consider as part of its work." *Id.* at 14–15.

The Commerce Department, meanwhile, has continued to take action to obtain citizenship data in ways that could impact the accuracy of the 2020 Census.  On September 6, 2019, the Census Bureau stated that an interagency working group would announce a plan for the collection and release of additional administrative citizenship data on March 31, 2020—the day before Census Day.   John M. Abowd, Chief Scientist & Assoc. Dir. for Research & Methodology, Census Bureau, Presentation, *Census Bureau Citizenship Data Research and Product Development* (Sept. 6, 2019), https://perma.cc/6ALQ-PXRE.

## ARGUMENT

The undisputed facts, contained in sworn testimony, judicial findings, legislative materials, and correspondence, make clear that Defendants have no valid basis for withholding information responsive to subpoenas that are lawful, binding, and central to the discharge of Congress's constitutional duties.  This Court has jurisdiction to address the Committee's suit to enforce its Article I authorities, and the Committee has Article III standing and a cause of action to seek an equitable remedy for the violation of its rights.  Summary judgment is therefore appropriate under Federal Rule of Civil Procedure 56 because there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

I.     **The Court Has Authority to Decide This Case**

A.     **The Court Has Subject Matter Jurisdiction**

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which grants original jurisdiction to the district courts for actions arising under federal law, including "all civil actions arising under the Constitution." 28 U.S.C. § 1331. The Committee seeks to enforce subpoenas for documents relevant to its investigation into maladministration of the Decennial Census. Because the Committee's "subpoenas 'derive[] implicitly from Article I of the Constitution,'" "the subpoena-enforcement claim that the [] Committee has brought to this Court for resolution … arises under the Constitution for the purpose of § 1331." *Comm. on Judiciary v. McGahn* ("*McGahn I*"), No. 19-cv-2379, 2019 WL 6312011, at *17 (D.D.C. Nov. 25, 2019) (quoting *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 64 (D.D.C. 2008)), *appeal pending*, No. 19-5331 (D.C. Cir.); *see United States v. Am. Tel. & Tel. Co.* ("*AT&T*"), 551 F.2d 384, 388–89 (D.C. Cir. 1976) (finding federal-question jurisdiction over suit concerning the enforcement of a House subcommittee's subpoena given the "fundamental constitutional rights" involved); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 17 (D.D.C. 2013) (reaching the same conclusion with respect to a suit to enforce a House subpoena).

B.     **The Committee Has Standing**

The Committee has standing to sue to enforce the Subpoenas. The D.C. Circuit held more than 40 years ago that "[i]t is clear that the House as a whole has standing to assert its investigatory power, and can designate a [Committee] to act on its behalf." *AT&T*, 551 F.2d at 391. As this binding precedent establishes, and as multiple judges of this Court have since held, the House and its duly authorized committees may sue in federal court to enforce subpoenas issued in furtherance of a Congressional investigation. *See McGahn I*, 2019 WL 6312011, at *26–29; *Holder,* 979 F. Supp. 2d at 20–24; *Miers*, 558 F. Supp. 2d at 65–78.

The Committee satisfies the requirements of Article III: it is suffering "concrete and particularized" injuries that are both "fairly traceable to" Defendants' refusal to comply with the Committee's subpoena and "redressable by a favorable ruling." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2663 (2015) (quotation marks omitted). The Constitution endows each House of Congress with investigative power that it may delegate to its committees. *See* U.S. Const., Art. I, § 1; House Rule XI.1(b)(1); XI.2(m)(1)(B). Defendants' refusal to comply with the Committee's duly issued subpoenas injures the Committee: Defendants are obstructing the Committee's investigation of pressing matters pertaining to the 2020 Census, impairing the Committee's ability to consider urgent remedial legislation and conduct necessary Executive Branch oversight, and depriving the Committee of critical information touching the core of our democratic institutions.

"[T]he injury incurred by the Committee, for Article III purposes, is [thus] both the loss of information to which it is entitled and the institutional diminution of its subpoena power," impeding its ability to function as a coequal branch. *Miers*, 558 F. Supp. 2d at 71; *see McGahn I*, 2019 WL 6312011, at *72–73; *Holder*, 979 F. Supp. 2d at 10; *see also U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998) ("[A] legislative body suffers injury when it cannot obtain information necessary to perform its constitutional legislative or judicial functions[.]"). And here, the Committee's injuries are compounded by the close connection the Constitution draws between Congress and the census, including the role the census plays in apportionment and, in particular, the express constitutional directive—stymied by Defendants—that the census be conducted "in such Manner as [Congress] shall by Law direct." U.S. Const. Art. I, § 2, cl. 3. Because the Constitution "'vests Congress,' not the Executive, 'with wide discretion over the conduct of the census,'" and because "it is only

[through] Congress's statutory delegations that the Secretary of Commerce has any authority to design and conduct the decennial census at all," the Commerce Department's "authority extends only as far as Congress has provided, ends where Congress says it ends, and can only be exercised subject to the conditions and constraints that Congress has imposed." *New York*, 351 F. Supp. 3d at 641 (quoting *Wisconsin v. City of New York*, 517 U.S. 1, 15 (1996)).

These injuries are directly caused by Defendants' defiance of the duly issued Congressional subpoenas.  A favorable ruling would redress these injuries by providing the Committee with the information to which it is entitled, reinforcing the Committee's power to compel compliance with Congressional subpoenas, and permitting the Committee to engage in informed consideration of legislation to preserve the integrity of the process that will determine its composition.

## II.      The Subpoenas Are Valid, Binding, and Judicially Enforceable

The Committee seeks to exercise rights that derive from Article I of the Constitution— the subpoena power and the concomitant right to receive information.  *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927) ("[T]he power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.").   The scope of the Committee's investigative power is "as penetrating and far reaching as the potential power to enact and appropriate under the Constitution."  *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).  The "[i]ssuance of subpoenas," in particular, is "a legitimate use by Congress of its power to investigate … [and] an indispensable ingredient of lawmaking."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 505 (1975); *see also Miers*, 558 F. Supp. 2d at 84 (Congress has the "right—derived from its Article I legislative function—to issue and enforce subpoenas, and a corresponding right to the information that is the subject of such subpoenas"); *McGahn I*, 2019 WL 6312011, at *11–12, 15 (describing the House's "well established" investigatory

power and ability "to pursue judicial enforcement of [its] duly authorized and legally enforceable requests for information").

Because the Subpoenas represent a valid exercise of Congress's constitutional rights, they are legally binding on Defendants and, absent a lawful basis for withholding, compel production of responsive documents.  And just as Article I provides each House of Congress the implied power to issue compulsory process in furtherance of its investigations, so too it grants each a cause of action to seek judicial redress of conduct that interferes with the discharge of its functions.  Numerous judges of this Court have so held.  *See, e.g.*, *McGahn I*, 2019 WL 6312011, at *29–31; *Miers*, 558 F. Supp. 2d at 78–94; *Holder*, 979 F. Supp. 2d at 22–24.

### A.   The Committee's Investigation Furthers Fundamental Constitutional Oversight and Legislative Objectives

The Barr and Ross Subpoenas are an essential part of an investigation that is squarely within the Committee's authority; they were issued pursuant to the House's rules and seek documents in furtherance of two of the Committee's most foundational responsibilities under Article I.

*First*, as the principal oversight body of the House of Representatives, the Committee is charged with overseeing the operations of the Executive Branch.  *See* House Rule X.2(a), (b)(1), House Rule X.3(i), X.4(c)(2).  Where, as here, the evidence reveals bad faith and outright dishonesty by agency officials on a matter as critical as the census, the Committee has a responsibility to "probe[] into departments of the Federal Government to expose corruption" and to understand whether the malfeasance has infected other aspects of census administration. *Watkins v. United States*, 354 U.S. 178, 187 (1957).

The Committee's oversight interest is particularly compelling in this case because Secretary Ross has repeatedly provided false information to Congress and the federal courts. *See*

*supra* Facts Section II; Ex. B at 3; Ex. C at 2–3; Ex. VV at 27; *see also New York*, 351 F. Supp. 3d at 571–72 (finding that Secretary Ross's testimony to Congress was an attempt to "avoid disclosure of, if not conceal, the real timing and the real reasons for the decision to add the citizenship question"). The Committee has a strong interest in understanding the origins and extent of that dishonesty and the participation by and coordination among DOJ, Commerce officials, and outside parties. Access to the full record concerning the attempt to add the citizenship question is particularly important for the Committee's effort to assess whether the Commerce Department (still populated by the officials who were involved in the attempted addition of the question) may be continuing to make inaccurate statements about the census process and using it to advance improper goals. *See, e.g.*, Ex. G at 7–9; Ex. XX at 1; Ex. JJJ at 3–4. Only with a complete understanding of events can the Committee exercise the full panoply of its oversight tools, including focusing public attention, having informed discussions with the Executive Branch about remedial efforts, and identifying additional areas of concern that warrant further examination.

In fact, the Executive Branch has long recognized that Congress has legitimate oversight interests in such circumstances, and executive agencies have produced documents without asserting privilege when those documents would shed light on how Congress was misled. *See* Ex. TTTT at 1, 6 (indicating that DOJ had shared more than 1,300 pages of internal deliberative material with a Congressional committee "in acknowledgment that [a previous letter from DOJ] contained inaccurate information"); *Comm. on Oversight & Gov't Reform v. Lynch*, 156 F. Supp. 3d 101, 105 (D.D.C. 2016) (noting that by sharing that material, DOJ had "acknowledged the legitimacy of the investigation" in question).

*Second*, the Committee's investigation is furthering its legislative responsibilities over the census.  *See* U.S. Const. Art. I § 2, cl. 3; House Rule X.1(n)(6), (n)(8).  The Committee is exploring a wide range of legislative reforms that may be necessary depending on the content of the subpoenaed materials and the Committee's ultimate findings.  *See* Ex. G at 14–15 (discussing categories of potential remedial legislation and citing as examples H.R. 732, H.R. 1734, and H.Amdt. 401 to H.R. 3055).  The troubling conduct unearthed thus far has caused the Committee to consider whether Title 13 of the U.S. Code, which delineates the scope of the Secretary's census authority, may require amendment, as well as whether Congress should pursue other legislative measures, such as judicially enforceable reporting obligations or emergency legislation and funding measures, to safeguard the accuracy and integrity of the 2020 Census. *See id*.

### B.    The Subpoenas Seek Documents Necessary to Complete the Investigation

While there is no legal requirement that the Committee establish a specific need for the information responsive to the Subpoenas, the need in this case is clear and compelling—and has been repeatedly communicated to Defendants.

The Ross Subpoena focuses on the 11 priority documents, one of which—the Uthmeier Memorandum—is also subject to the Barr Subpoena.  *See* Ex. LLL at 3; Ex. RRR at 3.  Both Subpoenas also compel Defendants to produce all internal and external documents and communications, from January 20, 2017, through December 20, 2017, regarding the addition of a citizenship question.  Ex. LLL at 3; Ex. RRR at 3.  That category includes DOJ's drafts of the Gary Letter.

The Committee selected the subpoenaed documents because they are central to the Committee's unresolved oversight and legislative concerns:  what were Secretary Ross's true reasons for pursuing the question; with whom inside and outside of the Commerce Department

did he interact in his efforts to add the question; how and why did he overrule independent Census Bureau experts and deny them critical information; and how and why did Secretary Ross and DOJ collaborate in concealing from Congress and the public their true objectives. *See* Ex. G at 2–3; Ex. JJJ at 3–4; Ex. XX at 1.

For example, the Uthmeier Memorandum—withheld in its entirety—is a substantive communication from the Commerce Department to DOJ that goes to the heart of the interactions between the two agencies in creating the VRA pretext. The Memorandum's delivery method— by hand and accompanied by a handwritten note, apparently to avoid leaving any digital fingerprints—suggests a contemporaneous effort to conceal its contents. *See* Gore Interview at 103–09 (describing the Uthmeier Memorandum and its method of delivery); Ex. S at 16–17 (discussing the Committee's interest in the Uthmeier Memorandum).

Eight of the 11 priority documents, while heavily redacted, similarly reflect communications among high-level Commerce Department officials about the citizenship question before receipt of the Gary Letter, which purportedly "initiated" consideration of whether to add the question. Exs. VVVV–CCCCC; Ex. B at 3. For example, the emails from May 2017 contain the following comment from Secretary Ross: "Worst of all they emphasize that they have settled with congress on the questions to be asked. I am mystified why nothing [has] been done in response to my months old request that we include the citizenship question. Why not?" Ex. WWWW at 1. Large blocks of text are completely redacted on both sides of Secretary Ross's statement, preventing the Committee from determining to whom the "they" referred and from seeing additional information regarding the Secretary's "months-old request" to his staff. *Id*. The privilege log that the Commerce Department provided states that the redacted materials in the email refers to "[p]re-decisional opinions re: census," despite the

Secretary's statement in the email itself that he had long since decided to add the citizenship question.  Ex. FFFFF at 117.[7]

The remainder of the 11 documents, also heavily redacted, appear to concern the Commerce Department's messaging to Congress and the public regarding the false rationale for adding the citizenship question.  *See* Exs. DDDDD–EEEEE.  Access to the full context and content of those communications is necessary for the Committee to assess whether it can credit assertions by the Commerce Department on census matters or instead whether, in order to counter dishonesty by Commerce Department officials, Congress must impose new reporting requirements with means of verifying the reported information.  *See, e.g.*, Ex. G at 14.

The Subpoenas' remaining categories focus on the involvement of internal and external parties in the Commerce Department's and DOJ's process for adding the citizenship question.  Ex. LLL at 3; Ex. RRR at 3.  These categories may encompass communications that are as significant as, or more significant than, the 11 key documents.  Such communications may assist the Committee in understanding the nature of the maladministration that resulted in the decision to add the citizenship question over expert objections, the process by which and reasons that DOJ provided a false rationale, *see* Ex. XX at 1, and the degree to which the census process has been politicized more generally, *see* Ex. G at 14.  Indeed, both DOJ and the Commerce Department acknowledge that there are many more responsive documents among this set ("tens of

---

[7] This is only one example of questionable assertions in the Commerce Department's privilege log.  A sentence in another of the 11 priority documents begins, "To run census," followed by a comma.  The clause that immediately follows is redacted, as are several additional lines of text.  Ex. AAAAA at 1.  The privilege log entries that most closely correlate with those emails cite "[r]edacted predecisional discussion about status of various matters unrelated to census" and "[r]edacted information with no relevance to census."  Ex. FFFFF at 58, 68.  That explanation is dubious—the redacted text appears to be about the census—and calls into question the reliability of Defendants' other redactions.

thousands" of pages in DOJ's case), but both have refused to produce them in reliance on a flawed "protective" privilege assertion.  Ex. K at 2; Ex. QQQ at 1–2; Ex. J at 2.

The Barr Subpoena also encompasses drafts of the Gary Letter—documents also withheld in their entirety.  *See* Ex. RRR at 3.  Those drafts would clarify the connection between the Gary Letter and Hofeller's draft, and with Hofeller's conclusion that redistricting based on citizenship data would politically benefit "Republicans and Non-Hispanic whites."  *See* Ex. OOO at 2–3 (describing the Committee's concerns about links between the Gary Letter and Hofeller's study); Ex. M at 9.

### III.    There Is No Valid Justification for Defying the Subpoenas

Because the Subpoenas are legally binding and enforceable, Defendants must comply unless they validly assert a legal excuse for withholding responsive documents.  In the course of the Committee's investigation, Defendants have invoked various privileges and purported confidentiality interests, including executive privilege, deliberative process privilege, attorney-client privilege, attorney work product, and "ongoing litigation."  For a number of reasons, none of those rationales justifies defiance of the Subpoenas.

### A.    Defendants' Assertion of Executive Privilege Was Overbroad and Does Not Implicate Any Constitutionally-Based Interest

On the day of the Committee's meeting to consider the contempt resolution, DOJ and the Commerce Department reported that the White House had asserted "executive privilege" over the individual priority documents and the drafts of the Gary Letter, and had also claimed a blanket "protective assertion of executive privilege" over the entirety of the other documents responsive to the Subpoenas.  Ex. K at 2; Ex. QQQ at 1.  That attempt to invoke executive privilege fails not only because it is invalid, but also because it does not encompass any constitutionally protected information.

1.      *Defendants Have Not Asserted Executive Privilege Over Most of the Responsive Documents*

With respect to the substantial but as-yet-unknown number of documents responsive to the Subpoenas' demand for relevant communications, Defendants have not actually made a valid assertion of executive privilege.  In order to assert that privilege, there must have been "actual personal consideration by [the] official" with control over the requested information and "a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege."  *Landry v. Fed. Deposit Ins. Corp.*, 204 F. 3d 1125, 1135 (D.C. Cir. 2000).  Similarly, under longstanding Executive Branch procedures, an executive privilege assertion requires a careful content-based review in support of a determination that the privilege applies to specific documents.  Mem. from Ronald Reagan, President, to the Heads of Exec. Dep'ts and Agencies, on Procs. Governing Responses to Cong'l Requests for Info. ("Reagan Memorandum") at 1 (Nov. 4, 1982) ("[E]xecutive privilege will be asserted … only after careful review demonstrates that assertion of the privilege is necessary.").[8]

Defendants did not even purport to follow those steps, which exist precisely to ensure that the privilege is asserted only where necessary and after due consideration of the gravity of invoking the Constitution as a basis to shield information from the public.  *See* Reagan Memorandum at 1 ("[E]xecutive privilege will be asserted only in the most compelling circumstances."); *United States v. Nixon*, 418 U.S. 683, 709–10 (1974) ("[P]rivileges against

---

[8] *See, e.g.*, Assertion of Exec. Privilege Over Commc'ns Regarding EPA's Ozone Air Quality Stds. and CA's Greenhouse Gas Waiver Request, 32 Op. O.L.C. 1, 1 (June 19, 2008) (stating that the Office of Legal Counsel had reviewed the documents for which assertion of executive privilege was recommended); Assertion of Exec. Privilege Concerning the Dismissal and Replacement of U.S. Att'ys, 31 Op. O.L.C. 1, 1–2 (June 27, 2007) (same); Assertion of Exec. Privilege for Docs. Concerning Conduct of Foreign Affs. with Respect to Haiti, 20 Op. Att'y Gen. 5, 5 (Sept. 20, 1996) (same).

forced disclosure, established in the Constitution, by statute, or at common law … are not lightly created nor expansively construed, for they are in derogation of the search for truth.").

Instead, Defendants cast an indiscriminate, all-encompassing cloak over internal and external communications concerning the citizenship question—including documents that both the Commerce Department and DOJ had been prepared to provide but for the contempt resolution—on the ground that they needed additional time to determine *whether* privilege applied.  Ex. K at 3; Ex. GGGG at 3 ("We also request that you make a protective assertion of executive privilege with respect to the remainder of the subpoenaed documents in order to give the Departments of Commerce and Justice time to determine whether a conclusive assertion of executive privilege would be necessary with respect to any of the remaining documents.").  But longstanding Executive Branch precedent establishes a mechanism to request additional time "to protect the privilege pending a Presidential decision" and makes clear that "the request itself does not constitute a claim of privilege."  Reagan Memorandum at 2.  Thus, even taking their reasoning at face value, Defendants have not actually made a formal (or in their terms a "conclusive") assertion of executive privilege.  Ex. GGGG at 3.[9]

Subsequent events, moreover, have called into question the sincerity of Defendants' purported rationale.  Months have passed with no apparent effort to undertake any further review and without any further productions of any documents in response to the Subpoenas—despite

---

[9] While the Executive Branch has made "protective" assertions before, there is no precedent for what Defendants attempted here.  In 1996, Attorney General Reno approved a "protective" assertion over documents from the White House Counsel's Office, but that preliminary step was followed two weeks later by an *actual* assertion of executive privilege. Assertion of Exec. Privilege Regarding White House Counsel's Off. Docs., 20 Op. Att'y Gen. at 2 (May 23, 1996).  The formal assertion was based not only on a particularized, careful review of the specific documents at issue—materials that, unlike those responsive to these Subpoenas, actually involved White House communications—but also on a judgment about Congressional need for the information.

additional outreach from the Committee following the Departments' privilege assertion and the House's contempt vote.  *See* Ex. KKKK at 4.[10]  Defendants have apparently used a "protective" assertion simply as an excuse to conceal the documents without undertaking the analysis of whether to make an actual assertion.

    2.    *The Only Constitutional Form of Executive Privilege Is Inapplicable*

Even as to the documents for which they specifically claim executive privilege (the priority documents and drafts of the Gary Letter), Defendants mischaracterize the nature of the privilege and misconceive its relevance to this case.  According to Defendants, the specified documents were "clearly protected from disclosure by the deliberative process, attorney-client communications, or attorney work product components of executive privilege."  Ex. QQQ at 1; Ex. K at 2.  But all three privileges are common law doctrines that, as discussed below, *see infra* Argument Section III(B), cannot excuse compliance with a constitutionally-based Congressional subpoena.

"Since the beginnings of our nation, executive officials have claimed a variety of privileges to resist disclosure of information the confidentiality of which they felt was crucial to fulfillment of the unique role and responsibilities of the executive branch of our government."  *In re Sealed Case* ("*Espy*"), 121 F.3d 729, 736 (D.C. Cir. 1997).  Only one such privilege, the Presidential communications privilege, "derive[s] from the supremacy of each branch within its own assigned area of constitutional duties."  *Nixon*, 418 U.S. at 705.  That privilege recognizes "[t]he President's need for complete candor and objectivity from advisers."  *Id.* at 706.  The D.C. Circuit has distinguished the Presidential communications privilege from other Executive Branch

---

[10]  At the December 13, 2019 status conference in this case, counsel for Defendants apparently conceded that, thus far, no attempt at such a review had been made:  "[W]e don't even know how many documents there are.  I mean, they would have to be reviewed on a document-by-document basis."  Tr. of Status Conf. at 30 (Dec. 13, 2019), Docket No. 14.

confidentiality interests on the ground that the former is "rooted in constitutional separation of powers principles and the President's unique constitutional role." *Espy*, 121 F.3d at 745.

Defendants have not asserted any valid claim of Presidential communications privilege. The President is not alleged to have been a party to the communications identified in the Subpoenas, and Defendants have not asserted that Presidential communications are among the responsive documents.   To the contrary, Secretary Ross has explicitly represented to the Committee in writing that "[n]o officials from the White House were a part of" the process of adding a citizenship question to the 2020 Census.  Ex. HHHHH at 1.  By definition, then, the responsive documents do not fall within the scope of the constitutionally-based form of executive privilege.

### B.    Common-Law Privileges Are Not Valid Grounds for Defying Congressional Subpoenas

Because this case does not involve Presidential communications, it concerns only the assertion of non-constitutional privilege doctrines developed in the context of judicial proceedings.   Those common law privileges do not justify refusal to produce responsive information to Congress.

The Subpoenas are backed by Congressional authority derived directly from Article I of the Constitution, which is "the supreme law of the land."   U.S. Const. Art. VI cl. 2.   It is foundational that statutes supersede common law, *see, e.g.*, *City of Milwaukee v. Ill.*, 451 U.S. 304, 313 (1981), and that the federal Constitution trumps both.  As James Madison explained, "[if] the common law be admitted as … of constitutional obligation, it would confer on the judicial department a discretion little short of a legislative power … [which] would be permanent and irremediable by the [L]egislature….   A discretion of this sort has always been lamented as incongruous and dangerous."   Rep. on the Va. Resols., H. of Delegates, Sess. of 1799–1800,

Concerning Alien and Sedition Laws, in 6 *Writings of James Madison* 380–81 (G. Hunt ed. 1906).

Authorities on common law privileges thus have acknowledged that "a legislative determination of a need for less confidentiality … would prevail over the common-law rule." Restatement (Third) of the Law Governing Lawyers § 74.  The common law attorney-client privilege, work product doctrine, and deliberative process privileges therefore yield to the Committee's exercises of its constitutional subpoena power.  *See In re Sealed Case*, 676 F.2d 793, 808 (D.C. Cir. 1982) (the attorney-client privilege and work product doctrine are "common law privileges"); *Landry*, 204 F.3d at 1135 (the deliberative process privilege is a "common law" privilege); *Espy*, 121 F.3d at 745 (the deliberative process privilege "originated as a common law privilege"); *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 772 (D.C. Cir. 1978) (the "deliberative process privilege" is a "common-law" privilege); *see also Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 773 (D.C. Cir. 1988) ("The common law discovery privilege at issue is the executive or deliberative process privilege.").[11]

Although Congress entertains common-law privilege assertions on a discretionary, case-by-case basis, it has long refused to recognize any *right* to assert such privileges against Congress.  Early Congresses adopted many of the practices of the British Parliament, which did

---

[11] One decision of this Court has entertained the assertion of deliberative process privilege in response to a Congressional subpoena.  *Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665, at *1–2 (D.D.C. Aug. 20, 2014) (citing *Espy*, 121 F.3d at 737 n.4); *see also Lynch*, 156 F. Supp. 3d at 115.  The Supreme Court, however, has been clear that an executive confidentiality interest is "constitutionally based" "*to the extent* [that the] interest relates to the effective discharge of a President's powers." *Nixon*, 418 U.S. at 711 (emphasis added).  And even if, as a general matter, the deliberative process privilege could be asserted against Congress, it should not be extended to documents and communications relating to matters that the Constitution places squarely under Congress' authority, such as the census. U.S. Const. Art. 1, § 2, cl. 3.

not recognize common law privileges.  *See, e.g.*, Luther Stearns Cushing, *Elements of the Law & Prac. of Legislative Assemblies in the U.S. of Am.*, § 983 (1856) ("A witness cannot excuse himself from answering, on the ground that ... the matter was a privileged communication to him.").  In 1857, the Senate debated common law privileges in connection with a bill to "more effectually ... enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to discover testimony."   Cong. Globe, 34th Cong., 3d Sess. 434 (1857). After a Senator objected strenuously that the bill "gives no protection to confidential communications between counsel and client," *id.* at 435, another pointed out that "[e]ither the House of Commons or House of Lords can extract [privileged] communications" under English law, and another argued that "[i]t is perfectly competent for Congress … to alter common law rules," *id.* at 436.  Subsequently, an amendment was proposed to provide that the act would "not be construed so as to deprive any witness of such privileges as are allowed to witnesses by the rules of the common law," *id.* at 439.  The Senate overwhelmingly rejected the amendment and passed the bill.  *Id.* at 443, 445.

In 1977, when a House subcommittee rejected a witness's assertion of attorney-client privilege, Chairman John Moss observed that "the commonwealth precedents … fully sustain rejecting a claim of attorney-client privilege if it impedes in any manner whatsoever the necessary inquiries of the Congress."  *Int'l Uranium Cartel: Hr'gs Before the Subcomm. on Oversight and Investigations of the H. Comm. on Interstate and Foreign Commerce*, 95th Cong., vol. I at 46, 123 (1977).   More recently, then-Chairman Chaffetz and Ranking Member Cummings reiterated the longstanding, bipartisan position of this Committee:  "The House of Representatives derives its authority from the United States Constitution and is bound only by the privileges derived therefrom.…   [N]either the Committee nor the United States House of

Representatives recognizes purported non-disclosure privileges associated with the common law." Ex. GGGGG at 1. Notably, in the Freedom of Information Act, although Congress permitted the Executive Branch to withhold information from the public under the deliberative process privilege, *see* 5 U.S.C. § 552(b)(5), Congress specified that the Act "is not authority to withhold information from Congress," *id.* § 552(d).

The Supreme Court likewise has recognized the unique nature of Congressional proceedings in *Hannah v. Larche*, which held that "when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used." 363 U.S. 420, 442 (1960). The Court noted by way of comparison that "only infrequently have witnesses appearing before congressional committees been afforded the procedural rights normally associated with an adjudicative proceeding." *Id.* at 445; *see also In re Provident Life & Accident Ins. Co.*, No. 1-90-219, 1990 U.S. Dist. LEXIS 21067, at *6–7 (E.D. Tenn. June 13, 1990) (noting that "Congress … stands as a separate and co-equal branch of government which is capable of making its own determinations regarding privileges asserted by witnesses before it," and that the court's ruling on attorney-client privilege was "not of constitutional dimensions, [and] is certainly not binding on the Congress of the United States").

### C.    The Asserted Common Law Privileges Do Not Apply Here

Not only do Congressional subpoenas override the deliberative process and attorney-client common law privileges Defendants invoke as a general matter, but those privileges also do not apply here for several key reasons.

#### 1.    *The Documents Lie Outside the Privileges*

Neither the deliberative process privilege nor the attorney-client privilege covers the subpoenaed documents. The deliberative process privilege encompasses only communications

that were created *before* an agency decision has been made. *Espy*, 121 F.3d at 737; *see, e.g.*, *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("In deciding whether a document should be protected by the [deliberative process] privilege we look to whether the document is 'predecisional'—*whether it was generated before the adoption of an agency policy*—and whether the document is 'deliberative'—whether it reflects the give-and-take of the consultative process." (emphasis added)). But as the District Court for the Southern District of New York has found as a factual matter, *see New York*, 351 F. Supp. 3d at 567, and as the evidence confirms, Secretary Ross made the decision to add the citizenship question early in his tenure; by May 2017, he was already describing that decision as "months old" and venting frustration that it had not been implemented, *see* Ex. W at 1.

As a matter of law, even if it otherwise applied, the deliberative process privilege would not shield any Commerce Department document post-dating Secretary Ross's decision early in 2017. *See Coastal States Gas Corp.*, 617 F.2d at 866. Nor was DOJ debating any policy decision at the time it was drafting the Gary Letter or the other documents the Subpoenas request. As the Southern District of New York determined, Secretary Ross and his aides were merely engaged in an effort to "launder their request through another agency—that is, to obtain cover for a decision that they had already made." *New York*, 351 F. Supp. 3d at 570. That DOJ understood this, and was not genuinely deliberating potential VRA policy, is clear from a September 2017 email in which DOJ agreed to "do whatever you all need us to do" because "[t]he AG is eager to assist." Ex. FF at 1. Defendants' efforts to redact or withhold documents therefore do not serve the deliberative process "privilege's ultimate purpose, which is to prevent injury to the quality of agency decisions." *Espy*, 121 F.3d at 737 (alterations omitted) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)).

Application of the deliberative process privilege is also limited to cases in which the government's decisionmaking process is a collateral issue. "If the plaintiff's cause of action is directed at the government's intent … it makes no sense to permit the government to use the privilege as a shield…. If Congress creates a cause of action that deliberatively exposes government decisionmaking to the light, the privilege's raison d'être evaporates." *In re Subpoena Duces Tecum Served on Office of Compt. of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998) (finding "no need to engage in the balancing test applied in deliberative process privilege cases" where a cause of action turned on the government's intent), *aff'd on reh'g*, 156 F.3d 1279, 1279–80 (D.C. Cir. 1998) (distinguishing the case from an "ordinary APA cause of action" in which "the actual subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior").

That principle applies here. As a result of repeated false statements by the Executive Branch, Congress's investigation concerns Defendants' true reasons for a decision and the process by which they adopted and espoused a false rationale. Entertaining an assertion of privilege over exactly those topics would undermine not only the immediate investigation but also Congress's ability to oversee Executive Branch agencies and officials in situations where oversight is needed most.

Defendants similarly fail in meeting their "burden of proving that the communications are protected" by the attorney-client privilege. *In re Lindsey* ("*Lindsey I*"), 148 F.3d 1100, 1106 (D.C. Cir. 1998). The context suggests that the documents instead reflect discussion of the "political" or "strategic" issue of how to conceal the rationale for a decision already made, as opposed to the kind of legal advice protected by privilege. *Id.* Defendants also fail to tailor their privilege assertions, withholding several documents in full. But "the attorney-client privilege

must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'"  *Id.* (quoting *In re Sealed Case*, 676 F.2d at 807 n.44).   Moreover, like the deliberative process privilege, the attorney-client privilege cannot be indiscriminately applied to a broad swath of information without particularized privilege determinations.[12]

2.   *Common Law Privileges Cannot Be Used to Hide Government Misconduct*

The D.C. Circuit has held that "[w]here there is reason to believe the documents sought may shed light on government misconduct, the [deliberative process] privilege is routinely denied" and "disappears altogether."   *Espy*, 121 F.3d at 738, 746; *see also id.* at 749 ("The argument for a narrow construction [of executive privilege] is particularly strong in cases like this one where the public's ability to know how its government is being conducted is at stake."); *cf. In re Subpoena Served Upon Compt. of Currency*, 967 F.2d 630, 634 (D.C. Cir. 1992) ("Even when asserted to protect deliberative material, the privilege may be overridden ... to shed light on alleged government malfeasance, or in other circumstances when the public's interest in effective government would be furthered by disclosure." (citations omitted)).   Similarly, "an attorney's opinion work product cannot be privileged if the work was performed in furtherance

_____

[12]   Although the District Court for the Southern District of New York made certain privilege rulings in civil litigation with respect to certain of the documents at issue, those rulings are not transferable to this interbranch dispute.   As explained above, the constitutional authority Congress asserts through the subpoenas overrides common law privileges that apply in civil litigation.   *See supra* Argument Section III(B); *see also Lindsey I*, 148 F.3d at 1108 (noting that government lawyers have an "allegiance to the principles embodied in" the Constitution).   Any balancing test applied to the plaintiffs in the civil litigation would not extend to Congress, which has significant need for the documents to complete its investigative, oversight, and legislative duties.   In any event, subsequent developments, including Judge Furman's own opinion and the Supreme Court's opinion, have confirmed that Defendants engaged in wrongdoing—including giving false information to Congress and the courts about the process that led to the addition of the citizenship question—that undercuts the privileges.   *See infra* Argument Section III(C)(2).   Because Judge Furman did not issue written opinions describing his reasoning in detail, moreover, these rulings also have limited, if any, precedential value in this matter.   *See, e.g.*, Order, No. 18-cv-2921 (S.D.N.Y. Sept. 30, 2018), Docket No. 361.

of a crime, fraud, or other type of misconduct fundamentally inconsistent with the basic premises of the adversary system." *In re Sealed Case*, 676 F.2d at 812. The same exception applies to attorney-client communications. *See, e.g.*, *Clark v. United States*, 289 U.S. 1, 15 (1933).

The record demonstrates that, in the course of attempting to add the citizenship question, the Executive Branch made misleading statements to Congress, the federal courts, and the American people. *See, e.g.*, Ex. B at 3; Ex. C at 2–3; Ex. S at 15; Ex. PP at 1; Ex. VV at 27; *New York*, 351 F. Supp. 3d at 548. The Supreme Court, after observing that "a strong showing of bad faith or improper behavior" is required to authorize inquiry into "the mental processes of administrative decisionmakers," concluded that the district court was "justified" in authorizing extra-record discovery. *Dep't of Commerce*, 139 S. Ct. at 2573–74; *see New York*, 351 F. Supp. 3d at 662. The evidence also raises serious questions about whether, among other things, the Executive Branch had an unconstitutional motive—such as furthering the ability to draw legislative boundaries "advantageous" to "Non-Hispanic Whites"—when it added the citizenship question to the 2020 Census. *See* Ex. OOO at 2–3 (quoting Ex. M at 9). President Trump's comments that the goal of the question was "districting" make that inquiry all the more pressing. Ex. WW at 9.

The subpoenaed materials go to the heart of this misconduct. As set out in detail in Facts Section III, *supra*, the materials are focused on Secretary Ross's true reasons for pursuing the citizenship question; with whom inside and outside of the Commerce Department he interacted in his efforts to add the question; how and why he overruled independent Census Bureau experts and denied them critical information; and how and why Secretary Ross and DOJ collaborated in concealing from Congress and the public their true objectives. Each of the documents requested thus specifically relates to the origins of and the reasons for perpetuating the false statements.

Indeed, the history of this matter makes Defendants' appeal to secrecy uniquely inappropriate. Among the government misconduct here is the very same attempt at concealment that Defendants are now seeking to advance by cloaking their communications in privilege. This Court should not permit Defendants to continue their concealment in yet another forum.

3.      <em>The Committee's Need Overcomes Any Asserted Privilege</em>

For each of the reasons set forth above, as a matter of well-settled law, this case does not require the judiciary to engage in any delicate balancing between valid constitutional interests asserted by two different branches. Congress is asserting core constitutional interests, while Defendants are relying only on non-constitutional evidentiary privileges based on the common law—and even those lesser privileges do not apply on the facts here. But if this Court were to engage in a weighing of competing interests, that exercise would not be difficult: the Committee's need for the documents, and the public's strong interest in disclosure, would easily overcome Defendants' interest in continued secrecy.

Even where it applies, the deliberative process privilege is a "qualified privilege and can be overcome by a sufficient showing of need." *Espy*, 121 F.3d at 737; *see also Holder*, 2014 WL 12662665, at *2 ("This is a lower threshold to overcome than the privilege that covers Presidential communications." (citing *Espy*, 121 F.3d at 745)). The same is true of attorney work product, and the attorney-client privilege is subject to analogous limits in the government context. *See In re Lindsey* ("*Lindsey II*"), 158 F.3d 1263, 1278 (D.C. Cir. 1998) ("[W]e do not believe that lawyers are more important to the operations of government than all other officials,

or that the advice lawyers render is more crucial to the functioning of the [Executive Branch] than the advice coming from all other quarters.").[13]

The Committee's interests readily outweigh any countervailing concerns. As explained above, *supra* Facts Section III and Argument Section II, the Committee's investigation is critical to the Committee's ongoing legislative and oversight work. "The public interest in honest government and in exposing wrongdoing by government officials," *Lindsey I*, 148 F.3d at 1102, is central to Congressional oversight, and the Committee cannot complete its investigation without full access to the documents concerning Secretary Ross's abuse of delegated authority, his efforts to mislead, and his manipulation of the census process. *See, e.g.*, *Trump v. Deutsche Bank AG*, 943 F.3d 627, 674 (2d Cir. 2019) (recognizing "[t]he hardship for [a Congressional] Committee … [that] would result from the loss of time to consider and act upon the material disclosed pursuant to [its] subpoenas, which will expire at the end of the 116th Congress," and noting that "the Committees have already been delayed in the receipt of the subpoenaed material since April 11 when the subpoenas were issued" and "need the remaining time to analyze the material, hold hearings, and draft bills for possible enactment"), *cert. granted*, No. 19-760 (Dec. 13, 2019). And, as described in Facts Section III and Argument Section II, *supra*, the documents demanded by the Subpoenas are critical to the Committee's investigation. Defendants' refusal to produce any documents in response to the Ross Subpoena and Barr Subpoena since the contempt

---

[13] While the attorney-client privilege is typically absolute, "the government attorney-client privilege is not recognized in the same way as the personal attorney-client privilege." *Lindsey II*, 158 F.3d at 1272. "[A]lthough the traditional privilege between attorneys and clients shields private relationships from inquiry in either civil litigation or criminal prosecution, competing values arise" when one agency of the government asserts the privilege in resisting demands from another. *Id.* at 1271–72 (holding that a Deputy White House Counsel may not assert the attorney-client privilege before a federal grand jury if attorney-client communications contain information pertinent to possible criminal violations).

vote confirms the Committee's inability to obtain the evidence it seeks absent judicial intervention.

The Committee's need for the documents also aligns with the "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp. v. Fed. Trade Comm'n*, 589 F.2d 582, 594 (D.C. Cir. 1978); *see also Deutsche Bank*, 943 F.3d at 674 ("The public interest in vindicating the Committees' constitutional authority is clear and substantial."); *Comm. on Judiciary v. McGahn* ("*McGahn II*"), No. 19-cv-2379, 2019 WL 6463406, at *6 (D.D.C. Dec. 2, 2019) ("[W]hen a committee of Congress seeks testimony and records by issuing a valid subpoena in the context of a duly authorized investigation, it has the Constitution's blessing, and ultimately, it is acting not in its own interest, but for the benefit of the People of the United States." (quotation marks omitted)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (noting the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." (quotation marks omitted)).

That interest is particularly acute when Congress is working to ensure that the Decennial Census process is free from improper partisan influences. The stakes for the House—and for the American people—could not be higher. The Decennial Census is "one of the most critical constitutional functions our Federal Government performs," 1998 Appropriations Act, Pub. L. No. 105-119, Title II, § 209(a)(5), 111 Stat. 2480, 2440–81 (1997). It is a "mainstay of our democracy," *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring), that is the basis for apportioning Congressional seats and more than $1.5 trillion in annual funding for federal programs and services. If maladministration of the 2020 Census goes undetected or unremedied because the Committee's investigation cannot proceed, the effects will be felt for at

least a decade, and once complete, the damage to the Census is irreparable.  *See Espy*, 121 F.3d at 737–38 (citing the "seriousness of the litigation" as a potential factor to be considered with respect to the deliberative process privilege).   Congress must be fully informed about that maladministration so that it may act quickly, intelligently, and with the least possible disruption to an ongoing process.  *See Murphy v. U.S. Dep't of Army*, 613 F.2d 1151, 1158 (D.C. Cir. 1979) ("Congress … must have the widest possible access to executive branch information if it is to perform its manifold responsibilities effectively.").

On the other side of the scale, disclosure of the documents will not harm Defendants because "compliance with a valid subpoena that a committee of Congress issues pursuant to Article I investigative powers is itself a legal duty, and therefore not an injury at all."  *McGahn II*, 2019 WL 6463406, at *4; *see also DL v. District of Columbia*, 194 F. Supp. 3d 30, 98 (D.D.C. 2016) (finding that an injunction requiring a party "to do nothing more than comply with its legal obligations cannot, by definition, harm it" (citing *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986) (noting the "injunction merely seeks to prevent the defendants from shirking their responsibilities")).   Defendants have no more valid interest in defying the Committee's subpoenas than they would have in "enforcement of an unconstitutional law," which "is always contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

Even if Defendants could claim cognizable harm from compliance with a lawful subpoena, any such harm would be extremely limited.  In the "unusual circumstances" here, *see Dep't of Commerce*, 139 S. Ct. at 2576, where Defendants have already been found to have acted improperly and in bad faith,[14] disclosure of the subpoenaed documents could have no long-term

---

[14] As discussed above, *supra* Argument Section III(C)(2), the evident misconduct at issue is an independent reason for rejecting any claimed harm from disclosure of the documents.  *See*

chilling effect or impact on executive policy discussions.  *See, e.g.*, *Espy*, 121 F.3d at 737–38 (citing the "possibility of future timidity by government employees" as a factor in assessing whether deliberative process privilege is overcome).  Indeed, the Supreme Court's decision in *Department of Commerce* "marks the first [and only] time the Court has ever invalidated an agency action as 'pretextual.'"  139 S. Ct. at 2583 (Thomas, J., dissenting) (stating that the decision should be "understood as an aberration—a ticket good for this day and this train only"); *cf. Nixon*, 418 U.S. at 712 ("We cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution.").

Any harm to the Executive Branch here would be less severe than harms courts have previously deemed outweighed by other interests, such as the fair administration of justice in an individual trial.  *See Nixon*, 418 U.S. at 715 (noting the "singularly unique role under Art. II of a President's communications and activities" (citing *United States v. Burr*, 25 F. Cas. 187 (C.C.D. Va. 1807) (Marshall, C.J.)); *Judicial Watch Inc. v. Dep't of Justice*, 365 F.3d 1108, 1115 (D.C. Cir. 2004) ("The same confidentiality and candor concerns calling for application of the [P]residential communications privilege in [other cases] do not apply as forcefully" to documents that "undergo various stages of intermediate review before … [they] are submitted for consideration by the President and his immediate White House advisers" or to documents that "never mak[e] their way to the Office of the President.").

Defendants have themselves diluted the asserted interests in confidentiality by releasing numerous statements regarding their decisionmaking and selectively denying certain allegations.

---

*In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 145 (D.C. Cir. 2015) (explaining that a claim of privilege cannot be used "as a tool for manipulation of the truth-seeking process" (quotation marks omitted)).

For example, a DOJ spokesperson stated in May that Hofeller's study "played no role in the Department's December 2017 request to reinstate a citizenship question to the 2020 Decennial Census." Hansi Lo Wang, *GOP Redistricting Strategist Played Role in Push for Census Citizenship Question*, NPR (May 30, 2019), https://perma.cc/S9HQ-99Y5. The Commerce Department similarly wrote to the Committee in June that "[n]either the press coverage nor the [civil litigation] plaintiffs' baseless allegations connect Hofeller and his ideas to the Department or the Secretary, because no such connection exists." Ex. PPP at 2. With respect to the involvement of other persons and entities in developing the citizenship question, the White House has publicly stated that the decision to add the citizenship question "was made at the department level." *WH says it wasn't behind census change*, Associated Press (Mar. 27, 2018), https://perma.cc/SWA2-N5UM. And, as discussed above, *supra* Facts Section II, Secretary Ross has made misleading statements in multiple settings about the origins, purpose, and process for adding the question. *See* Ex. B at 3; Ex. C at 2–3; Ex. VV at 27. The Executive Branch cannot simultaneously make public representations about these events while claiming that it would be harmed by disclosure of the facts.

### D.     Defendants Cannot Withhold Documents Based on Their Purported Relevance to Civil Litigation

Finally, both DOJ and the Commerce Department have cited confidentiality concerns arising from ongoing civil litigation as a basis for refusing to comply with the Subpoenas, but there is no "ongoing litigation privilege" that would permit defiance of a Congressional subpoena.

The Supreme Court has repeatedly recognized that, because Congress exercises constitutional authority independent from any civil lawsuit, parallel litigation neither precludes Congress from investigating nor provides a valid defense to a Congressional subpoena. As the

Court explained in *Hutcheson v. United States*, "a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, or when crime or wrongdoing is disclosed." 369 U.S. 599, 618 (1962) (citing *McGrain*, 273 U.S. at 179–180, and *Sinclair v. United States*, 279 U.S. 263, 295 (1929)); *see Sinclair*, 279 U.S. at 295 ("[Congress' authority], directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits."), *overruled on other grounds*, *United States v. Gaudin*, 515 U.S. 506 (1995).

In any event, the Supreme Court has resolved the challenge to the citizenship question, affirming the District Court for the Southern District of New York's ruling that Secretary Ross's decision was illegal absent a genuine rationale. *See generally Dep't of Commerce*, 139 S. Ct. 2551. Defendants have since abandoned their effort to add the question to the 2020 Census, and the White House has declared that it will seek citizenship information through other means. In light of these developments, while the Committee's concerns have only grown with time, the litigation that purportedly paralleled the Committee's investigation is substantively complete.[15] Accordingly, even if an ongoing litigation privilege existed, Defendants could no longer plausibly invoke it as a reason to withhold information from the Committee.

## CONCLUSION

The Court should grant summary judgment to the Committee; declare that Defendants' proffered justifications for withholding documents are inapplicable and invalid; declare that Defendants' failure to produce responsive documents in their entirety and in unredacted form is

---

[15] The only remaining aspects of the litigation are sanctions motions, which are pending before the Southern District of New York. *See, e.g.*, NYIC Pl.'s Reply Br. in Supp. of Mot. for Sanctions, *New York*, No. 18-cv-2921 (S.D.N.Y. Aug. 9, 2019), Docket No. 654.

without legal justification; and expeditiously issue a permanent injunction ordering Defendants to produce immediately to the Committee copies of all documents responsive to the Subpoenas in unredacted form.

Respectfully submitted,

*/s/ Douglas N. Letter*
Douglas N. Letter (DC Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Associate General Counsel*
Josephine Morse (DC Bar No. 1531317)
   *Associate General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
   *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone: (202) 225-9700
douglas.letter@mail.house.gov

David A. O'Neil (DC Bar No. 1030615)
Anna A. Moody (DC Bar No. 1047647)
Laura E. O'Neill (DC Bar No. 1033764)
Nathaniel Johnson (DC Bar No. 241433) (*D.D.C.*
   *admission application pending*)

DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave., N.W.
Washington, DC  20004
Telephone: (202) 383-8000

*Counsel for Plaintiff the Committee on Oversight*
   *and Reform, U.S. House of Representatives*

December 17, 2019