**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND
    REFORM, UNITED STATES HOUSE
    OF REPRESENTATIVES,

        *Plaintiff*,

    v.

WILLIAM P. BARR, in his official capacity as
    Attorney General of the United States,
    *et al.*,

        *Defendants*.

No. 19-cv-3557 (RDM)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
MOTION FOR EXPEDITED SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' CROSS-MOTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 5

I.     This Court Has Jurisdiction over This Case ..................................................... 5

       A.     The Committee Has Article III Standing ............................................... 6

              1.     The Committee Has Suffered Injury in Fact ............................... 6

              2.     Defendants' Standing Arguments Are Meritless ...................... 10

       B.     This Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331 ............. 16

       C.     The Committee Is Entitled to Seek Judicial Enforcement of Its Subpoena ......... 22

II.    The Committee's Subpoenas Fall Squarely within Congress's Constitutional Authority 26

       A.     The Subpoenas Seek Information Relevant to Legislation ................... 26

       B.     The Subpoenas Seek Information Relevant to Oversight ..................... 32

III.   No Form of Executive Privilege Permits Defendants to Withhold the Priority Documents
       from Congress ................................................................................................. 35

       A.     The Privileges Defendants Invoke Cannot Block a Congressional Investigation
              Into Executive Branch Misconduct ........................................................ 35

       B.     The Privileges Defendants Invoke Over the Priority Documents Do Not Apply on
              These Facts or Justify Defiance of the Subpoenas ................................ 42

       C.     The Committee's Need for the Disclosure of the Priority Documents Far
              Outweighs Defendants' Desire for Secrecy .......................................... 47

IV.    Defendants Have No Valid Basis for Withholding the Remaining Documents ............... 51

       A.     The Parties Are at an Impasse and the Case Is Ripe for Adjudication ................ 51

       B.     The Subpoenas Are Appropriately Tailored ......................................... 53

CONCLUSION .............................................................................................................. 58

## **TABLE OF AUTHORITIES**

**Cases**

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014)................................................21

*Alexander v. Fed. Bureau of Investigs.*, 186 F.R.D. 170 (D.D.C. 1999) ......................................36

*Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011)............................................................................25

*Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652 (2015) ...........................10, 11

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015)..................................22, 23, 24

*Barenblatt v. United States*, 360 U.S. 109 (1959) ........................................................7, 27, 41, 42

*Bloche v. Dep't of Def.*, 279 F. Supp. 3d 68 (D.D.C. 2017) ....................................................43, 44

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..............................................................................................16

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000).......................................................................11

*Carroll v. Safford*, 44 U.S. (3 How.) 441 (1845)..........................................................................24

*Checkosky v. Secs. & Exch. Comm'n*, 23 F.3d 452 (D.C. Cir. 1994) .............................................44

*Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367 (2004)....................49, 54, 55, 56

*Chenoweth v. Clinton*, 181 F.3d 112 (D.C. Cir. 1999) .................................................................11

*Comm. on Judiciary v. McGahn*, No. 19-cv-2379 (KBJ), 2019 WL 6312011
    (D.D.C. Nov. 25, 2019).......................................................................................... *passim*

*Comm. on Judiciary v. McGahn*, 407 F. Supp. 3d 35 (D.D.C. 2019).............................................54

*Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53 (D.D.C. 2008) ....................................... *passim*

*Comm. on Judiciary v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) .......................................................9

*Comm. on Oversight & Gov't Reform, U.S. House of Representatives v. Lynch*,
    156 F. Supp. 3d 101 (D.D.C. 2016) .................................................................................34

*Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1 (D.D.C. 2013)...........9, 17, 40

*Comm. on Oversight & Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL
    12662665 (D.D.C. 2014) ...........................................................................................39, 49

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532
    F.3d 860 (D.C. Cir. 2008)................................................................................................49

*Deakins v. Monaghan*, 484 U.S. 193 (1988)............................................................51

*Dellums v. Powell*, 561 F.2d 242 (D.C. Cir. 1977)................................................49

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ..................................*passim*

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975)...........................6, 16, 33

*Ex Parte Young*, 209 U.S. 123 (1908) ...................................................................23

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)..................................................50

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477
    (2010)...................................................................................................................23

*Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836 (9th Cir. 2011) .........17

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308
    (1999)...................................................................................................................24

*Hannah v. Larche*, 363 U.S. 420 (1960)...............................................................42

*In re Grand Jury*, 475 F.3d 1299 (D.C. Cir. 2007)...............................................36

*In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998).....................................................46

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998).....................................................48

*In re Provident Life & Accident Ins. Co.*, No. 90-cv-219, 1990 U.S. Dist. LEXIS
    21067 (E.D. Tenn. June 13, 1990)..................................................................42

*In re Sealed Case*, 107 F.3d 46 (D.C. Cir. 1997)..................................................37

*In re Sealed Case (Espy)*, 121 F.3d 729 (D.C. Cir. 1997) ..................................*passim*

*In re Sealed Case*, 223 F.3d 775 (D.C. Cir. 2000)................................................36

*In re Sealed Case*, 676 F.2d 793 (D.C. Cir. 1982)................................................48

*In re Sealed Case*, 754 F.2d 395 (D.C. Cir. 1985)................................................36

*In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*,
    145 F.3d 1422 (D.C. Cir. 1998).......................................................................36

*Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018)..........................................24, 25

*Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1008 (D.C. Cir. 2004)...........41, 50

*Jurney v. MacCracken*, 294 U.S. 125 (1935) ........................................................15

*Landry v. FDIC*, 204 F.3d 1125 (D.C. Cir. 2000) ........................................................56

*McGrain v. Daugherty*, 273 U.S. 135 (1927) .................................................... *passim*

*McPhaul v. United States*, 364 U.S. 372 (1960).........................................................27

*Mead Data Cent., Inc. v. United States Dep't of Air Force*, 566 F.2d 242 (D.C. Cir. 1977) ...................................................................................................43, 45

*Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014) ..................25

*Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368 (2012)............................................17, 18

*Morton v. Mancari*, 417 U.S. 535 (1974) ..................................................................17

*Murphy v. Dep't of Army*, 613 F.2d 1151 (D.C. Cir. 1979)....................................41, 54

*Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't of Labor*, 828 F. Supp. 2d 183 (D.D.C. 2011) ...............................................................................43

*Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014)...................................44

*New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 572 (S.D.N.Y. 2019)..................... *passim*

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982).........................................................39, 41, 49

*Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973) .......................................................48

*Raines v. Byrd*, 521 U.S. 811 (1997) ............................................................5, 10, 11

*Reed v. County Commissioners of Delaware County, PA*, 277 U.S. 376 (1928) ..................23, 24

*Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) ...................................................................................... *passim*

*Shelby Cty. v. Lynch*, 799 F.3d 1173 (D.C. Cir. 2015) ................................................25

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968).........................................30

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950).....................................26

*Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995)..............36

*Trump v. Mazars USA, LLP*, 940 F.3d 710 (D.C. Cir. 2019) ................................ *passim*

*U.S. Dep't of Interior v. Klamath Water*, 532 U.S. 1 (2001)......................................45

*U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76 (D.D.C. 1998) ......................................................................................................9

*United States v. Am. Tel. & Tel. Co. (AT&T I)*, 551 F.2d 384 (D.C. Cir. 1976) .................. *passim*

*United States v. Am. Tel. & Tel. Co. (AT&T II)*, 567 F.2d 121 (D.C. Cir. 1977) ................. *passim*

*United States v. Borden Co.*, 308 U.S. 188 (1939) ....................................................... 21

*United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807) ............................................... 12

*United States v. Morgan*, 313 U.S. 409 (1941) .......................................................... 40

*United States v. Nixon*, 418 U.S. 683 (1974) ....................................................... *passim*

*United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989) .................................. 56

*United States v. Torres*, 115 F.3d 1033 (D.C. Cir. 1997) ............................................ 9

*Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019) ........................... *passim*

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635
    (2002) ........................................................................................................ 20, 21

*Watkins v. United States*, 354 U.S. 178 (1957) ................................................... *passim*

*Webster v. Doe*, 486 U.S. 592 (1988) ....................................................................... 22

*Winstead v. J.C. Penney Co.*, 933 F.2d 576 (7th Cir. 1991) ...................................... 19

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ............................................................ 24, 25

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) .................................. 12

**Constitution and Statutes**

U.S. Const., Art. I ..................................................................................................... *passim*

U.S. Const., Art. VI .................................................................................................... 35

2 U.S.C. § 194 ............................................................................................................ 15

28 U.S.C. § 41 ........................................................................................................ 23, 24

28 U.S.C. § 1331 ..................................................................................................... *passim*

28 U.S.C. § 1337 ........................................................................................................ 19

28 U.S.C. § 1338 ........................................................................................................ 19

28 U.S.C. § 1339 ........................................................................................................ 19

28 U.S.C. § 1343 ........................................................................................................ 19

28 U.S.C. § 1365 .................................................................................... *passim*

28 U.S.C. § 1366 ................................................................................................. 20

28 U.S.C. § 2201 ................................................................................................. 25

Pub. L. No. 94-574 .............................................................................................. 18

Pub. L. No. 95-521 .............................................................................................. 18

Pub. L. No. 96-486 .............................................................................................. 18

Pub. L. No. 104-292 ............................................................................................ 19

**Other Authorities**

160 Cong. Rec. S4105 (daily ed. Mar. 11, 2014) ............................................... 54

*Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op.
   O.L.C. 252 (1984) ........................................................................................... 39

*Final Report of the Select Committee on the Events Surrounding the 2012
   Terrorist Attack in Benghazi*, H. Rep. No. 114-848 (2016) ........................... 54

H. Rep. No. 95-1756 (1978) .......................................................................... 19, 21

H. Res. 430, 116th Cong. (2019) ........................................................................ 10

*The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4)
   Applications for Tax-Exempt Status Submitted by "Political Advocacy"
   Organizations from 2010-2013*, S. Rep. No. 114-119 (2015) ...................... 54

James Uthmeier, LinkedIn, https://www.linkedin.com/in/james-uthmeier-
   5669782b ........................................................................................................ 46

Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation
   of Powers* (2017) ............................................................................................ 15

*The Latest: WH Says It Wasn't Behind Census Change*, Associated Press (Mar.
   27, 2018) ......................................................................................................... 56

President Ronald Reagan, *Procedures Governing Responses to Congressional
   Requests for Information* (Nov. 4, 1982) ....................................................... 56

*Prosecution for Contempt of Congress*, 8 Op. O.L.C. 101 ............................... 22

*Response to Congressional Requests for Information Regarding Decisions Made
   Under the Independent Counsel Act*, 10 Op. O.L.C. 68 (1986) ............... 17, 22

Rules of the House of Representatives, 116th Cong. (Jan. 11, 2019)..........................10, 11, 27, 34

S. Rep. No. 95-170 (1977) ................................................................................................18, 21

# INTRODUCTION

Defendants, the Attorney General and the Secretary of Commerce, devote the majority of their brief to attempting to persuade this Court that it cannot or should not reach the merits of this suit. In the process, they ignore the history that led to this dispute and that demonstrates why this case is unusual—perhaps unique—among interbranch controversies over information.

The Committee on Oversight and Reform (the "Committee") is urgently investigating Defendants' attempt to manipulate, for improper purposes, the Decennial Census. At stake is no less than the integrity of the process by which seats in Congress are apportioned and more than $1.5 trillion in annual federal funds are distributed. To fulfill its constitutional obligations and understand how to protect that process, the Committee must have full access to all relevant facts about the many "ways in which Secretary Ross and his aides tried to avoid disclosure of, if not conceal, the real timing and the real reasons for the decision" to add a citizenship question to the 2020 Census, *New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 571 (S.D.N.Y. 2019), *aff'd in part & rev'd in part*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), and the reasons and ways that they provided "materially inaccurate" testimony to Congress about it, *id.* at 547.

The District Court for the Southern District of New York concluded that this conduct reflected a "strong showing of bad faith" and "improper behavior" by Secretary Ross and his staff. *Id.* at 662 (quotation marks omitted). The Supreme Court endorsed that finding. *See Dep't of Commerce*, 139 S. Ct. at 2573-74. And for the first time in history, the Supreme Court, in rejecting the Commerce Department's citizenship question attempt, invalidated an agency's explanation for its action as pretextual, *id.* at 2574-76; *see id.* at 2583 (Thomas, J., dissenting)— in other words, dishonest. The Supreme Court could "[]not ignore the disconnect between the decision made and the explanation given." *Id.* at 2575. Nor can the Committee, and nor should

this Court in evaluating Defendants' continued effort to conceal their actions in yet another forum.

Particularly in light of this context, Defendants cannot block the Committee's access to the courts to enforce the two subpoenas at issue (the "Subpoenas").  Nor is there any merit to Defendants' belated appeal to the prospects of an accommodations process that they terminated. After steadfastly refusing to produce key, unredacted documents, Defendants ceased their productions altogether in June 2019.  Whatever Defendants' views about having been held in contempt of Congress for their obstructive conduct, the Committee's Subpoenas remain in effect, and yet for these last six months Defendants have not produced a *single* document in response to them.[1]  Defendants cannot now credibly claim that all along they had been "prepared to deliver more" materials.  Defs.' Mot. at 7.  That is especially so given the strong indication from Defendants' submissions that the documents Defendants did produce consisted in large part, if not entirely, of documents that were already public or that had already, months earlier, been reviewed and produced to the plaintiffs in the *New York* litigation.

This Court should compel Defendants to comply with the Committee's Subpoenas. There are no valid grounds for continuing to permit Defendants to defy their legal obligations.

*First*, as every other court to confront the question has concluded, this Court has jurisdiction to resolve this dispute.  *See* Section I, *infra*.

---

[1] *See* Defs.' Response to Pl.'s Statement of Material Facts Not in Dispute ¶¶ 182-83 (Jan. 14, 2020), ECF No. 19-9 ("[u]ndisputed" that, since July 17, 2019, the Commerce Department and the Department of Justice ("DOJ") made no additional productions in response to, respectively, the Ross Subpoena, *see* Pl.'s Mot. for Exped. Summ. J. ("Pl.'s Mot.") (Dec. 17, 2017), ECF No. 17-8, Ex. LLL, and the Barr Subpoena, *see id.*, Ex. RRR); Defs.' Mot. to Dismiss, or, in the Alt., for Summ. J. ("Defs.' Mot.") at 7 (Jan. 14, 2020), ECF No. 19.

2

*Second*, the Subpoenas are firmly grounded in the Committee's constitutional powers. *See* Section II, *infra*. The Committee is investigating whether Executive Branch misconduct necessitates remedial legislation and requires oversight of the Executive agencies to which Congress has delegated authority over the census—authority that the Constitution carefully and specifically assigns to Congress in the first instance. *See* U.S. Const., Art. I, § 2, cl. 3. On these facts, Defendants cannot dispute the legitimacy of the Committee's inquiry. It is frivolous to suggest, as Defendants do, that the Committee's investigation is being "conducted solely for the personal aggrandizement of the investigators." Defs.' Mot. at 35 (quotation marks omitted). And it is false that the Committee is "demand[ing] every document in the agencies' files." *Id.* at 38. The Committee's investigation is focused on a single, and singular, course of conduct: the development and propagation of a contrived rationale for adding a citizenship question to the census, a cornerstone of our democracy. The Committee must fully understand the process by which that misconduct occurred to determine whether new laws are required, and whether the relevant agencies are operating independently from improper influences and with the necessary accountability.

*Third*, Defendants' claims of privilege are baseless. *See* Section III, *infra*. Notably, Defendants make no serious attempt to substantiate their indiscriminate "protective assertion" of privilege, Defs.' Mot. at 63 n.20, over the potentially "tens of thousands" of additional documents that Defendants suggest—but, significantly, do not confirm—might be responsive to the Committee's Subpoenas, *id.* at 62. Instead, Defendants erroneously claim privilege over the documents that the Committee has consistently identified as its top priority.[2] The evidence of

---

[2] The Committee's priority documents comprise the 11 documents and email chains identified in a March 15, 2019 email from Committee staff to Commerce Department staff, *see*

government misconduct that the courts have found, and that the Committee has marshalled so far, abrogates the privileges that Defendants attempt to invoke over the priority documents. In any event, those common-law privileges must yield to the Committee's constitutional fact-finding authority, and Defendants have not established the foundations for the privileges' application. Even if the privileges did apply, they are qualified, not absolute, and the Committee's need for disclosure prevails.

*Fourth*, and finally, this Court should reject Defendants' attempt to avoid complying with the Committee's Subpoenas by claiming a desire to reopen an accommodations process that they shut down. *See* Section IV, *infra*. Both parties agree that they are at an impasse regarding the priority documents. Owing to Defendants' stonewalling, they are just as far apart regarding the remaining documents. As indicated above, it seems that Defendants have yet to even search for records responsive to the Committee's Subpoenas, which were issued nearly ten months ago. *See* Hr'g Tr. at 30 (Dec. 13, 2019) (DOJ counsel: "But, we don't even know how many documents there are."). Instead, Defendants appear to have taken a period of months to dole out documents previously produced to private plaintiffs in the *New York* litigation—even as Defendants claimed that the pendency of that litigation prohibited them from producing key, unredacted documents to the Committee (a position that they no longer advance).

If Defendants recognized early on that the administrative record from the civil litigation was responsive to the Committee's Subpoenas, as they now claim, it is not clear why it took them so long to produce those materials. That is, unless their goal was to deliberately delay the

---

Compl. ¶¶ 90-91 & n.153; *id.*, Ex. EEE; *see also id.*, Ex. JJJ, as well as the Uthmeier Memorandum, an accompanying handwritten note, and all drafts of the Gary Letter, identified in a June 3, 2019 letter from Chairman Cummings to Attorney General Barr, *see id.* ¶ 110 & n.174; *id.*, Ex. YYY at 6. *See also* Pl.'s Mot. at 22 (Commerce documents); *id.* at 27 (DOJ documents).

Committee's investigation until after the Supreme Court ruled—or, as now, well beyond.  There is simply no excuse for Defendants to continue to withhold documents "on the basis of … [']we asserted a protective assertion of privilege[] here because we didn't have time to review them and then Congress held us in contempt and, therefore, we just stopped doing everything at that point in time.[']"  Hr'g Tr. at 30 (Dec. 13, 2019) (the Court).  Yet that is precisely what Defendants are doing, notwithstanding this Court's urging.  *See id.* at 30, 33.

The Committee recognizes and respects the "implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of" the parties' respective needs.  *United States v. Am. Tel. & Tel. Co.* (*AT&T II*), 567 F.2d 121, 127 (D.C. Cir. 1977).  "[I]n th[is] particular fact situation," *id.*, the only tenable outcome is enforcement of the Committee's Subpoenas.  For these reasons and those stated below, the Committee respectfully requests that the Court grant judgment in the Committee's favor.

## ARGUMENT

## I.     This Court Has Jurisdiction over This Case

Defendants' argument that this Court lacks jurisdiction to enforce the Committee's Subpoenas is contrary to precedent that they cannot overcome.  The D.C. Circuit has recognized that the House of Representatives may sue to enforce a subpoena, and judges in this District have uniformly—and correctly—held that courts have jurisdiction over such suits brought by the House and its committees.

Against this authority, Defendants rely on *Raines v. Byrd*, 521 U.S. 811 (1997), a Supreme Court decision concerning the standing of individual legislators, not that of a body of Congress; on 28 U.S.C. § 1365, a provision concerning Senate subpoenas; and on abstract separation of powers concepts.  Defendants' arguments are misguided for the same fundamental reason:  they ignore that the injury here is to a power that the House and its authorized

committees have *as a body*, and that the House enjoys *separately* from the Senate and the

Executive Branch.  Like every court to have considered Defendants' arguments, this Court

should reject them in holding that the Committee may sue to enforce its Subpoenas.[3]

A.      **The Committee Has Article III Standing**

By defying the Subpoenas, Defendants are withholding information that is vital to the

Committee's exercise of its Article I legislative and oversight functions.  That is an Article III

injury that this Court can redress.

1.      **The Committee Has Suffered Injury in Fact**

The Constitution vests "[a]ll legislative Powers" in Congress, U.S. Const., Art. I, § 1, and

specifies that the census shall be conducted "in such Manner as [Congress] shall by Law direct,"

*id.*, Art. I, § 2, cl. 3.  Because "[a] legislative body cannot legislate wisely or effectively in the

absence of information," *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927), the Supreme Court

has recognized that under Article I, each House of Congress, and each House's authorized

committees, possesses "the power of inquiry—with process to enforce it"—as "an essential and

appropriate auxiliary to the legislative function," *id.* at 174; *see, e.g.*, *Eastland v. U.S.

Servicemen's Fund*, 421 U.S. 491, 504-05 (1975).

Congress's investigatory authority "is broad."  *Watkins v. United States*, 354 U.S. 178,

187 (1957).  It "is as penetrating and far-reaching as the potential power to enact and appropriate

---

[3] In a separate, pending case, the D.C. Circuit is considering DOJ's claim that courts lack authority to hear subpoena-enforcement disputes between the Legislative and Executive branches.  *See Comm. on Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. argued Jan. 3, 2020). The Committee also notes that, contrary to Defendants' arguments in *McGahn* and here—that courts cannot adjudicate subpoena disputes between the branches—President Trump's impeachment trial counsel has argued in the Senate that Congress should take such disputes to court.  *See, e.g.*, Answer of President Donald J. Trump at 5, *In re Impeachment of President Donald J. Trump* (U.S. Senate Jan. 18, 2020), https://perma.cc/93C6-D33K, *reprinted at* S. Doc. No. 116-12, at 14 (2019).

under the Constitution." *Barenblatt v. United States*, 360 U.S. 109, 111 (1959).  It

"'encompasses inquiries concerning the administration of existing laws as well as proposed or

possibly needed statutes,' 'it includes surveys of defects in our social, economic or political

system for the purpose of enabling the Congress to remedy them,' and 'it comprehends probes

into departments of the Federal Government to expose corruption, inefficiency or waste.'"

*Trump v. Mazars USA, LLP*, 940 F.3d 710, 722-23 (D.C. Cir. 2019) (alterations omitted)

(quoting *Watkins*, 354 U.S. at 187), *cert. granted*, No. 19-715 (Dec. 13, 2019).

Exercising this authority, *see* Pl.'s Mot. at 19-20 (explaining the Committee's powers

under the House Rules), the Committee is investigating the processes by which Defendants and

their agencies attempted to add a citizenship question to the 2020 Census, and the false testimony

provided to Congress about those efforts, *see id.* at 20-33.  As further discussed below, the

Committee's investigation will inform Congress's consideration of whether to amend or enact

legislation, including appropriations legislation, to protect the census.  The Committee's

investigation is part of its oversight of the "departments of the Federal Government" currently

responsible for the census with the goal of informing itself about any "corruption, inefficiency or

waste" in them, *Mazars*, 940 F.3d at 723 (quotation marks omitted), and also seeks to preserve

Congress's power of inquiry by better understanding how Secretary Ross came to provide false

testimony on multiple occasions, *see* Pl.'s Mot. at 16-17.

As part of its investigation, the Committee served the Subpoenas at issue here.

Defendants' defiance of those Subpoenas impedes the Committee's investigation and obstructs

its exercise of its constitutional powers.  *See id.* at 34-36.  "[N]o federal judge has ever held that

defiance of a valid subpoena does not amount to a concrete and particularized injury in fact."

*Comm. on Judiciary v. McGahn*, No. 19-cv-2379 (KBJ), 2019 WL 6312011, at *27 (D.D.C.

Nov. 25, 2019), *appeal pending*, No. 19-5331 (D.C. Cir. argued Jan. 3, 2020).  And while "the *nature* of the injury" is similar where a private litigant's subpoenas are defied, "the Supreme Court has suggested that the *degree* of harm is an order of magnitude different" when a Congressional subpoena is at issue "because, under our constitutional scheme, the Legislature is empowered to issue subpoenas in order to conduct the investigations that are necessary to perform its crucial functions of enacting legislation and overseeing the operations of government."  *Id.* (citing *Watkins*, 354 U.S. at 187).  "If there is fraud or abuse or waste or corruption in the federal government, it is the constitutional duty of Congress to find the facts and, as necessary, take corrective action.  Conducting investigations is the means that Congress uses to carry out that constitutional obligation."  *Id.* at *28.  "[B]latant defiance of Congress' centuries-old power [of inquiry] is not an abstract injury."  *Id.*

More than four decades ago, the D.C. Circuit rejected a justiciability challenge to a dispute between the Legislative and Executive branches over a Congressional subpoena, concluding that the House and its committees have standing to vindicate their right to information.  *See United States v. Am. Tel. & Tel. Co.* (*AT&T I*), 551 F.2d 384, 391 (D.C. Cir. 1976).  *AT&T I* involved a House subcommittee's subpoena to AT&T for documents related to wiretaps undertaken at the FBI's request.  *See id.* at 385.  When AT&T indicated that it would comply, the Executive Branch filed suit to prohibit it from doing so, and the chairman of the House subcommittee intervened as a defendant.  *Id.*  As the D.C. Circuit explained, the case presented "a clash of the powers of the legislative and executive branches of the United States" over a legislative subpoena.  *Id.* at 389.

With that understanding of the dispute, the D.C. Circuit held that "[i]t is clear that the House as a whole has standing to assert its investigatory power."  *Id.* at 391; *see AT&T II*, 567

F.2d at 134 (affirming that the House has "threshold legal standing").  The D.C. Circuit noted

that it had reached the merits of a similar dispute in *Senate Select Committee on Presidential*

*Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974), and construed that case to

"establish[], at a minimum, that the mere fact that there is a conflict between the legislative and

executive branches over a congressional subpoena does not preclude judicial resolution of the

conflict."  *AT&T I*, 551 F.2d at 390.

Following *AT&T I*, all judges of this Court to have considered the question have held that

courts have Article III jurisdiction over suits by the House and its authorized committees to

enforce subpoenas to the Executive Branch.[4]  Yet Defendants address *AT&T I* only as an

afterthought.  *See* Defs.' Mot. at 27-28.  Defendants initially claim that *AT&T I* "is not

controlling," *id.* at 27, pointing to a per curiam decision by the D.C. Circuit granting a stay

pending appeal in *Committee on Judiciary v. Miers*, 542 F.3d 909 (D.C. Cir. 2008).  That is a

strange contention.  The *Miers* per curiam cites *AT&T I* twice, *see id.* at 911, and Judge Tatel

cites it once in his concurrence, *see id.* at 912, all without even suggesting—much less holding—

that it is no longer good law.  *See United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997)

("[D]istrict judges … are obligated to follow controlling [C]ircuit precedent until either [the D.C.

Circuit], sitting en banc, or the Supreme Court, overrule it.").

Defendants next attempt to distinguish *AT&T I* on its facts, pointing out that there the

House intervened after the district court quashed the subpoena.  Defs.' Mot. at 27-28.  But the

timing of the House's intervention was not relevant to the D.C. Circuit's conclusion that the

---

[4] *See McGahn*, 2019 WL 6312011, at *18-26, *26-29; *Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 65-78 (D.D.C. 2008); *Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 9-17, 20-22 (D.D.C. 2013); *see also U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998) (three-judge district court).

House "has standing to assert its investigatory power." 551 F.2d at 391. To the extent Defendants are arguing that the Committee would suffer an Article III injury from a judicial decision holding its Subpoenas invalid, but not from an Executive Branch decision refusing compliance with the Subpoenas, that argument is groundless.

### 2.    Defendants' Standing Arguments Are Meritless

**i.** In contesting the Committee's standing, Defendants principally rely on the Supreme Court's decision in *Raines*. Defs.' Mot. at 14-18; *see also id.* at 28 (arguing that *AT&T I* does not "survive *Raines*"). But as another judge of this Court has explained, *Raines* is "entirely inapposite." *McGahn*, 2019 WL 6312011, at *29. *Raines* addressed whether *individual legislators*—neither the House nor the Senate as a whole, nor any of their authorized committees—could advance an *institutional* interest that neither body of Congress had endorsed (and which both opposed). 521 U.S. at 829. *Raines* has no bearing where, as here, an authorized committee of the House seeks to vindicate its entitlement to information in the exercise of its Article I authorities.[5]

The Supreme Court has emphasized that *Raines* held "specifically and only" that "six *individual Members* of Congress lacked standing to challenge the Line Item Veto Act." *Ariz. State Legis. v. Ariz. Indep. Redist. Comm'n*, 135 S. Ct. 2652, 2664 (2015); *see Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 n.4 (2019) ("*Raines* held that individual

---

[5] Defendants err in suggesting that the House has not authorized this suit. *See* Defs.' Mot. 15-16 n.6. The Constitution assigns the House alone the power to "determine the Rules of its Proceedings." U.S. Const., Art. I, § 5, cl. 2. The House has established the Bipartisan Legal Advisory Group (BLAG) to "speak[] for, and articulate[] the institutional position of, the House in all litigation matters," House Rule II.8(b), and has confirmed that a BLAG vote "to authorize litigation and to articulate the institutional position of the House in that litigation is the equivalent of a vote of the full House of Representatives," H. Res. 430, 116th Cong. (2019). In turn, the full House has authorized the Committee to sue to enforce its Subpoenas with BLAG approval, *see* H. Res. 497, 116th Cong. (2019); H. Res. 430, 116th Cong, and BLAG has authorized this suit, *see* Compl. ¶ 29 (Nov. 26, 2019).

Members of Congress lacked standing[.]").  As *Raines* explained, the Members were not the

proper parties to claim that the Act impaired Congress's institutional role in lawmaking because

that interest belonged to Congress as a whole.  Such an injury was not personal to individual

lawmakers but "widely dispersed."  521 U.S. at 829.[6]  "[T]he possible future 'dilution of

institutional legislative power'" at issue in *Raines* "is a completely different type of injury than

the harm to established constitutional investigatory rights."  *McGahn*, 2019 WL 6312011, at *29.

*Arizona State Legislature* puts to rest any notion that a legislative body (as distinct from

individual members) lacks standing to redress an injury to its rights and powers.  There, the

Supreme Court held that a state legislature had standing to challenge the constitutionality of a

state initiative that displaced its role in the Congressional redistricting process.  In contrast to the

individual legislators in *Raines*, the legislature was "an institutional plaintiff asserting an

institutional injury" that the federal courts were competent to hear.  *Ariz. State Legis.*, 135 S. Ct.

at 2664.  Here, too, the injury has been incurred by the institutional body that filed suit.

*Bethune-Hill* further supports the Committee's standing.  There, the Supreme Court held

that "a single House of a bicameral [state] legislature lacks capacity to assert interests belonging

to the legislature *as a whole*"—the interest in sustaining the constitutionality of its redistricting

plan.  139 S. Ct. at 1953-54 (emphasis added).  This case, by contrast, involves an injury to

interests held by each body of Congress (including its respective committees) *separately*—the

constitutional power to investigate—which the House has delegated to the Committee.  *See*

Rules of the U.S. House of Representatives (House Rules) X.2(a), (b)(1), X.3(i), X.4(c)(2),

---

[6] *See Ariz. State Legis.*, 135 S. Ct. at 2664 (in *Raines*, the alleged injury "necessarily impacted all Members of Congress and both Houses … equally"); *see also Chenoweth v. Clinton*, 181 F.3d 112, 113-16 (D.C. Cir. 1999) (relying on *Raines* to hold that *individual Members* lacked standing to challenge certain of the President's environmental initiatives); *Campbell v. Clinton*, 203 F.3d 19, 20-21 (D.C. Cir. 2000) (same, President's military decisions).

XI.1(b)(1), XI.2(m)(1)(B), 116th Cong.  Unlike in *Bethune-Hill* and *Raines*, there is no "mismatch between the body seeking to litigate and the body to which the relevant constitutional provision allegedly assign[s] … authority."  *Bethune-Hill*, 139 S. Ct. at 1953.

**ii.**  Defendants' argument that this case is not justiciable because it involves an interbranch conflict, *see, e.g.*, Defs.' Mot. at 19-22, is also wrong.  As the D.C. Circuit stressed in *AT&T II*, "[t]he simple fact of a conflict between the legislative and executive branches over a congressional subpoena does not preclude judicial resolution."  567 F.2d at 126.  Courts routinely resolve questions involving the separation of powers: "the federal courts have adjudicated disputes that impact the divergent interests of the other branches of government for centuries."  *McGahn*, 2019 WL 6312011, at *24 (collecting cases); *see AT&T II*, 567 F.2d at 126 n.13 (same).  "[T]he Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'"  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196-97 (2012) (reversing dismissal on political-question grounds of interbranch dispute).  The issues presented here are equally within the competence of an Article III court to decide, as the D.C. Circuit concluded in *Senate Select Committee* and *AT&T*.  At issue here is Defendants' failure to comply with their "unremitting obligation" to respond to the Committee's Subpoenas.  *Watkins*, 354 U.S. at 187.  As the D.C. Circuit demonstrated in *Senate Select Committee* and concluded in *AT&T*, this issue is within the competence of an Article III court to decide.

Although Defendants rely on history, Defs.' Mot. at 14-17, the relevant history undermines their separation-of-powers argument.  For more than two hundred years, courts have adjudicated the Executive Branch's legal obligations to respond to subpoenas.  *See, e.g.*, *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J.) (resolving privilege questions raised by subpoena to the President); *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997)

(deciding White House's claims of executive privilege in suit brought by Office of the Independent Counsel to compel compliance with grand jury subpoena served on White House Counsel).  The Supreme Court's decision in *United States v. Nixon* (*Nixon*), 418 U.S. 683 (1974), demonstrates this point.  There, the Court resolved executive-privilege objections to a subpoena for President Nixon's Oval Office tapes, rejecting the President's characterization of the dispute as a nonjusticiable political question and emphasizing that, "[w]hatever the correct answer [to the privilege questions] on the merits, these issues are 'of a type which are traditionally justiciable.'"  418 U.S. at 697.

In *Nixon*, the Supreme Court adjudicated an *intra*-branch dispute over access to information.  Inter-branch disputes, too, are traditionally justiciable.  As the D.C. Circuit recently emphasized, Congressional investigations of the Executive Branch—and of the President himself—"stretch far back in time and broadly across subject matters," *Mazars*, 940 F.3d at 721, and adjudication of the validity of a Congressional subpoena is a "familiar tale," *id.* at 747.  In *Senate Select Committee*, "perhaps the most high-profile congressional investigation into a President," the D.C. Circuit considered whether "President Nixon had 'a legal duty to comply with' a subpoena issued by the Senate Watergate Committee."  *Id.* at 722.  "President Nixon, apparently taking no issue with the general power of congressional committees to subpoena sitting Presidents, instead asserted executive privilege over the individual tapes requested."  *Id.* The D.C. Circuit reached the merits of the dispute notwithstanding the "conflict between the legislative and executive branches over a congressional subpoena."  *AT&T I*, 551 F.2d at 390.

Contrary to Defendants' argument, it is the Committee's position that respects the separation of powers.  "[A] decision to foreclose access to the courts, as the Executive urges, would tilt the balance in favor of the Executive[.]"  *Miers*, 558 F. Supp. 2d at 95; *cf. Mazars*, 940

F.3d at 739 ("A proposition that so strips Congress of its power to legislate would enforce only the Executive's arrogation of power, not the separation of powers.").  Accepting Defendants' position would severely undermine Congress's ability to carry out its constitutional functions by curtailing the power of factfinding that is integral to their exercise.

To the extent an imbalance remains, with Congress able to sue the Executive but not necessarily vice versa, there is *every* "indication that the Framers intended" this result.  Defs.' Mot. at 22; *see* U.S. Const., Art. I, § 6, cl. 1 ("for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other place").  The Constitution provides checks and balances, but does not guarantee each branch identical tools and protections.  Regardless, as *Miers* points out, the Executive Branch *has* "invoked the aid of the federal judiciary" to "challenge[] the validity of a congressional subpoena," albeit not by suing Congress.  *See* 558 F. Supp. 2d at 96 (collecting cases).  Indeed, the President himself has initiated suits in his personal capacity to enjoin compliance with Congressional subpoenas, and DOJ has supported aspects of his claims without objecting to the courts' jurisdiction to hear those cases.  *See, e.g.*, *Mazars*, 940 F.3d at 717-18.

**iii.**  There is no merit to Defendants' claim that the Committee should be limited to the use of "political self-help if it is dissatisfied with the Executive Branch's response to a congressional investigation."  Defs.' Mot. at 19 (quotation marks omitted).  Defendants' suggested alternatives ignore that Congress and its committees possess investigative authority separate and apart from the Executive Branch.  Their alternatives also are neither feasible nor effective at obtaining the information the Committee seeks.  Use of the appropriations process to grind the government to a halt over a subpoena dispute would be extraordinary and impractical; legislation, which requires presentment, cannot extract information from a recalcitrant Executive

14

Branch; appealing to the public in the next election does not aid this Committee in its urgent legislative inquiries; and the House can impeach but it cannot "remove officials" itself, *id*. at 20—that is a power of the Senate alone, *see* U.S. Const., Art. I, § 3, cl. 6-7.  And these alternatives are particularly ill-suited to obtaining the information the Committee needs in time for the Committee to complete its work.

In any event, the House has already employed political tools here, to no avail:  it held Defendants in contempt, H. Res. 497, and referred them to the U.S. Attorney for the District of Columbia for prosecution, *see* Compl. ¶ 128; 2 U.S.C. § 194.  Remarkably, Defendants highlight this remedy, *see* Defs.' Mot. at 21, even though they responded to it here not by producing documents but by *ceasing* their productions, *see* Pl.'s Mot., Ex. G at 2; *see also* Defs.' Mot. at 7 (asserting that the contempt vote "brought the accommodation process to a halt").

Unsurprisingly, Defendant Barr's Department of Justice refused to prosecute Defendants for contempt of Congress.  *See* Pl.'s Mot., Ex. LLLL.  That example underscores the error in Defendants' position, *see* Defs.' Mot. at 21, which at any rate cannot be squared with history. Action by the Houses of Congress to vindicate their inherent powers, taken separately and without the assistance of the Executive Branch, is nearly as old as the Republic.[7]  The Congressional contempt power exists independent of, and was not displaced by, its authorization to the Executive Branch to bring prosecutions for contempt of Congress.  *See Jurney v. MacCracken*, 294 U.S. 125, 151 (1935); *McGrain*, 273 U.S. at 165.  Yet Congress's "arrest and confinement of … senior executive official[s] would provoke an unseemly constitutional

---

[7] *See generally* Josh Chafetz, *Congress's Constitution: Legislative Authority and the Separation of Powers* 172-79 (2017); Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* 4-6 (2017).

confrontation that should be avoided." *Miers*, 558 F. Supp. 2d at 78.  "[T]here is no need to run the risk of such mischief when a civil action can resolve the same issue in an orderly fashion." *Id.* at 92.

Defendants misconstrue the nature of civil actions such as these.  The Committee is not suing as "a sub-component of the sovereign" to "'vindicate public rights'" or to enforce or execute federal law; it is not exercising the kind of law enforcement power that the Supreme Court in *Buckley v. Valeo* concluded could not "'possibly be regarded as in aid of the legislative function.'"  Defs.' Mot. at 21 (alterations omitted) (quoting 424 U.S. 1, 138, 140 (1976)); *see Buckley*, 424 U.S. at 678-79 (surveying provisions of the Federal Election Campaign Act of 1971 that would have granted the Federal Election Commission power to seek "injunctive or other relief against any acts or practices which constitute or will constitute a violation of [the] Act," among other things (quotation marks omitted)).  To the contrary, in suing to enforce its Subpoenas, the Committee is exercising power "of an investigative and informative nature"— power that *Buckley* specifically contrasted with law enforcement and identified as of the kind that "Congress might delegate to one of its own committees."  *Id.* at 137-38 (citing, among other cases, *McGrain*, 273 U.S. 135, and *Eastland*, 421 U.S. 491).  *Buckley* reaffirms that "before and when the Constitution was framed and adopted," the "power of inquiry, *with enforcing process*, was regarded and employed as a necessary and appropriate attribute of the power to legislate, indeed, was treated as inhering in it."  *Id.* at 138 (emphasis added) (quoting *McGrain*, 273 U.S. at 175).

### B.    This Court Has Federal Question Jurisdiction Under 28 U.S.C. § 1331

**i.**  Defendants do not dispute that the Committee's suit satisfies the plain language of Section 1331:  "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331; *see* Pl.'s Mot.

16

at 34.  Indeed, more than forty years ago, the D.C. Circuit in *AT&T I* found "subject matter jurisdiction under 28 U.S.C. § 1331" over a suit concerning the enforcement of a House subcommittee's subpoena because the action arose "under the Constitution of the United States." *AT&T I*, 551 F.2d at 388-89.  That holding is dispositive here.

The fact that the parties' positions are reversed—Executive Branch officials are the defendants and a House committee is the plaintiff—makes no difference, for a controversy between two parties arises under federal law regardless of which party is plaintiff or defendant. *See Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th Cir. 2011).  OLC agrees.  *See Response to Congressional Requests for Information*, 10 Op. O.L.C. 68, 88 (1986) (*AT&T I*'s reasoning on subject-matter jurisdiction "would appear to apply equally to suits filed by a House of Congress seeking enforcement of its subpoena").  Judges of this Court have uniformly relied on *AT&T I* to find subject-matter jurisdiction under Section 1331 over actions to enforce House subpoenas.  *See McGahn*, 2019 WL 6312011, at *16-18; *Holder*, 979 F. Supp. 2d at 17-20; *Miers*, 558 F. Supp. 2d at 64-65.

Defendants argue that Section 1365, a provision titled "*Senate* actions" that governs "any civil action brought by *the Senate* or any authorized committee or subcommittee of *the Senate*" to enforce a subpoena, 28 U.S.C. § 1365(a) (emphasis added), implicitly repeals jurisdiction under Section 1331 over suits to enforce House subpoenas.  *See* Defs.' Mot. at 22-26.  That argument is meritless, as every court to consider it has concluded.

Implied repeals are strongly disfavored and, "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."  *Morton v. Mancari*, 417 U.S. 535, 550 (1974).  That doctrine applies with particular force in this context.  *See Mims v. Arrow Fin.*

17

*Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C. § 1331 should hold firm against mere implication flowing from subsequent legislation." (quotation marks omitted)); *see also id.* at 379 ("Divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331." (alterations and quotation marks omitted)).

By its terms, Section 1365 does not apply to House subpoenas, it is not irreconcilable with Section 1331, and the history of both provisions confirms that Section 1365 has no bearing here. In 1976, Section 1331 was amended to remove the amount-in-controversy requirement for actions "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub. L. No. 94-574, § 2, 90 Stat. 2721 (1976); *see AT&T I*, 551 F.2d at 389 n.7. But a jurisdictional gap remained: under the then-existing Section 1331, the amount-in-controversy requirement applied for actions against private parties and officials acting in their individual capacity. Accordingly, Congress still needed to satisfy the amount-in-controversy requirement in those subpoena-enforcement suits. The Senate was particularly concerned about this issue because of its "[then-]recent experience" of having a district court hold in *Senate Select Committee* that a Senate committee had not satisfied that requirement. S. Rep. No. 95-170, at 20-21, 91 (1977); *see McGahn*, 2019 WL 631201, at *17. Congress resolved the Senate's concern in 1978, by enacting Section 1365. Pub. L. No. 95-521, Title VII, § 705(f)(1), 92 Stat. 1879 (1978) (originally codified at 28 U.S.C. § 1364). Section 1365 eliminated the amount-in-controversy requirement for the enforcement of Senate subpoenas against private parties. In 1980, two years after Section 1365 was enacted, Congress removed Section 1331's amount-in-controversy requirement entirely. Pub. L. No. 96-486, § 2(a), 94 Stat. 2369 (1980).

This history cannot reasonably be interpreted to have stripped courts of jurisdiction to enforce House subpoenas by implication.  Section 1365 was enacted against the backdrop of the D.C. Circuit's holding in *AT&T I* that Section 1331 *granted* jurisdiction over enforcement of House subpoenas.  It is inconceivable that Congress sought to overrule *AT&T I*'s holding regarding House subpoenas by enacting a provision that says nothing about House subpoenas.  Indeed, during the legislative process, reference to House subpoenas was removed from Section 1365 because the House committees had not had an opportunity to review the issues.  H. Rep. No. 95-1756, at 80 (1978).  Congress did not *sub silentio* eliminate the House's ability to seek judicial enforcement of its subpoenas when it enacted a statute that the House did not have an adequate opportunity to consider.

**ii.**  Defendants' contrary arguments are wrong for several reasons.  *First*, Defendants place significant weight on an amendment to Section 1365 enacted in 1996, which clarified that Section 1365 applies in a suit against a federal official "if the refusal to comply is based on the assertion of a personal privilege or objection."  Pub. L. No. 104-292, § 4, 110 Stat. 3460 (1996); *see* Defs.' Mot. at 25-26.  Defendants posit that if Section 1331 already conferred jurisdiction for all Congressional suits seeking to enforce subpoenas, then the 1996 amendment to Section 1365 was superfluous.

Section 1365, however, is not unusual in its overlap with Section 1331.  When Congress removed the amount-in-controversy requirement from Section 1331, it rendered redundant several other provisions, including 28 U.S.C. § 1337 (commerce and antitrust cases), § 1338 (patent and trademark cases), § 1339 (postal service cases), and § 1343 (civil rights cases).  Congress was not required to repeal those provisions to eliminate redundancies.  *Winstead v. J.C. Penney Co.*, 933 F.2d 576, 580 (7th Cir. 1991) ("[T]he elimination of the minimum amount in

controversy from section 1331 made of the numerous special federal jurisdictional statutes that required no minimum amount in controversy … so many beached whales, yet no one thought to repeal those now-redundant statutes.").

*Second*, the Supreme Court in *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002), rejected an argument like Defendants'.  The *Verizon Maryland* plaintiffs claimed that the determination of a state public service commission violated federal law—a claim that presented a federal question under Section 1331.  *See id.* at 640.  The court of appeals had held that a separate statute—a provision of the Telecommunications Act of 1996— "strip[ped] this jurisdiction" by "mak[ing] *some other* actions by state commissions reviewable in federal court."  *Id.* at 642-43.  The Supreme Court reversed, explaining that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others."  *Id*. at 643.  The Court reviewed the Telecommunications Act and observed that "none of [the Act's] other provisions … evince[d] any intent to preclude federal review of a commission determination."  *Id.* at 644.  To the contrary, the Court explained, these other provisions "reinforce the conclusion that [the statute's] silence on the subject leaves the jurisdictional grant of § 1331 untouched," because "where otherwise applicable jurisdiction was meant to be excluded, it was excluded expressly."  *Id.*

The same is true here.  The Committee's claim presents a federal question and nothing in Section 1365—which "merely makes *some other* [subpoena-enforcement] actions … reviewable in federal court," *id.* at 643—"displays any intent to withdraw federal jurisdiction under § 1331," *id.* at 644.  Other provisions of the jurisdictional scheme "reinforce the conclusion that [Section 1365's] silence on the subject leaves the jurisdictional grant of § 1331 untouched."  *Id.*; *see* 28 U.S.C. § 1366 (expressly excluding challenges to certain laws from Section 1331).  This Court

should "not presume that [Section 1365] means what it neither says nor fairly implies." *Verizon Maryland*, 535 U.S. at 644.

*Third*, Defendants erroneously rely on Section 1365's exclusion of Senate actions to enforce subpoenas against officials asserting governmental privileges. *See* Defs.' Mot. at 24. The accompanying Senate report disavowed this argument, explaining that "[t]his exception in the statute is not intended to be a Congressional finding that the Federal courts do not now have the authority to hear a civil action to enforce a subpoena against an officer or employee of the Federal Government." S. Rep. No. 95-170, at 91-92; *see McGahn*, 2019 WL 6312011, at *17. And to the extent the Senate opted to limit federal-court jurisdiction over suits to enforce its own subpoenas, the House declined to similarly limit itself. *See* H. Rep. No. 95-1756, at 80.

For the same reasons, Defendants err in invoking the canon that a specific statute controls a more general one. *See* Defs.' Mot. at 25. As the D.C. Circuit has explained, "[t]he canon is impotent … unless the compared statutes are 'irreconcilably conflicting,'" and "[a]bsent clearly expressed congressional intent to the contrary, it is [the courts'] duty to harmonize the provisions and render each effective." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698-99 (D.C. Cir. 2014). There is no "positive repugnancy" between Section 1331 and Section 1365 as to enforcement of House subpoenas. *United States v. Borden Co.*, 308 U.S. 188, 198-99 (1939) (quotation marks omitted).

There also is no merit to Defendants' constitutional-avoidance argument. *See* Defs.' Mot. at 26. Section 1331 *does* "unambiguously confer jurisdiction over the Committee's suit," *id.* (emphasis omitted), as confirmed by its plain text and as held by the D.C. Circuit in *AT&T I*. Yet even if there were any ambiguity in the statutory scheme, it should be resolved in the Committee's favor: it is Defendants' interpretation that would raise a "serious constitutional

question" by "deny[ing] any judicial forum for" the Committee's constitutional claim.  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  The Supreme Court has held that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  *Id.* Defendants have not made that "heightened showing," *id.*, by relying on excerpts of legislative history and a statutory provision that makes no mention of House subpoenas.

*Fourth*, and finally, the Executive Branch has acknowledged that Congress can sue to enforce its subpoenas under Section 1331.  In 1986, OLC concluded that the legislative history of Section 1365 counseled against any argument that it "provides the exclusive route for either House to bring a civil action to enforce its subpoenas, and thus, that no route exists for civil enforcement against an executive branch officer."  *Response to Congressional Requests for Information*, 10 Op. O.L.C. at 87 n.31.  Accordingly, OLC wrote, "although the civil enforcement route has not been tried by the House, it would appear to be a viable option."  *Id.* at 88; *accord Prosecution for Contempt of Congress*, 8 Op. O.L.C. 101, 137 & n.36 (1984).  OLC was correct.

### C.    The Committee Is Entitled to Seek Judicial Enforcement of Its Subpoena

Article I authorizes the Committee to seek equitable relief to enforce its Subpoenas.  *See* Pl.'s Mot. at 36-37.  The Supreme Court has long confirmed the power of courts in equity to enjoin unconstitutional actions by Executive Branch officials, as well as Congress's power to enforce its Article I authorities in court.  Defendants' observation that courts have been reluctant to imply non-statutory causes of action against federal officials for *damages liability* is irrelevant to the Committee's right to seek an equitable remedy here.

**i.** The Supreme Court has made clear that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action."  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S.

22

Ct. 1378, 1384 (2015).  As the Court stressed in *Armstrong*, "in a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer."  *Id.* (quotation marks omitted).  The Court "found no support for the argument" that a challenge to governmental action under separation-of-powers principles "should be treated 'differently than every other constitutional claim' for which 'equitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.'"  *Armstrong*, 135 S. Ct. at 1391 (some quotation marks omitted) (quoting *Free Enter. Fund*, 561 U.S. at 491 n.2 (rejecting the contention that a plaintiff lacked "an implied right of action directly under the Constitution to challenge governmental action under … separation of powers principles")); *see also Ex Parte Young*, 209 U.S. 123, 149, 165, 167 (1908).  This case presents just such a constitutional claim for equitable relief.  Defendants have defied their "unremitting obligation" under Article I, *Watkins*, 354 U.S. at 187, to comply with the Committee's Subpoenas.

Defendants rely heavily on *Reed v. County Commissioners of Delaware County, PA*, 277 U.S. 376 (1928), but they misunderstand that case.  *See* Defs.' Mot. at 32-33.  In *Reed*, a Senate committee sued to enforce a subpoena for ballot boxes.  The question presented was not whether the committee had a cause of action in equity, but whether the federal courts had subject-matter jurisdiction to hear the case under a statute that was then codified at 28 U.S.C. § 41(1).  277 U.S. at 386.  Section 41(1) granted district courts jurisdiction over "all suits of a civil nature, at common law or in equity, brought by the United States, or by any officer thereof *authorized by law to sue*."  *Id.* (emphasis added).  Subject-matter jurisdiction therefore turned on whether "the committee or its members were authorized to sue by" Senate resolution.  *Id.* at 388.  The Supreme Court held that subject-matter jurisdiction was lacking because Senate resolutions authorizing the committee "to do such other acts as may be necessary in the matter of said

investigation," *id.*, did not authorize the Committee "to sue" on behalf of "the United States" within the meaning of Section 41(1), *id.* at 389.  The Court did not discuss or question whether the Committee would have had a cause of action in equity in a case where subject-matter jurisdiction existed, as it does here.

Defendants argue that under *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), the Court may not exercise its equitable powers in this case, asserting that the relief the Committee requests was not "traditionally accorded by courts of equity."  *Id.* at 319; *see* Defs.' Mot. at 33.  This ignores that the equitable relief ordered by the district court in *Grupo Mexicano*—a preliminary injunction preventing the transfer of assets in an action for money damages before judgment had been entered—had been "specifically disclaimed by longstanding judicial precedent."  527 U.S. at 322.  Here, by contrast, federal courts of equity have traditionally accorded declaratory and injunctive relief when Executive officials act contrary to federal law, and the relief the Committee seeks is thus consistent with historical practice.  *Armstrong*, 135 S. Ct. at 1384-85; *see, e.g.*, *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845) ("[W]e entertain no doubt, that, in a proper case, relief may be given in a court of equity … to prevent an injurious act by a public officer, for which the law might give no adequate redress.").

Defendants' invocation of *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), and *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), is also misplaced.  *See* Defs.' Mot. at 32-34.  Both cases considered whether to recognize an implied *damages* remedy for violations of the plaintiffs' rights, and they shed no light on whether the Committee may enforce its constitutional right to compel documents.  Courts hesitate to imply damages causes of action because they "often create substantial costs, in the form of defense and indemnification," and it is not the courts but

Congress that "has a substantial responsibility to determine whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government." *Abbasi*, 137 S. Ct. at 1856; *see also Jesner*, 138 S. Ct. at 1402-03 (expressing additional reluctance given certain foreign-policy concerns).  Those concerns have no application here.  In any event, *Abbasi* recognizes that courts possess traditional equitable powers to enforce the Constitution.  *See* 137 S. Ct. at 1856 ("When determining whether traditional equitable powers suffice to give necessary constitutional protection—*or whether, in addition*, a damages remedy is necessary—there are a number of economic and governmental concerns to consider." (emphasis added)).

**ii.**  The Declaratory Judgment Act also supplies the Committee with a basis to seek judicial relief.  *See, e.g.*, *McGahn*, 2019 WL 631201, at *31; *Miers*, 558 F. Supp. 2d at 82.  Although the Act does not create substantive rights, it does provide a mechanism for plaintiffs to seek a declaration vindicating rights guaranteed elsewhere—here, in Article I.  A court may declare parties' "rights" and "legal relations" in a case involving an "actual controversy" and within the court's jurisdiction, "whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see, e.g.*, *Shelby Cty. v. Lynch*, 799 F.3d 1173, 1183 (D.C. Cir. 2015).

The Supreme Court has not doubted that a party meeting the Act's requirements is entitled to seek relief, and has acknowledged that the Act may provide a basis for a plaintiff's entry into court.  *See, e.g.*, *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191 (2014).  Defendants rely on decisions suggesting that the Act does not provide a "cause of action," *see* Defs.' Mot. at 34, but those cases—understood in context—simply reaffirm that the Act is not a source of new substantive rights and may not be used to circumvent other limits on district courts' authority, *see, e.g.*, *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011) (stating

that the Act does not provide a "cause of action" after rejecting plaintiffs' claims pertaining to each of the substantive rights asserted). *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950), similarly holds only that the Act does not expand courts' jurisdiction. *See id.* at 671-72. Those decisions do not undermine the long-settled understanding that the Act provides a mechanism for the courts to resolve the legal rights and obligations of parties that are established elsewhere. Here, "Article I provides Congress" with a "judicially remediable right." *Miers*, 558 F. Supp. 2d at 84 (citing *McGrain*, 273 U.S. at 161).

Possessed of Article III and subject-matter jurisdiction, as well as equitable power to redress the Committee's injury, this Court should not stay its hand. *See Miers*, 558 F. Supp. 2d at 94-99 (comprehensively explaining why courts hearing Congressional subpoena-enforcement cases should not exercise their discretion under the Declaratory Judgment Act to decline review). In the face of Defendants' defiance, and the significance of the matters under investigation, the Committee urgently needs this Court to enforce the Subpoenas.

## II. The Committee's Subpoenas Fall Squarely Within Congress's Constitutional Authority

Defendants resist enforcement of the Subpoenas on the ground that they do not further a legitimate purpose within Congress's constitutional power. That argument is incorrect because, as the Committee has repeatedly explained, the Subpoenas are an exercise of Congress's core constitutional responsibility to gather information in furtherance of its legislative authority. *See, e.g.*, Pl.'s Mot., Ex. G. That authority encompasses not only the consideration of specific remedial legislation, but also the conduct of effective oversight of Executive Branch operations.

### A. The Subpoenas Seek Information Relevant to Legislation

Defendants concede, as they must, that the Committee may subpoena documents that inform whether and what type of legislation concerning the census is necessary or appropriate.

26

The Constitution explicitly states that the enumeration must be conducted "in the Manner as [Congress] shall by Law direct," U.S. Const., Art. I, § 2, cl. 3, and as explained above, Congress's power to gather information is "as penetrating and far reaching as the potential power to enact and appropriate under the Constitution," *Barenblatt*, 360 U.S. at 111.

Exercising its constitutional authority to "determine the Rules of its Proceedings," U.S. Const., Art. I, § 5, cl. 2, the House of Representatives has empowered the Committee with legislative jurisdiction over "[p]opulation and demography generally, including the Census," and more broadly over the "[o]verall economy, efficiency, and management of government operations and activities."  House Rules X.1(n)(6), (n)(8).  The House has also authorized the Committee, "at any time," to "conduct investigations of any matter" regardless of whether it is within the Committee's legislative jurisdiction, House Rule X.4(c)(2), and to issue subpoenas for documents or testimony "as it considers necessary" to "carry[] out any of [its assigned] functions and duties," House Rule XI.2(m)(1).  The Committee issued the Subpoenas pursuant to these authorities.  Defendants nevertheless argue that the Subpoenas exceed the Committee's authority because, in Defendants' opinion, the Committee does not "actually need" the documents it has requested to decide on any "legitimate" legislation.  Defs.' Mot. at 38-39.  That argument fundamentally misstates both the law and the facts.

The Constitution does not empower the Executive Branch to decide what documents are "necessary" for Congress to consider potential legislation.  That is a Congressional prerogative.  And when a court is called upon to consider the validity of a Congressional subpoena, the standard is not necessity but reasonable relevance.  *See Mazars*, 940 F.3d at 740 (observing that Congress may subpoena "information which is 'reasonably relevant' to its legitimate investigation" (quoting *Watkins*, 354 U.S. at 206)); *see, e.g.*, *McPhaul v. United States*, 364 U.S.

372, 381-82 (1960) (upholding Congressional requests for information because the requested documents "were not plainly incompetent or irrelevant to any lawful purpose …, but, on the contrary, were reasonably relevant to the inquiry.").  Similarly, it is not for Defendants to decide what type of legislation would be "legitimate" for Congress to enact in light of the facts the Committee identifies here.  The question is "whether the Committee is investigating a subject on which constitutional legislation 'could be had.'"  *Mazars*, 940 F.3d at 724 (quoting *McGrain*, 273 U.S. at 177).  Given the Constitution's assignment of census responsibility to Congress, the answer to that question is plainly yes, and Defendants' views on the wisdom or necessity of potential legislation are irrelevant.

On these facts, moreover, there can be no genuine dispute that the Subpoenas satisfy both elements of the correct standard:  they further a "legitimate investigation" within Congress's legislative authority, and they seek information "reasonably relevant" to that inquiry.  *Id.* at 740. In attacking the Committee's inquiry, Defendants once again ignore critical context.  The facts unearthed thus far reveal a scheme by the Commerce Department to create a false rationale for adding content to the Census questionnaire, to launder that rationale through an obliging Department of Justice, and to propagate the false reason in multiple statements to Congress, the public, and the courts.  These events highlight a troubling pattern of maladministration and misinformation that the Committee would be irresponsible in *failing* to investigate.  The Committee must understand the communications surrounding the attempt to add the citizenship question, the identity of the officials involved, and the processes by which the scheme was carried out.  Those facts will materially aid the Committee's consideration of whether remedial measures are necessary to protect the integrity of the 2020 Census and future enumerations.

That Defendants failed in their attempt to add the question to the 2020 Census obviously does not mean that their actions have no continuing significance. *See* Pl.'s Mot., Ex. G at 3 (summarizing the Committee's "live concerns"). Defendants advance the baseless assertion that the Subpoenas are illegitimate because they are "entirely backwards-looking." Defs.' Mot. at 38; *see id.* at 57-58 (similar). Every investigation is necessarily "backwards-looking" because Congress cannot investigate events that have not yet occurred. The Committee with jurisdiction over the census has concluded that the events in question require investigation because, as explained above, they constitute maladministration that is not only extraordinarily serious, involving efforts to mislead multiple parties, but also indicative of patterns and processes that may manifest in additional attempts to manipulate the census for improper reasons. *See, e.g.,* Pl.'s Mot., Ex. G at 9. The Committee has an obvious interest in the implications of an episode demonstrating the willingness of the Commerce Department—the agency responsible for executing Congressional mandates regarding the census—to ignore experts, manufacture rationales, and misrepresent how and why it sought to change the very contents of the Census questionnaire. *See, e.g., id.* at 9-13.

The legitimacy of the Committee's legislative purpose is confirmed by the same two factors the D.C. Circuit cited in *Mazars*.[8] First, as in that case, the Committee has made its

---

[8] Although *Mazars* did not technically involve a dispute between Congress and the Executive Branch, its reasoning on this issue is fully applicable here. The D.C. Circuit observed that although the case "present[ed] no direct inter-branch dispute, separation-of-powers concerns still linger in the air," and the Court therefore approached the issue on the assumption that it "owe[d] Congress no deference" on its assertions of legislative purpose. 940 F.3d at 726. The question in Mazars, moreover, was whether the purpose of Congress's inquiry was within the scope of its constitutional authority. *Id.* at 724. While the identity of the recipient may inform other aspects of the analysis, the validity of the investigative purpose does not change depending on whether the particular subpoena is addressed to a private individual or instead to a government official.

legislative purpose clear and identified specific concerns that may justify legislative action in its letters to Defendants and in its public memoranda and reports.  *See* 940 F.3d at 726-27.  The Committee has explained, for example, that its investigation "may lead to legislation, including but not limited to reforming the process used to add questions to the Census, changing requirements for congressional notifications or testing of new or existing topics and questions," or "requiring disclosure of Census questions proposed by third parties."  Pl.'s Mot., Ex. OOO at 6.  The Committee has elaborated that, as part of its investigation, it "is seeking information on the Administration's actual reasons for adding the citizenship question and the process it followed to do so," "the potential negative impacts on certain congressional districts caused by inaccuracies resulting from undercounts," and "the accuracy of the Administration's past statements to Congress and the public regarding these issues."  *Id.*, Ex. III at 6; *see id.*, Ex. G at 1, 3, 14-15 (detailing the Committee's legislative efforts and how Defendants' conduct has obstructed them).  When, as here, the "assert[ion]" of valid legislative "purpose … is supported by references to specific problems which in the past have been or which in the future could be the subjects of appropriate legislation, then [courts] cannot say that a committee of the Congress exceeds its broad power when it seeks information in such areas."  *Mazars*, 940 F.3d at 727 (quoting *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968)).

Second, "although the House is under no obligation to enact legislation after every investigation," *id.*; *see Eastland*, 421 U.S. at 509, the Committee has identified specific legislative measures as potential responses to its concerns, *e.g.*, Pl.'s Mot., Ex. G at 14-15 (discussing categories of potential remedial legislation and citing examples).  "[T]he fact that the House has pending several pieces of legislation related to the Committee's inquiry offers highly probative evidence of the Committee's legislative purpose."  *Mazars*, 940 F.3d at 727.

For similar reasons, Defendants fail in challenging the Subpoenas as "extraordinarily broad." Defs.' Mot. at 38. The Subpoenas are not "a blunderbuss demand for documents about the census writ large," nor do they "seek every document in the agency's files." *Id.* To the contrary, the Subpoenas focus on one specific and exceptionally egregious instance of census maladministration, and the particular documents that the Subpoenas seek about that event relate to the specific concerns that the Committee has identified as the target of potential remedial legislation. Access to the full context and content of the priority documents—critical senior-level exchanges about the attempt to add a citizenship question—will further the Committee's understanding of two ongoing concerns: first, whether the officials involved in creating the false rationale remain engaged in census administration, *see, e.g.*, Pl.'s Mot., Ex. XX at 1; and second, whether the Committee can credit assertions by the Commerce Department on census matters or whether legislation is necessary to impose new reporting requirements with means of verifying the reported information, *see, e.g.*, *id.*, Ex. G at 14. The remaining communications the Committee has subpoenaed focus on the involvement of internal and external parties in the Commerce Department's and DOJ's process for adding the citizenship question. Access to those documents will illuminate how the political leadership of the Commerce Department treated expert views; what methods, processes, and channels were used to add the citizenship question; and whether those processes are susceptible to further efforts to abuse the census power as a lever to achieve partisan ends. *See* Pl.'s Mot., Ex. G at 14.

In short, through the citizenship-question episode, Defendants have demonstrated a willingness not only to conceal how they are administering one of the crown jewels of American democracy, the Decennial Census, but also to mislead Congress and the public about their true intentions. The Committee is trying to understand who was involved, how they communicated,

and what they were hoping to accomplish so as to determine what legislative steps should be taken to ensure that similar abuses do not recur.  That is manifestly a legitimate legislative inquiry.

### B.     The Subpoenas Seek Information Relevant to Oversight

As the Committee has explained, *id.*, Ex. G at 3, the Subpoenas further another legitimate purpose that is inherent in Congress's legislative authority:  effective oversight of Executive Branch operations.  Administrations of both parties have consistently recognized the validity of Congressional oversight and have understood that it is a salutary part of our system of divided government.  Indeed, oversight is not only one of the central methods by which the Legislative Branch obtains information necessary to legislate effectively, but also a vitally important means of preserving the balance of power between the branches.  Defendants' denial of the constitutional basis for oversight—and their belief that responding to such oversight is a matter of Executive Branch grace—reflects a fundamental misunderstanding of the relationship between the coordinate branches and an extraordinarily cramped view of Congressional authority.

Defendants attempt to dismiss the Committee's oversight interest as "a bare desire to publicize misconduct."  Defs.' Mot. at 37.  That is not the purpose of this investigation or of Congressional oversight generally, which is instead intended to facilitate an ongoing dialogue between the political branches and to enhance the operations of government.  Congress conducts oversight primarily by requesting information, preferably through informal means such as briefings and voluntary productions of documents.  Congress then uses that information to monitor the Executive Branch's adherence to Congressional mandates, its execution on matters of shared constitutional responsibility, and its development of policies on issues of mutual interest.  Oversight requests frequently highlight areas of concern, and those concerns may in turn prompt public hearings or subpoenas that not only further inform Congress but also focus

the attention of Executive Branch officials on potential problems and solutions.  Often, the

Executive Branch will respond to oversight by heeding the views of Congress and taking

remedial measures on its own initiative.  When the identified concerns are sufficiently severe, or

when the Executive Branch does not adequately respond, the process may lead Congress to

consider legislation mandating Executive Branch action or to change appropriation of funds.

Thus, while oversight may ultimately end in legislation, it can and often does achieve

important objectives even if no legislation results.  But that does not eliminate or diminish the

constitutional basis for the exercise of oversight as an instrument of Congress's power to inform.

For one thing, "Congress's power to monitor executive actions is implicit in the appropriations

power … to assure that appropriated funds are not being used for illegal" purposes."  *AT&T I*,

551 F.2d at 394; *see* Pl.'s Mot., Ex. G at 3 ("Depending on the Committee's findings regarding

the processes that led to the addition of the citizenship question, Congress may need to direct the

Commerce Department's use of resources relating to the Census[.]").  And as noted above,

Congress's constitutional investigative authority "comprehends probes into departments of the

Federal Government to expose corruption, inefficiency or waste."  *Watkins*, 354 U.S. at 187.

Moreover, "to be a valid legislative inquiry there need be no predictable end result,"

*Eastland*, 421 U.S. at 509:

> [T]he purpose of an investigation, as the Court explained in *McGrain,* is to
> gather "information respecting the conditions which the legislation is
> intended to affect or change," it is, as the Court added in *Eastland*,
> "research" that informs future Congressional action. Congress's decision
> whether, and if so how, to legislate in a particular area will necessarily
> depend on what information it discovers in the course of an investigation,
> and its preferred path forward may shift as members educate themselves
> on the relevant facts and circumstances.

*Mazars*, 940 F.3d at 731 (citations omitted).  "The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises."  *Eastland*, 421 U.S. at 509.

The Committee's Subpoenas represent a valid exercise of its oversight authority.  In addition to its responsibility for the census, the Committee has primary responsibility for overseeing Executive Branch operations.  *See* House Rule X.2(a), (b)(1), X.3(i), X.4(c)(2).  The Committee has discharged that responsibility by seeking to understand the circumstances surrounding the bad faith and outright dishonesty that Executive Branch officials displayed in their interactions with Congress and the public, and the way in which the Executive Branch has approached Congressional mandates.  *See* Pl.'s Mot., Ex. B at 3; *id.*, Ex. C at 2-3; *id.*, Ex. VV at 27; *see also New York*, 351 F. Supp. 3d at 571-72 (recounting the "sheer number of ways in which Secretary Ross and his aides tried to avoid disclosure of, if not conceal, the real timing and the real reasons for the decision to add the citizenship question," including in the Secretary's Congressional testimony).

In contrast to Defendants' position here, the Executive Branch has previously acknowledged that the provision of inaccurate information to Congress is a valid focus of oversight.  *See* Pl.'s Mot., Ex. TTTT at 1, 6; *Comm. on Oversight & Gov't Reform, U.S. House of Representatives v. Lynch*, 156 F. Supp. 3d 101, 105 (D.D.C. 2016) (noting that DOJ had "acknowledged the legitimacy of the investigation" into the process by which DOJ had provided Congress inaccurate information).  The Committee has a valid oversight interest in understanding why, how, and by whom Congress was misled—not to "expose for the sake of exposure," not for the "personal aggrandizement of the investigators," and not to "punish,"

*Watkins*, 354 U.S. at 187, 200, but instead to understand the nature of, and to assess potential remedies for, Executive Branch maladministration.

III.   **No Form of Executive Privilege Permits Defendants to Withhold the Priority Documents from Congress**

To fulfill its legislative and oversight responsibilities, the Committee must fully understand Defendants' misconduct in obscuring their reasons for seeking to add a citizenship question to the census.  The facts about Defendants' misconduct that have emerged to date, including as found by the courts, vitiate the privileges that Defendants have attempted to assert to shield the priority documents from disclosure.  Defendants elide that issue, arguing instead that the Committee's investigation must yield to common-law privileges.  Defendants are wrong: such privileges do not defeat the Committee's constitutional authority.  *See* U.S. Const., Art. VI, cl. 2 (Supremacy Clause).  Regardless, even if the privileges applied, Defendants have not established the requisite foundations, and the Committee's need for disclosure overpowers Defendant's desire for secrecy.

A.   **The Privileges Defendants Invoke Cannot Block a Congressional Investigation Into Executive Branch Misconduct**

Defendants cannot rely on the deliberative process, attorney-client, and attorney work product privileges to shield evidence of their misconduct from Congress.

**i.**  The privileges Defendants assert do not apply because the Committee is investigating the Executive Branch's misconduct, both in elaborating a false rationale for adding a citizenship question to the census and in providing false testimony to Congress.  Even in circumstances where it might otherwise apply, the deliberative process privilege "disappears altogether when," as here, "there is any reason to believe government misconduct occurred."  *In re Sealed Case* (*Espy*), 121 F.3d 729, 746 (D.C. Cir. 1997).  In particular, "where there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied'

35

on the grounds that shielding internal government deliberations in this context 'does not serve the public's interest in honest, effective government.'" *Id.* at 738 (quoting *Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995)); *see, e.g., Alexander v. FBI*, 186 F.R.D. 170, 177-78 (D.D.C. 1999).

Defendants have offered no response to this point, *see* Pl.'s Mot. at 52—nor could they, given *Espy*. Defendants instead quibble with the related concept that, because the Committee's investigation encompasses the "intent" of Executive Branch decisionmakers, "it makes no sense to permit [Defendants] to use the privilege as a shield." *Id.* at 51 (quoting *In re Subpoena Duces Tecum Served on the Office of Comptroller of Currency*, 145 F.3d 1422 (D.C. Cir. 1998)). Defendants' argument is unpersuasive. *See* Defs.' Mot. at 51. It makes no difference that Defendants' intent, as a technical pleading matter, is not "an *element* of [the Committee's] subpoena-enforcement claim" in this lawsuit. *Id.* (emphasis added). What matters instead is that the Committee's constitutional investigative authorities are focused directly on the nature of, and motives behind, Defendants' and their agencies' decisionmaking. "[I]f either the Constitution or a statute makes the nature of governmental officials' deliberations *the* issue, the [deliberative process] privilege is a nonsequitur." *In re Subpoena Duces Tecum*, 145 F.3d at 1424.

The attorney-client and attorney work product privileges are subject to similar exceptions. "Attorney-client communications are not privileged if they 'are made in furtherance of a crime, fraud, or other misconduct.'" *In re Grand Jury*, 475 F.3d 1299, 1305 (D.C. Cir. 2007) (quoting *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985)). This exception applies if the client made or received the otherwise privileged communication with the intent to further such an act, and if the client actually carried out the act. *See id.*; *In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000). The attorney work product privilege, while "broader than the

attorney-client privilege," is "less absolute" and does not apply if "the client consult[ed] the lawyer or use[d] the material for the purpose of committing a crime or fraud," regardless of whether the misconduct actually occurred.  *In re Sealed Case*, 107 F.3d 46, 51 (D.C. Cir. 1997); *see id.* at 51 n.7.

The Committee has put forward credible evidence of Executive Branch misconduct in developing and propagating a false rationale for adding a citizenship question to the census, including by soliciting and acting on advice from attorneys to further their scheme.  *See* Pl.'s Mot. at 7-19, 53-54.  The priority documents concern Defendants' attempts to manufacture this false justification and thus go to the heart of the misconduct at issue in this case.  Summarizing the record of deception before it, and applying "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt," the District Court for the Southern District of New York "infer[red] from the various ways in which Secretary Ross and his aides acted like people with something to hide that they *did* have something to hide."  *New York*, 351 F. Supp. 3d at 661-62.  The District Court found a "strong showing of bad faith" and "improper behavior" by Secretary Ross and his staff, *id.* at 662 (quotation marks omitted), and the Supreme Court affirmed that finding, *see Dep't of Commerce*, 139 S. Ct. at 2573-74.

In the face of this precedent, Defendants cannot contest that the Committee has made a *prima facie* showing of misconduct that abrogates the asserted privileges.  Defendants point only to the Supreme Court's observation that "no *particular step* in the process stands out as inappropriate or defective."  *Id.* at 2574-75 (emphasis added); *see* Defs.' Mot. at 53.  That the very next sentence of the Supreme Court's opinion begins "[a]nd yet," *Dep't of Commerce*, 139 S. Ct. at 2575, is almost all that needs to be said.  The Court went on to explain that, "viewing

37

the evidence as a whole," there was "a significant mismatch between the decision the Secretary made and the rationale he provided"—an "incongruen[ce]" between "the agency's priorities and decisionmaking process," on the one hand, and the Secretary's "explanation" on the other.  *Id.*; *see id.* at 2575-76.

This is not, as Defendants would have it, simply a routine finding that "the rationale given by the Secretary … did not *adequately* explain his decision" under the Administrative Procedure Act (APA).  Defs.' Mot. at 53 (emphasis added).  It is a finding that Secretary Ross's rationale "seems to have been contrived," *Dep't of Commerce*, 139 S. Ct. at 2575—that his rationale was not a "genuine justification[]," *id.*, but rather "more of a distraction," *id.* at 2576; *see also id.* at 2583 (Thomas, J., dissenting) ("Today's decision marks the first time the Court has ever invalidated an agency action as 'pretextual.'").

Government misconduct of this nature has consequences far beyond the APA.  That is particularly so given that the integrity of the census is at stake, and in light of evidence suggesting that the real reason Secretary Ross sought to add the citizenship question was unconstitutional.  *See* Pl.'s Mot. at 53.  In investigating this misconduct, the Committee is addressing a certain and pressing need for oversight and potential remedial legislation.  And the Committee's investigation is made all the more urgent by the fact that Defendants' misconduct included providing false testimony to Congress, *id.* at 16-17, 53; *see New York*, 351 F. Supp. 3d at 548, 572—testimony that Defendants make no effort to defend.  In carrying out its constitutional responsibilities, Congress must be able to rely on Executive Branch officials to testify truthfully.  To protect the census and preserve its constitutional prerogatives, the Committee needs to understand how the Administration abused the process in this case, and the privileges Defendants assert cannot—and, under the law, do not—stand in the way.

As OLC has summarized, the privileges asserted here "should not be invoked to conceal evidence of wrongdoing or criminality on the part of executive officers." *Congressional Subpoenas of Department of Justice Investigative Files*, 8 Op. O.L.C. 252, 267 (1984). "[E]vidence of misconduct … render[s] the assertion of privilege inappropriate." *Id.* Because evidence of misconduct is manifest here, this Court should reject Defendants' assertion of privilege at the outset.

**ii.** The Committee has also established that none of the common-law privileges Defendants assert apply in a Congressional investigation. *See* Pl.'s Mot. at 46-49. In arguing to the contrary, and pressing for the recognition of a constitutionally-grounded executive privilege beyond the Presidential communications privilege, Defendants misread the D.C. Circuit's decisions in *Espy* and subsequent cases. *See* Defs.' Mot. at 40-43; *see also Comm. on Oversight and Gov't Reform v. Holder*, No. 12-cv-1332, 2014 WL 12662665, at *1-2 (D.D.C. 2014) (making the same error). *Espy* did not involve a Congressional subpoena, so the *Espy* Court had no occasion to test Congressional authority against the deliberative process privilege. Nor did *Espy* purport to ground that privilege in the Constitution.

Contrary to Defendants' selective quotation, *see* Defs.' Mot. at 41, *Espy* specifically explained that while the Presidential communications privilege and the deliberative process privilege are "closely affiliated," in that both cover aspects of executive decisionmaking, they are "distinct and have different scopes." *Id.* at 745; *see id.* at 735-40, 744. Most importantly for purposes of this case, these two "distinct" privileges arise from different sources of law: "The presidential privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role; the deliberative process privilege is primarily a common law privilege." *Id.* at 745. The Supreme Court has expressed the same view, recognizing that

the Presidential communications privilege is "rooted in the separation of powers under the Constitution," *Nixon v. Fitzgerald* (*Fitzgerald*), 457 U.S. 731, 753 (1982) (quoting *Nixon*, 418 U.S. at 708), "while courts generally have looked to the common law to determine the scope of" the deliberative process privilege, *id.*; *see id.* at 753 n.35 (collecting cases).

The contrary conclusion adopted by the *Holder* court and advanced by Defendants is premised in large part on a misreading of footnote 4 of the *Espy* opinion, which observed in dictum that "[s]ome aspects of the privilege, for example the protection accorded the mental processes of agency officials, have roots in the constitutional separation of powers." 121 F.3d at 737 n.4 (citing *United States v. Morgan*, 313 U.S. 409, 421-22 (1941)). That footnote was a reference to "aspects of the privilege" that are simply inapposite here, as confirmed by the footnote's reliance on *Morgan* as its sole support for the stated proposition.

*Morgan* held that it was error for a court to compel the testimony of a Cabinet Secretary regarding his mental thought processes concerning an *adjudicatory* proceeding that he conducted personally. 313 U.S. at 422. The *Morgan* Court observed that "[t]he proceeding before the Secretary 'has a quality resembling that of a judicial proceeding,'" and that the Court had "explicitly held in this very litigation that it was not the function of the court to probe the mental processes of the Secretary" in performing that role because "[j]ust as a judge cannot be subjected to such scrutiny, … so the integrity of the administrative process must be equally respected." *Id.* (quotation marks omitted). *Espy*'s passing reference to the *adjudicatory* aspect of the privilege at issue in *Morgan* thus had nothing to do with traditional executive decisionmaking, which is generally shielded from disclosure at common law. 121 F.3d at 745; *accord id.* at 737 (although now codified in FOIA, "the deliberative process privilege … originated as a *common law privilege*" (emphasis added)).

40

Far from lending support to Defendants' claim, *Espy* undermines it.  *Espy* rejected an extension of the Presidential communications privilege "to staff outside the White House in executive branch agencies," given the "significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President."  *Id.* at 752; *see Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1008, 1121 (D.C. Cir. 2004) (holding that the Presidential communications privilege does not extend to the Deputy Attorney General and his staff).  Yet the privilege that Defendants ask this Court to recognize is just as sweeping and in no way tethered to the President's "unique status under the Constitution," which "distinguishes him from other executive officials."  *Fitzgerald*, 457 U.S. at 750.  *Espy* also expressly declined to limit Congress's investigative powers, "underscor[ing]" that the "opinion should not be read as in any way affecting the scope of the privilege in the congressional-executive context."  121 F.3d at 753 (citing secondary sources suggesting particular power of Congressional inquiry).

The deliberative process privilege is a uniquely inappropriate ground for resisting a Congressional investigation into Executive Branch maladministration.  *See Watkins*, 354 U.S. at 187, 200 n.33.  But permitting Defendants to assert *any* non-constitutional privilege against the Committee, including the attorney-client and attorney work product privileges, *see* Pl.'s Mot. at 47-48, would elevate judge-made common law above the constitutional authority of a coordinate Branch.  *See, e.g.*, *Barenblatt*, 360 U.S. at 111; *McGrain*, 273 U.S. at 175.  It would ignore that Congress "must have the widest possible access to executive branch information if it is to perform its manifold responsibilities effectively."  *Murphy v. Dep't of Army*, 613 F.2d 1151, 1158 (D.C. Cir. 1979); *see also Espy*, 121 F.3d at 749 ("[O]penness in government has always been thought crucial to ensuring that the people remain in control of their government.").  It

would, then, disturb the separation of powers, particularly given that the Executive Branch's

Article II confidentiality interests, *see* Defs.' Mot. at 40-42, are sufficiently protected by the

Presidential communications privilege, which is not at issue here, *see* Pl.'s Mot. at 45-46.

Regardless, Congressional investigations are "purely … fact-finding," not adjudicatory.

*Hannah v. Larche*, 363 U.S. 420, 441 (1960).  Beyond impeachment and inherent contempt

proceedings, Congress "does not hold trials or determine anyone's civil or criminal liability."  *Id.*

Rules and procedures essential to adjudications are thus simply "not necessary" when Congress

conducts "a general fact-finding investigation."  *Id.* at 442.  Defendants protest that *Hannah*

arose in a different factual context, Defs.' Mot. at 45, but *Hannah*'s rationale squarely applies to

Congressional investigations.  Congress, of course, must respect constitutional privileges, *see*

*Barenblatt*, 360 U.S. at 112, but nothing in the Constitution requires Congressional

investigations to yield to privileges derived from the common law.  To the contrary, our

constitutional scheme contemplates that Congress "mak[es] its own determination" whether its

need for legislative evidence should yield to the interests served by non-constitutional privileges

asserted in a legislative proceeding.  *In re Provident Life & Accident Ins. Co.*, No. 90-cv-219,

1990 U.S. Dist. LEXIS 21067, at *6-7 (E.D. Tenn. June 13, 1990) (noting that the court's ruling

on attorney-client privilege was "not of constitutional dimensions" and was "certainly not

binding on the Congress of the United States").

### B.    The Privileges Defendants Invoke Over the Priority Documents Do Not Apply on These Facts or Justify Defiance of the Subpoenas

Even assuming the asserted privileges apply as a general matter, Defendants have not met

their burden of demonstrating that those privileges cover the priority documents.  "[E]xceptions

to the demand for every man's evidence are not lightly created nor expansively construed, for

they are in derogation of the search for truth."  *Espy*, 121 F.3d at 749 (quoting *Nixon*, 418 U.S. at

710).  "Whether the deliberative process, attorney-client, or attorney work-product privilege

applies depends on the content of each document and the role it plays in the decisionmaking

process."  *Bloche v. Dep't of Def.*, 279 F. Supp. 3d 68, 79 (D.D.C. 2017); *see Espy*, 121 F.3d at

735-36.  "Therefore, 'when an agency seeks to withhold information it must provide a relatively

detailed justification, specifically identifying the reasons why a particular exemption is relevant

and correlating those claims with the particular part of a withheld document to which they

apply.'"  *Bloche*, 279 F. Supp. 3d at 79 (citing *Mead Data Cent., Inc. v. United States Dep't of

Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)).  Defendants have failed to make the requisite

showings.

      First, the deliberative process privilege does not cover the priority documents because

they are not pre-decisional.  The documents post-date Secretary Ross's decision to add the

citizenship question, which was already "months old" by May 2017.  Pl.'s Mot. Ex. WWWW at

1; *see New York*, 351 F. Supp. 3d at 566-67.  The "timing" of these records "is important in the

analysis[:] communications made after a decision has been made and designed to explain that

decision are not privileged."  *Nat'l Right to Work Legal Def. & Educ. Found., Inc. v. U.S. Dep't

of Labor*, 828 F. Supp. 2d 183, 189 (D.D.C. 2011).

      Defendants argue that the documents are pre-decisional because they predate the

issuance of Secretary Ross's announcement of his decision in March 2018.  Defs.' Mot. at 49-50.

That argument is undermined by the record, which demonstrates that Secretary Ross's decision

early in his tenure to add the citizenship question was not a mere "initial policy inclination," *id.*

at 49, but rather a final decision that he and his staff then aggressively worked to implement, *see*

*Dep't of Commerce*, 139 S. Ct. at 2574 ("Th[e] evidence showed that the Secretary *was*

*determined to reinstate a citizenship question from the time he entered office*; instructed his staff

to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the Voting Rights Act [(VRA)] rationale late in the process." (emphasis added)); *see, e.g.*, *New York*, 351 F. Supp. at 550, 567-68.  Defendants' argument finds no support in *Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994), as that case concerns a determination by the Securities and Exchange Commission, which effectively sits as a court of appeals for agency administrative law judge decisions, rather than a policy decision made by a single Department head with ultimate authority over the matter within the Executive Branch.

Defendants also have not shown that the documents were "intended to facilitate or assist development of the agency's final position on the relevant issue."  *Nat'l Sec. Archive v. CIA*, 752F.3d 460, 463 (D.C. Cir. 2014).  The relevant "position" was "final" when the ultimate decisionmaker, Secretary Ross, decided to add the citizenship question, and there was no subsequent "development" of that position, *id.*, other than "to launder [it] through another agency—that is, to obtain cover for a decision that [Secretary Ross] had already made," *New York*, 351 F. Supp. 3d at 570.

Defendants claim that the Gary Letter, the Uthmeier Memo drafts, and the handwritten note "reflect the process by which Justice Department employees decided upon the final language," Defs.' Mot. at 47—a position that would extend the deliberative process privilege to cover *all* drafts of *all* documents, despite Defendants' acknowledgement that draft documents are not *per se* privileged, *see id.* (citing *Bloche*, 370 F. Supp. 3d at 51).  Defendants also argue that the Uthmeier Memo and drafts involved deliberation about "whether reinstating a citizenship [question] could be warranted because the data gathered would be useful for enforcement of the

44

Voting Rights Act." *Id.* But that Memo came well after Secretary Ross determined to add the citizenship question, and his decision was made "for reasons unrelated to the VRA." *New York*, 351 F. Supp. 3d at 660.

That same flaw defeats Defendants' assertion of the deliberative process privilege over documents (b), (c), (i), (j), and (k) of the Ross Subpoena, at least to the extent they reflect inputs, advice, or the crafting of explanations regarding the addition of a citizenship question. *See* Defs.' Mot. at 48. The object of the deliberative process privilege is to protect "the quality of agency decisions" for the good of the general public, *see, e.g.*, *U.S. Dep't of Interior v. Klamath Water*, 532 U.S. 1, 8-9 (2001), not to conceal agency efforts to concoct a post-hoc rationale designed to mislead the public. As the courts have already concluded, any discussion of the "merits" of the VRA explanation was an exercise in pretext intended to distract, not genuine deliberation intended to inform. *See Dep't of Commerce*, 139 S. Ct. at 2575-76.

Finally, Defendants still have not met their burden of establishing that attorney-client privilege applies to certain priority documents. *See* Pl.'s Mot. at 51-52. Defendants have failed to show, for example, that the Uthmeier Memo and accompanying note are confidential. *See Mead Data Central, Inc.*, 566 F.2d at 253 (attorney-client privilege "does not apply" when a document "has been or is later shared with third parties"). According to the Commerce Department, the Memo was prepared "by Mr. Uthmeier for the purposes of providing legal advice to Secretary Ross," Second Foti Decl. ¶ 10, and Defendants accordingly are careful to define the privilege as running between "an attorney (Mr. Uthmeier) [and] his client (the Secretary of Commerce)," Defs.' Mot. at 52.[9] But the Commerce Department conveyed the

---

[9] Moreover, during Secretary Ross's tenure, including prior to drafting the Uthmeier Memo, Mr. Uthmeier alternately served in roles as "advisor" to the Secretary and as Department

Memo and note to a political appointee at DOJ's Civil Rights Division.  Second Foti Decl. ¶ 7.
The fact that the Memo has been "kept confidential within the Executive Branch," *id*. ¶ 11, is not
enough to prove its confidentiality for purposes of the attorney-client privilege where
Defendants' submissions neither explain, on these facts, the nature of any attorney-client
relationship between the Commerce Department and the appointee at DOJ's Civil Rights
Division, nor assert that the Memo sought legal advice from or provided it to that appointee.  *Cf.*
Davis Decl. ¶ 5 (DOJ declaration merely "concur[ring]" with Second Foti Decl. ¶¶ 6-17 as to the
Memo).  Indeed, what Defendants *do* say about the Memo—that it was conveyed to DOJ "in the
course of Commerce's consultation with the Department of Justice as to whether" adding a
citizenship question "could be *warranted* to gather data useful for enforcement of the [VRA],"
Second Foti Decl. ¶ 7 (emphasis added)—suggests that legal advice was not at issue.  *See also
New York*, 351 F. Supp. 3d at 552-53.

Although Defendants emphasize that the Uthmeier Memo drafts were held privileged in
the *New York* litigation, they ignore that Congress is not bound by that determination, *see* Pl.'s
Mot. at 52 n.12, and that it predated the *New York* court's ultimate conclusion about the
impropriety of Defendant's conduct and the pretextual purpose of their communications, *see,
e.g.*, 351 F. Supp. 3d at 662.  That conclusion changes the character of the documents for
privilege purposes.  It means that, despite the involvement of an attorney and references to
caselaw, the documents primarily reflect advice on the "political [or] strategic" issue of how to
make a deceptive rationale sound more believable to the public.  *In re Lindsey*, 148 F.3d 1100,

---

counsel.  *See* James Uthmeier, LinkedIn, https://www.linkedin.com/in/james-uthmeier-
5669782b.  Because he has not performed exclusively legal services for the Commerce
Department or Secretary Ross, Defendants bear a heavier burden of showing that his memoranda
to Secretary Ross are protected by the attorney-client privilege.  *In re Lindsey*, 148 F.3d at 1123.

1106 (D.C. Cir. 1998).  Such discussions "would not be shielded from disclosure by the attorney-client privilege," *id.*, and are certainly not the type of open and candid discussions that privileges are designed to encourage.  Likewise, the privilege does not extend to documents (i) and (k), which Defendants acknowledge contain "impressions and advice about what issues to address and in what depth in the Uthmeier Memo and the Secretary's formal decision memorandum." Defs.' Mot. at 52.

In a case like this one, "where the public's ability to know how its government is being conducted is at stake," the "argument for a narrow construction" of any asserted privileges "is particularly strong."  *Espy*, 121 F.3d at 749.  Defendants have not satisfied their burden.

### C.   The Committee's Need for the Disclosure of the Priority Documents Far Outweighs Defendants' Desire for Secrecy

Even if the deliberative process, attorney-client, and attorney work product privileges applied here—which they do not—and even if Defendants had laid the requisite foundations for them—which Defendants have not—this Court still should order the priority documents disclosed.  The privileges Defendants invoke are qualified, not absolute, and the Committee has demonstrated that its need overcomes them.  *See* Pl.'s Mot. at 54-59.  In claiming otherwise, *see* Defs.' Mot. at 54-60, Defendants ask this Court to enforce a heightened standard that finds no basis in the relevant caselaw, and attempt to minimize, to a startling extent, the urgency of the Committee's investigation.

**i.**  Defendants do not seriously contest that all of the privileges they assert are qualified. In *Espy*, the D.C. Circuit set forth the standard for the deliberative process privilege, holding that it "can be overcome by a sufficient showing of need."  121 F.3d at 737.  *Espy* instructs that courts' "need determination is to be made flexibly on a case-by-case, ad hoc basis," and must take into account "factors such as the relevance of the evidence, the availability of other

evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees." *Id.* at 737-38 (quotation marks omitted).  A similar standard pertains for the attorney-client and attorney work product privileges.  *See In re Lindsey*, 158 F.3d 1263, 1278 (D.C. Cir. 1998).[10]

Invoking *Senate Select Committee*, 498 F.2d 725, Defendants argue that the Committee must make a heightened showing.  *See* Defs.' Mot. at 54-57.  But *Senate Select Committee* is not "'the case most directly on point.'"  *Id.* at 55 (quoting *Espy*, 121 F.3d at 755).  Setting aside that the "case" *Espy* cited was *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973), not *Senate Select Committee*, *see Espy*, 121 F.3d at 755, *Senate Select Committee* is inapposite.  That decision's articulation of the "demonstrably critical" standard that Defendants seek here, *see* 498 F.2d at 731, cannot be understood in isolation from its conclusion that, because another Congressional committee already possessed the subpoenaed tapes, "the Select Committee's immediate oversight need" for them was, "from a congressional perspective, merely cumulative," *id.* at 732.

More fundamentally, at issue in *Senate Select Committee* was the Presidential communications privilege.  *See id.* at 726.  Overcoming that privilege requires a "demonstrated, specific need," *Nixon*, 418 U.S. at 713—a showing "that each discrete group of the subpoenaed materials likely contains important evidence" and "that this evidence is not available with due diligence elsewhere," *Espy*, 121 F.3d at 754; *see id.* at 756.  That is effectively the standard Defendants seek here.  *See* Defs.' Mot. at 57 (arguing that the Committee must show that

---

[10] The work product privilege is qualified even outside of the government context.  In litigation, work product containing relevant facts may be overcome by a showing of substantial need, and work product revealing the opinions and judgments of counsel may be overcome in extraordinary circumstances.  *In re Sealed Case*, 676 F.2d 793, 810 (D.C. Cir. 1982).  Courts also find work product privilege to be waived where "a party seeks greater advantage from its control over work product than the law must provide to maintain a healthy adversary system." *Id.* at 818.

"obtaining the documents … is 'critical to the responsible fulfillment of the Committee's functions'" (quoting *Senate Select Committee*, 498 F.2d at 731)).  But *Espy* holds that overcoming the deliberative process privilege requires a lesser showing, and that the balancing "is more ad hoc."  121 F.3d at 746 (as compared to the "deliberative process privilege," the Presidential communications privilege is "more difficult to surmount" and "affords greater protection against disclosure").

Finally, there is no merit to Defendants' suggestion that the deliberative process privilege standard articulated in *Espy* (on which Defendants otherwise rely) does not apply because that case arose in the context of an intra-branch dispute.  Defs.' Mot. at 54-55.  *Espy* confirmed that even "*congressional* … negation of the presidential communications privilege is subject to greater scrutiny than denial of the deliberative privilege."  121 F.3d at 745 (emphasis added); *see Holder*, 2014 WL 12662665, at *2 (any applicable deliberative process privilege is subject to "a lower threshold to overcome than the privilege that covers Presidential communications").

Defendants likewise err in relying on *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004).  *See* Defs.' Mot. at 56-57.  *Cheney* is readily distinguishable.  "To begin with, the discovery request in *Cheney* was directed at the Vice President himself."  *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 532 F.3d 860, 865 (D.C. Cir. 2008).  The Committee's Subpoenas, by contrast, are directed at Executive agencies—agencies that *Congress*, by law, has established.  It is therefore irrelevant that the claim of privilege here "was made by the President himself."  Defs.' Mot. at 57.  There is no doubt that the *President* "occupies a unique position in the constitutional scheme," *Fitzgerald*, 457 U.S. at 749, but the Committee seeks no documents from him, thus hazarding no "diversion of his energies" and concomitant "risks to the effective functioning of government," *id.* at 751.

Rather, the Committee seeks document from "other executive officials," who are differently situated. *Id.* at 750.

Accepting Defendants' position would relegate Congress, in wielding its Article I authorities and seeking to overcome the common-law privileges that Defendants invoke, to a lesser position than that of FOIA requesters, grand juries, and civil litigants seeking to overcome the constitutionally based Presidential communications privilege. *See Judicial Watch*, 365 F.3d at 1114; *Espy*, 121 F.3d at 756-57, 762; *Dellums v. Powell*, 561 F.2d 242, 246 (D.C. Cir. 1977). That is not the law.

**ii.**   Regardless of the applicable standard, the Committee should prevail because its need for disclosure far exceeds Defendants' claims for confidentiality.   Defendants do not advance their argument by portraying the Committee's "interests" as "negligible."  Defs.' Mot. at 57. The census is a "mainstay of our democracy."  *Franklin v. Massachusetts*, 505 U.S. 788, 818 (1992) (Stevens, J., concurring).   Congress alone has the authority—and the duty—to decide whether the events under investigation necessitate legislative changes and to conduct oversight of how the Executive Branch is carrying out Congress's existing mandates.  As described above and further elaborated below, the Committee's investigation is tailored to understand the Executive Branch's misconduct in seeking to add a citizenship question to the census and in providing false testimony about those efforts.  The information the Committee's Subpoenas seek concerning the process, personnel, and influences that resulted in the decision to add a citizenship question, and Defendants' misleading disclosures about that decision, is critical to the Committee's constitutional tasks.  *Cf. Espy*, 121 F.3d at 761 ("As we commented in *Senate [Select] Committee*, if one of the crimes that the grand jury is investigating relates to 'the content

of certain conversations, the grand jury's need for the most precise evidence, the exact text of oral statements ... is undeniable.'" (quoting 498 F.2d at 732)).

The priority documents that Defendants highlight only underscore the point.  To determine whether the Census Bureau is operating with sufficient independence from improper influences, for example, the Committee must understand the Executive Branch's views on "the strengths and weaknesses of various potential sources of legal authority" for potentially compromising the census with the addition of a citizenship question.  Defs.' Mot. at 58.  For the same reason, the Committee must also understand the different ways that one of those rationales—the one that was ultimately advanced, as a pretext—might have been "presented," and on "potential sources of information and advice" on the issue generally.  *Id*.  And to discern whether current law provides sufficient accountability to the Branch entrusted with conducting the census—Congress, *see* U.S. Const., Art. I, § 2, cl. 3, the Committee is absolutely entitled to know the Executive Branch's interpretation of "the applicability of congressional notification requirements," Defs.' Mot. at 58.

## IV.   Defendants Have No Valid Basis for Withholding the Remaining Documents

### A.    The Parties Are at an Impasse and the Case Is Ripe for Adjudication

Defendants urge the Court to refrain from addressing the Committee's claim to the non-priority documents until the parties have pursued a compromise.  *See* Defs.' Mot. at 60-62.  Defendants' argument stretches the accommodation principle beyond recognition.  The D.C. Circuit has entertained such abstention, which constitutes a narrow exception to federal courts' "virtually unflagging obligation to exercise their jurisdiction," *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988) (quotation marks omitted), only in the rare circumstance when the record "demonstrate[s] the proximity of the parties to a workable compromise," *AT&T I*, 551 F.2d at 386.  Here, the nature of the Defendants' argument—that the Defendants may refuse, outright, to

provide documents which they are legally obligated to produce as a lever to extract

concessions—confirms that no such compromise is possible in this case.

    The record reflects that the Committee repeatedly sought to accommodate Defendants in

the months leading to the contempt vote, including by identifying a narrow set of key priority

documents, narrowing the categories of documents and date range covered by the Subpoenas

compared to previous voluntary document requests, delaying and limiting testimony, and seeking

to meet personally to determine whether a resolution might be negotiated.  *See* Pl.'s Mot. at 19-

28.  In light of this record, Defendants concede that the parties are at an impasse with respect to

the priority documents.  *See* Defs.' Mot. at 61.  And with respect to the remaining materials,

Defendants have offered no accommodation whatsoever.  Instead, they have issued a blanket

refusal to produce *any* additional documents, ceasing all productions in response to the

Subpoenas, in direct violation of their legal obligations and evidently in an effort to leverage

their continued withholding of "a significant number of additional documents identified as

responsive."  *See* Pl.'s Mot., Ex. L at 1-2.  Defendants appear to admit that they have made no

effort whatsoever to follow up on the representations that purported to justify their "protective"

assertion of privilege.  *See* Defs.' Mot. at 12-13.

    The only case on which Defendants rely in arguing that this Court should abstain, *AT&T*,

in fact demonstrates the impropriety of such an approach here.  In *AT&T I*, the D.C. Circuit

refrained from resolving an inter-branch conflict only because the parties were so close to a

"workable compromise" that the court could "suggest the outlines of a possible settlement which

may meet the mutual needs of the congressional and executive parties."  551 F.2d at 385-386.

The parties had "c[o]me close to success" because they had already agreed on the documents the

Committee would be permitted to review; the remaining gap concerned only "the means of

verifying the accuracy and candor of the classifications and generic descriptions" in those documents. *Id.* at 386-87. Even then, the Court recognized that "[s]ince Congress wishes to investigate executive abuse" of authority, Congress "should not be required to take the Executive's word." *Id.* at 394. When the D.C. Circuit considered the dispute a second time, it decided several threshold legal issues but refrained from reaching the ultimate question because "[n]egotiation ha[d] narrowed … the gap between the parties." *AT&T II*, 567 F.2d at 123.

*AT&T* therefore does not require that the Court refrain from intervening in this case. Instead, the D.C. Circuit held that where, as here, "the parties reach an impasse," the Court must "enter an order disposing of" the matter. *AT&T I*, 551 F.2d at 385. The Court should not accept Defendants' efforts to transform *AT&T*'s good faith streamlining of separation-of-powers disputes into an impossibly high bar to judicial resolution of such disputes. Indeed, even in *AT&T II,* where the parties were close to a compromise, the D.C. Circuit proceeded to resolve justiciability questions to give the parties further guidance in their interactions. 567 F.2d at 123. Given the Defendants' continued defiance of their obligations, the impasse here is crystallized and this Court's review is warranted.

### B.    The Subpoenas Are Appropriately Tailored

The Subpoenas seek materials critical to the Committee's inquiry. *See* Pl.'s Mot. at 39-42. The Court should not entertain Defendants' unfounded argument that the Subpoenas are unconstitutionally burdensome. *See* Defs.' Mot. at 62-65.

Defendants' position rests on a fundamental mischaracterization of what information a Congressional committee may validly request in the course of an investigation. As explained in Section II, *supra*, a Congressional request for information is appropriate whenever it is "reasonably relevant" to a Congressional inquiry, *Mazars*, 940 F. 3d at 740 (quotation marks omitted), and Congressional inquiries may cover any subject on which legislation "could be

had," *McGrain*, 273 U.S. at 177.[11]   For the reasons discussed above, the Committee has amply

shown "the propriety of [its] requests."  *Cheney*, 542 U.S. at 388.  The Committee requires "the

widest possible access to executive branch information" in order to fulfill its legislative and

oversight responsibilities.  *Murphy*, 613 F.2d at 1158 ("Congress … must have the widest

possible access to executive branch information if it is to perform its manifold responsibilities

effectively."); *cf. Comm. on the Judiciary v. McGahn*, 407 F. Supp. 3d 35, 42 (D.D.C. 2019)

("[C]ompliance with a valid subpoena that a committee of Congress issues pursuant to Article I

investigative powers is itself a legal duty, and therefore not an injury at all.").

    Once again, Defendants' reliance on *Cheney* is particularly misplaced.  *See* Defs.' Mot. at

64-65.  That case did not involve a Congressional subpoena.  There, the Supreme Court held that,

in a civil case involving a private citizen and the Vice President, the private litigant may need to

demonstrate "the propriety of [a civil discovery] request"—including relevance, admissibility,

and specificity—before forcing the President to make privilege determinations, so as to avoid

"unnecessary intrusion into the operation of the Office of the President."  *Cheney*, 542 U.S. at

---

[11] For this reason, federal agencies routinely produce significantly more documents in response to Congressional inquiries than Defendants protest here.  Defendants complain that they have produced over "30,000 pages" and that the materials responsive to the Committees' requests "could include tens of thousands more [pages]."  Defs.' Mot. at 62.  For comparison, during an investigation into the attack on a U.S. compound in Benghazi, Libya, the State Department produced over 70,000 pages of documents to the House's Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi.  *Final Report of the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi*, H. Rep. No. 114-848, at 358 (2016).  The Central Intelligence Agency produced 6.2 million pages of documents to the Senate Select Committee on Intelligence during an investigation into detention and interrogation practices, and did so while navigating significant national security sensitivities.  *See* 160 Cong. Rec. S1488 (daily ed. Mar. 11, 2014) (statement of Sen. Dianne Feinstein).  In connection with the Senate Committee on Finance's investigation into the tax-exempt status of political advocacy organizations, the Internal Revenue Service produced "approximately 1,300,000 pages of documents."  *The Internal Revenue Service's Processing of 501(c)(3) and 501(c)(4) Applications for Tax-Exempt Status Submitted by "Political Advocacy" Organizations from 2010-2013*, S. Rep. No. 114-119, at 15 (2015).

387-88.  Because *Cheney* involved "[t]he right to production of relevant evidence in civil proceedings," however, the case lacked the "constitutional dimensions" present here, arising from the "impairment of another branch's essential functions." *Id.* at 370 (quotation marks omitted) (distinguishing *Nixon*).

But even if Defendants could simply decline to comply with a duly authorized subpoena on the basis of inconvenience—which they cannot—they have alleged no compelling burden here.  Defendants' response is remarkable in its apparent acknowledgment that Commerce appears to have done nothing more than produce the records it already reviewed and prepared in the *New York* litigation.  Defendants note that the Commerce Department "began by delivering [to the Committee] documents contained in the administrative record compiled in the Census litigation," Defs.' Mot. at 8, then estimate the total volume of its productions at "more than 13,000 pages," *id.* at 9—approximately the same volume of the complete administrative record compiled in the Census litigation, *see id.* at 5.  Thus, other than producing "143 pages of emails" in response to a different request, Defs.' Statement of Material Facts Not in Dispute ¶ 19 (Jan. 14, 2020), ECF No. 19-9, it appears that the Commerce Department has done nothing to respond to the Committee's inquiry beyond repurposing past productions.[12]  For its part, DOJ also admits that it has concluded it could "expeditiously provide the Committee with responsive documents without undertaking a new, duplicative effort to collect and review documents" by relying on

---

[12] *See* First Foti Decl. ¶¶ 53, 55 (stating that, before it ceased productions, the Commerce Department "focused its efforts to respond to the Committee's request by processing documents contained in the [*New York*] Administrative Record," and thereafter addressing the steps "the Department *would* have to [take] to conduct searches for and produce additional documents responsive to the Committee's subpoena (assuming there are any) beyond that the Department has already furnished to the Committee" (emphasis added)).

work it had performed "in response to a third-party subpoena served in" the "then-ongoing" *New York* litigation.  Greer Decl. ¶ 8.

Defendants express particular concern that the Subpoenas "burden[] the President with the task of making thousands of individual determinations of executive privilege over documents, unlike the 'priority' documents, in which the Committee has expressed no particularized interest at all."  Defs.' Mot. at 64.  As a preliminary matter, the Committee cannot describe with particularity documents that Defendants have withheld in their entirety.  Instead, the Committee has repeatedly conveyed its interest in the categories of documents that it has subpoenaed.  *See, e.g.*, Pl.'s Mot., Ex. JJJ; *id.*, Ex. G.

In addition, Defendants' reliance on cases concerning communications of the President or the Vice President is misplaced.  *See Cheney*, 542 U.S. at 372, 382; *United States v. Poindexter*, 727 F. Supp. 1501 (D.D.C. 1989) (discussing a judicial subpoena for President Ronald Reagan's personal diaries and notes).  No such communications are at issue here: Secretary Ross has represented that "[n]o officials from the White House were a part of" the process of attempting to add a citizenship question to the 2020 Census.  Pl.'s Mot., Ex. HHHHH, at 1; *see The Latest: WH Says It Wasn't Behind Census Change*, Associated Press (Mar. 27, 2018), https://perma.cc/Y55K-W26F (quoting the White House Press Secretary as stating that the decision "was made at the department level").  Neither judicial nor Executive Branch precedent contemplates that President Trump will personally review thousands of documents to which he has no direct connection.[13]  Accordingly, Defendant Barr requested a blanket, protective

---

[13] *See, e.g.*, *Landry v. FDIC*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (privilege is asserted by the "head of the department" that controls the requested information); Reagan Mem. re: *Procedures Governing Responses to Congressional Requests for Information* ¶ 5 (Nov. 4, 1982), https://perma.cc/LSR3-WJGC (contemplating that a department head's *request* for the assertion

assertion of privilege "to give the Departments of Commerce and Justice"—not the President—
"time to determine whether any remaining documents may be subject to privilege."  Pl.'s Mot.,
Ex. GGGG at 8.

Finally, Defendants could start productions tomorrow without suffering any new burden.
Defendants have repeatedly acknowledged that they possess "tens of thousands more pages of
identified non-privileged documents" that they "intended" to produce since June 2019.  Greer
Decl. ¶ 25; *see, e.g.*, Defs.' Mot. at 62; Pl.'s Mot., Ex. QQQ.  They have flatly refused to provide
these documents since the President's July 2019 "protective assertion of privilege."  Defs.' Mot.
at 63 n.20.  Defendants do not describe these documents.  But Defendants' seeming admission
that they primarily produced to the Committee documents that were already produced in the
citizenship question litigation (which involved more than 160,000 pages, *id.* at 5), suggests that
Defendants' protective assertion of privilege may cover documents that were already produced to
private plaintiffs or others.

Defendants' representations about the materials that they could have produced, but have
not produced, raise troubling questions about their use of executive privilege in this case.
Defendants may have successfully leveraged a protective assertion to withhold documents as to
which there is not even a plausible confidentiality interest.  And there is no indication that
Defendants have used the substantial time since the protective assertion to undertake any review
of the documents—as they represented they would—or to actually assert privilege over such
documents.  Invocation of privilege, even in the protective form, is a serious act.  *See Nixon*, 418
U.S. at 710 & n.18.  Historically, it has been taken seriously.  When the Executive Branch claims

---

of privilege—not all of the relevant documents—"shall be presented to the President" for "the
President's decision" (emphasis added)).

privilege in a Congressional inquiry, a coordinate branch is deprived of relevant information. Accordingly, the Executive Branch has developed careful procedures to ensure that privilege is not lightly or carelessly invoked.  Defendants' submissions suggest that the resort to privilege in this case was not undertaken with due regard for its constitutional significance.

## CONCLUSION

The Court should deny Defendants' motion to dismiss or, in the alternative, for summary judgment, and grant the Committee's motion for summary judgment.

Respectfully submitted,

/s/ Douglas N. Letter
Douglas N. Letter (DC Bar No. 253492)
   *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
   *Principal Deputy General Counsel*
Megan Barbero (MA Bar No. 668854)
   *Deputy General Counsel*
Josephine Morse (DC Bar No. 1531317)
   *Deputy General Counsel*
Adam A. Grogg (DC Bar No. 1552438)
   *Associate General Counsel*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, DC  20515
Telephone:  (202) 225-9700
douglas.letter@mail.house.gov

David A. O'Neil (DC Bar No. 1030615)
Anna A. Moody (DC Bar No. 1047647)
Laura E. O'Neill (DC Bar No. 1033764)
Nathaniel Johnson (DC Bar No. 241433)
DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave. NW
Washington, DC  20004
Telephone:  (202) 383-8000

*Counsel for Plaintiff the Committee on Oversight*
   *and Reform, U.S. House of Representatives*

January 22, 2020