**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON OVERSIGHT AND
    REFORM, UNITED STATES HOUSE
    OF REPRESENTATIVES,

                        *Plaintiff*,

    v.

WILLIAM P. BARR, in his official capacity
    as Attorney General of the United
    States, *et al.*,

                    *Defendants*.

No. 19-cv-3557 (RDM)

## JOINT STATUS REPORT

The parties respectfully submit this joint status report in compliance with the Court's orders of August 27, 2020, and August 31, 2020, directing the parties to address (1) "the progress of accommodations on the priority documents," and (2) "how the Court should proceed in light of the opinion issued [on August 31, 2020] by the U.S. Court of Appeals for the D.C. Circuit in *Committee on the Judiciary v. McGahn*, No. 19-5331 (D.C. Cir.)," respectively.

**Committee on Oversight and Reform's Statement**:

The parties are at an impasse with respect to the remaining priority documents. These 11 Commerce Department documents and email chains have been prioritized by the Committee since March 2019. *See* Compl. ¶¶ 90-91 & n.153 (Nov. 26, 2019), ECF No. 1.[1] Defendants have now informed the Committee that the remaining priority documents span a mere 51 pages.

---

[1] The Gary Letter drafts were also among the Committee's priority documents, *see* ECF No. 23 at 3-4 n.2, but after the Department of Justice permitted Committee staff to review them *in camera*, the Committee informed Defendants and the Court that they are no longer at issue, *see* Aug. 27 Tr. at 5.

Despite committing to negotiate over these materials as recently as August 27, 2020, Defendants have declined to do so, and are now refusing to accommodate the Committee's need for these documents.  Defendants' attempts to wield the accommodations process as a means of delaying disclosure about their maladministration and politicization of the 2020 Census must end.

The Committee's investigation centers on conduct that the District Court for the Southern District of New York found to demonstrate a strong showing of bad faith—a finding that the Supreme Court endorsed.[2]  Yet despite the continued urgency of that investigation, and notwithstanding the parties' impasse regarding the remaining priority documents, the Committee must once again request that the Court await further proceedings in *McGahn* before moving forward.  The Committee respectfully requests, however, that as soon as D.C. Circuit precedent allows, the Court immediately order Defendants to disclose the remaining priority documents to the Committee.

**1.**  At the August 27 status conference, when the Court asked whether there was "still room for compromise with respect to" the remaining priority documents—all of which the Committee requested from the Commerce Department—Defendants asserted: "In our view, Your Honor, yes, there certainly is still room for future accommodation."  Aug. 27 Tr. at 19; *see id.* at 20 ("[W]e shouldn't be pessimistic about how this can proceed.").  The Court instructed the parties to focus their accommodation efforts on those documents, and then to report what progress has been made and whether "further efforts could be fruitful," *id.* at 38, so the Court could "understand precisely what documents remain in dispute," *id.* at 39.

---

[2] *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573-76 (2019), *aff'g in part & rev'g in part New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 547-48, 571-72, 661-62 (S.D.N.Y. 2019).

Since the August 27 status conference, Defendants have confirmed—first in correspondence with the Committee on September 9 and now in their statement below—that the parties are at an impasse with respect to all 11 of the remaining priority documents.

**a.**  Shortly after the August 27 status conference, the Committee renewed its request that Defendants permit Committee staff to review the remaining priority documents *in camera* to enable the Committee to determine whether or not to continue to seek their disclosure.  The Committee further asked, if Defendants would not permit such review, what other accommodations Defendants were prepared to offer.  When Defendants had not responded by September 2, the Committee followed-up and suggested a call.  On September 9, without engaging with the terms of the Committee's requests, Defendants notified the Committee that "after further consideration of the Committee's request for access to the remaining 11 priority documents, in light of the Committee's most recent articulation of its need for these documents in the parties' August 17, 2020, Joint Status Report, [Defendants] are unable to offer the Committee an accommodation regarding these documents at this time."

Defendants' latest about-face—a sharp reversal from August 27 to September 9— suggests that they never had any genuine intent to accommodate the Committee's need for the remaining priority documents.  *See, e.g.*, ECF No. 46 at 4-5.  Instead, their actions indicate that their aim all along has been to delay disclosure of those documents—including by repeatedly holding out an artificial promise of an accommodation and then withdrawing it—until, in their view, "there is zero chance" of any additional revelations about their misconduct making a difference.  *Id.* at 10.  Since at least March 2019, Defendants have professed a willingness to compromise but insisted on judging the Committee's requests for information against an unlawful standard that Defendants then claim the Committee cannot meet.  *See* ECF No. 34 at 2.

In mid-January 2020, after the Committee filed suit, Defendants reversed course, admitting in their brief that "[t]he parties have reached an impasse" regarding the priority documents.  ECF No. 19 at 60.  Yet on January 30, Defendants changed course once again, telling the Court at the hearing that it should stay its hand because they were "prepared to continue to engage on those documents."  Jan. 30 Tr. at 85-86; *accord* ECF No. 34 at 5.

Defendants repeated that claim just two weeks ago, as detailed above, in again urging delay at the August 27 status conference.  To be sure, Defendants "ma[de] clear" that they were "not promising" anything, asserting that their willingness to "reach an accommodation … depends on conversations between the parties and what the House can explain as to what it needs and why," Aug. 27 Tr. at 20—echoing their previous refrains and ignoring that the Committee's thorough explanations of its legislative purpose suffice under any standard, *see* ECF No. 46 at 2.[3] Finally, since the status conference, Defendants have declined to even have a conversation with the Committee and have again refused to accommodate the Committee's need for the remaining priority documents.  Defendants have not explained why it took them 18 months to alert the Committee, and 9 months to alert this Court, of that final determination.

Defendants have represented to the Court that they have "been telling the Committee *throughout this process*" that they are open to an accommodation regarding the remaining priority documents.  Aug. 27 Tr. at 19 (emphasis added).  That was not true on August 27, *see, e.g.*, ECF No. 19 at 60, and it certainly is not true now.  In fact, the only thing that has been

---

[3] *See also* Jan. 30 Tr. at 86 (The Court, to counsel for Defendants: "My sense is you probably have what you're going to get with respect to the description of need, which is at least in the House's papers that they've filed in this case where they've devoted a fair amount of attention to discussing the need.  And it may be that they are not in a position to tell you exactly the need for a particular document because they don't know what's in the document until they see it.").

consistent about Defendants' behavior is that they have claimed to be open to accommodations over the remaining priority documents only when they think that is to their advantage. Defendants' shifting statements to the Court and to the Committee raise troubling questions about whether they have been negotiating over the remaining priority documents in good faith. Their statements also fit a pattern: the very misconduct the Committee is investigating concerns Defendants' bad faith in repeatedly asserting a falsehood to courts and to Congress. *See, e.g.*, ECF No. 46 at 2.[4]

The Court should be concerned about Defendants' gambit. The Committee respectfully suggests that the Court hold a status conference to examine how and why Defendants' positions have changed so conspicuously over time. Courts routinely hold status conferences to ask questions of parties, including agency counsel, in far less serious circumstances. An initial step like that is warranted here, to assess Defendants' representations to the Court and to understand from the decisionmakers at the Commerce Department whether their negotiations regarding the remaining priority documents have been in good faith.

**b.** To the extent there was ever any question, Defendants' statement below confirms that the parties are at an impasse with respect to the remaining priority documents. While the Court asked the parties to be "as forthcoming as possible" about the prospect of future accommodations so the Court could "know which documents" to "focus on," Aug. 27 Tr. at 39, Defendants' statement does not provide that kind of detail. Instead, Defendants restate their legal arguments and attempt to re-litigate the fundamental legal dispute that has divided the parties from the start

---

[4] Defendants "hasten to observe," below, that the *New York v. Dep't of Commerce* court declined *to sanction* the Commerce and Justice Departments upon concluding that the record in that case did not show "clear and convincing evidence of … a scheme" to "intentionally mislead the Court" on a particular issue. No. 18-cv-2921, 2020 WL 2564933, at *5 (S.D.N.Y. May 21, 2020) (quotation marks omitted). This does not allay the Committee's concerns.

regarding the priority documents. *See* ECF No. 34 at 2-4. That dispute—which largely concerns Defendants' insistence on a legally incorrect standard for disclosure of those documents[5]—has been fully addressed in the parties' briefs, *see* ECF Nos. 17, 19, 23, 27, at the January 30 argument, and in the parties' dueling statements in their February 13 Joint Status Report, *see* ECF No. 34. It is ripe for adjudication. *See id.* at 2-4.

Defendants are wrong in asserting that the House sees "the accommodation processes [as] an obstacle to what it really want[s] to be doing, which [is] litigating in Court." Aug. 27 Tr. at 20; *see Comm. on Judiciary v. McGahn*, 968 F.3d 755, 772 (D.C. Cir. 2020) (en banc) ("Litigation, as the [House] General Counsel … emphasized to this court during oral argument, is not a preferred option of politicians."). But "the ordinary and effective functioning of the Legislative Branch critically depends on the legislative prerogative to obtain information." *Id.* at 761. For the accommodations process to function, both sides must approach it genuinely, and when it falters, "judicial enforcement of congressional subpoenas" becomes necessary. *Id.*; *see id.* at 771-72.

**2.** The Committee's investigation into Defendants' misconduct is urgent. *See, e.g.*, ECF No. 46 at 2-3, 5-6. Indeed, since the parties filed their August 17 Joint Status Report, the Committee's concerns have only increased. The Committee has obtained and publicized an internal Census Bureau document warning the Commerce Department that forcing the Bureau to complete its count under the current deadlines could severely degrade the count's accuracy and completeness. The Committee has also conducted briefings with three senior Bureau officials

---

[5] Defendants also gesture at whether common-law privileges apply as against Congress, but as the Committee has previously explained, the Court need not reach that constitutional question because even if the privileges did apply, Defendants' misconduct has vitiated them and Defendants have not laid the proper foundations for them. *See, e.g.*, ECF No. 23 at 35.

who all confirmed the imminent risk to an accurate 2020 Census—and who were prevented from answering several of the Committee's questions by Commerce Department lawyers—and held another hearing.[6]

In the past week alone, courts have struck down as unlawful President Trump's July 2020 memorandum ordering the exclusion of immigrants lacking lawful status from the reapportionment following the 2020 Census, and temporarily restrained the Bureau from ending the count by September 30 (a month earlier than planned).[7]  As the Committee has explained, these actions by the Trump Administration provide further evidence of maladministration by political appointees and attempts to politicize the census.  ECF No. 46 at 2-3.  The need for remedial legislation and ongoing oversight continues to increase, and to fulfill its constitutional responsibilities, the Committee is plainly entitled to the communications among the major players in Defendants' scheme.  Nonetheless, the Committee must now request that the Court await further action by the en banc D.C. Circuit in *McGahn* before adjudicating the parties' cross-motions in this case.

In *McGahn*, a divided panel of the D.C. Circuit has held that a House committee lacks a cause of action to enforce its subpoena to a former Executive Branch official.  *See* No. 19-5331, 2020 WL 5104869 (D.C. Cir. Aug. 31, 2020), *pet. for reh'g pending* (D.C. Cir. filed Sept. 8, 2020).  The *McGahn* panel's decision conflicts with precedent, including the Supreme Court's recent reaffirmation of House committees' constitutional right to obtain information, *Trump v.*

---

[6] *See* Letter from Chairwoman Carolyn B. Maloney to Speaker Nancy Pelosi, *et al.*, at 1-2, 4 & n.6, 6 (Sept. 2, 2020), https://perma.cc/C766-ZX4Y; Committee on Oversight and Reform, *Providing the Census Bureau with the Time to Produce a Complete and Accurate Census* (Sept. 10, 2020), https://perma.cc/77JS-ZWEZ.

[7] *See New York v. Trump*, No. 20-cv-5770, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020) (three-judge court); *Nat'l Urb. League v. Ross*, No. 20-cv-5799, 2020 WL 5291452 (N.D. Cal. Sept. 5, 2020).

*Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020), and the en banc D.C. Circuit's recent holding

that "constitutional structure and historical practice support judicial enforcement of

congressional subpoenas when necessary," *McGahn*, 968 F.3d at 761.  The *McGahn* panel's

decision also threatens to hamstring Congressional investigations.  Accordingly, the House has

petitioned for rehearing en banc and the D.C. Circuit has ordered the Department of Justice to

respond by September 24.  Further action by the en banc D.C. Circuit in *McGahn* will inform

this Court's determination whether the Committee has a cause of action to seek judicial

enforcement of its subpoenas.

　　　The Committee respectfully requests that, as soon as D.C. Circuit precedent allows, the

Court immediately proceed to order disclosure of the remaining priority documents to the

Committee.  In the meantime, the Committee intends to attempt further progress with Defendants

with respect to documents other than the remaining priority documents.  Of the non-priority

documents Defendants have withheld in full or in part, the Committee has highlighted a small

percentage—around 830 documents, less than 15% of the already substantially narrowed set—

and requested that Defendants permit Committee staff review them *in camera* to determine

whether the Committee will continue to press for their disclosure.  The vast majority of those

requests remain pending, some for six months.  As the Court has observed, "actions by the

judiciary can sometimes help move the parties along in their discussions."  Aug. 27 Tr. at 21.

Accordingly, the Committee respectfully requests that the Court require the parties to file joint

status reports on their accommodations efforts every three weeks, as they have been doing.

　　　With regard to the non-priority documents, Defendants' statement below is notable for

what it omits.  In arguing that the accommodations process has been successful so far, Defendants

claim that it has been responsible for reducing "the number of pages as to which the Court may

one day have to rule … from 346 to approximately 50."  That does not include the non-priority documents, which remain part of this case.  *See, e.g.*, ECF No. 23 at 51-58.  The initial draft of Defendants' statement that Defendants sent to the Committee expressed a willingness to "continue engaging in the accommodation process with respect to the non-priority documents for as long as the parties' conversations remain productive, irrespective of the status of this litigation."  The revised draft of Defendants' statement omits that assurance, further confirming the Committee's concern about Defendants' commitment to the process. **Defendants' Statement**:

      1.     As the Court is aware, the subpoenaed documents that the Committee has identified as "priority" documents may be divided into three categories:  (1) two drafts of a memorandum prepared by a former Department of Commerce ("Commerce") attorney, James Uthmeier, containing advice submitted to Secretary Ross regarding the legal authority for reinstating a citizenship question on the 2020 census questionnaire; (2) nine e-mail chains, six of which are between the Secretary and his senior advisors, two of which are between the Secretary's senior advisors, and one of which is between the Secretary's senior advisors and the White House, from which certain information, both related and unrelated to the census, has been redacted; and (3) 89 drafts of the so-called "Gary" letter in which the Department of Justice requested that the Bureau of the Census restore a citizenship question to the 2020 census.

      Over the course of the accommodation process that the parties have pursued since February of this year, the Department of Justice ("DOJ") has permitted Committee staff to review all 89 drafts of the Gary letter.  In addition, both Commerce and DOJ have provided the Committee copies of all documents that they produced during the litigation in *State of New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y.), *aff'd in part and rev'd in part,* 139 S. Ct. 2551 (2019).  DOJ has also permitted Committee staff to review 163 additional privileged documents

that DOJ withheld in the *New York* case.  These were documents of interest to which Committee staff requested access after DOJ permitted the Committee to review its privilege log prepared in that case.

At the Court's direction, Defendants have recently focused their efforts on evaluating the possibility of an accommodation with respect to the remaining priority documents, rather than the non-priority documents that the parties had been primarily discussing.  For the reasons explained below, however, Commerce has concluded, after consultation with the Office of Legal Counsel ("OLC"), that it cannot agree to accommodate the Committee's request for production, or staff review, of the remaining 11 priority documents.

As the Supreme Court recently confirmed, recipients of congressional subpoenas "have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020).  Accordingly, a decision to disclose subpoenaed agency documents and communications over which the President has made a formal assertion of executive privilege must take into account the Executive Branch confidentiality interests implicated by the sought-after materials, and the interests that would be served by permitting the disclosure.  *See United States v. Nixon*, 418 U.S. 683, 711-12 (1974); *In re Sealed Case*, 121 F.3d 729, 755-57 (D.C. Cir. 1997).

The confidentiality interests implicated by the remaining priority documents are of a higher order than the other documents, including the draft Gary letters, that Defendants have shared with the Committee or its staff.  The two draft Uthmeier memoranda were prepared for the purpose of providing legal advice to the Secretary regarding his statutory authority to reinstate a citizenship question.  *See* Second Decl. of Anthony Foti ("2d Foti Decl.") ¶¶ 5, 10 (ECF No. 18-7).  Matters

concerning the scope of the legal authority possessed by high-ranking officials are often those on which expert advice is vital, and to ensure the candor and objectivity of that advice its confidentiality must be assured, at least in all but exceptional cases.

The additional nine priority documents all constitute e-mail exchanges involving the Secretary and/or his senior advisors on a variety of matters, some pertaining to the census, some not. *See id.* ¶¶ 23-26. "[T]he valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties . . . is too plain to require [extended] discussion." *Nixon*, 418 U.S. at 705. Regardless of the specific subject matter or content of a given e-mail exchange, it is essential to the effective functioning of the Executive Branch that the confidentiality of communications between Cabinet-level officials and their senior staff be protected from unwarranted intrusion, to ensure the candor and objectivity of the information and advice that these officials receive.

To overcome the Executive confidentiality interests inhering in documents and communications of this nature requires at the very least that a Congressional committee make a specific demonstration of need for the desired materials to fulfill its legislative functions. *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730-31 (D.C. Cir. 1974) (en banc). Although the Committee continues to insist that the remaining priority documents are "crucial" and "critical" to its ongoing investigation, Joint Status Report (Aug. 17, 2020) ("Aug. 17 JSR") at 2, 3 (ECF No. 46), it has made no demonstration of a specific need for these documents that would justify their disclosure. Most recently the Committee has asserted an "ongoing responsibility to exercise its oversight authority to ensure that the Trump Administration acts to further the Census's constitutional goals[,]" and a corresponding need to "understand what Defendants' actions reveal about the integrity of the census process." *Id.* at 2. But these are

generalities only.   They describe the overall nature and objectives of the Committee's investigation, but they do not explain why the particular documents on which the Committee is fixated are "crucial" or "critical" to achieving those objectives.

With somewhat greater specificity, the Committee now points to several actions and initiatives by the Administration as "further" evidence, in the Committee's eyes, that the Secretary's decision to reinstate a citizenship question was part of a plan, conceived of by a (now deceased) redistricting specialist named Dr. Thomas Hofeller, to "manipulat[e]" the census to enhance the political power of "Republicans and Non-Hispanic Whites."   Aug. 17 JSR at 2-3. Defendants hasten to observe that the district court in *New York* recently found no support for claims that the Departments of Commerce or Justice have been concealing evidence of any such plan.   *State of New York v. U.S. Dep't of Commerce*, 2020 WL 2564933, at *2, *5-6 (May 21, 2020).   Certainly the remaining priority documents, now nearly three or more years old, shed no light on the existence (or not) of a scheme currently afoot to "manipulat[e]" the census for political purposes.   The draft Uthmeier memoranda discuss the legal grounds for reinstating a citizenship question, not the motivation or purpose for doing so.   *See* 2d Foti Decl. ¶¶ 5, 10.[8]  The information redacted from five of the nine "priority" e-mail chains concerns the Census Bureau's logistical and financial readiness for the 2020 census; from whom Commerce should seek advice regarding reinstatement of a citizenship question; whether Commerce was required to notify Congress of DOJ's request to reinstate a citizenship question; and what issues concerning restoration of a citizenship question should be discussed in the Secretary's decision memo.   *Id*. ¶¶ 19-23.   The

---

[8]   Similarly, Mr. Uthmeier's cover note, accompanying the draft of his memorandum provided to DOJ, expresses the Secretary's tentative view on the utility of a citizenship question for purposes—and only for purposes—of enforcing the Voting Rights Act.  2d Foti Decl. ¶ 16.

material redacted from the final four "priority" e-mails has nothing to do with the census at all.  *Id.* ¶¶ 24-26.

Having reconsidered the Committee's request for disclosure of the remaining priority documents, and the explanations given by the Committee for its request, Commerce has concluded, after consultation with OLC, that the privileged information withheld from these documents bears insufficient relation to the Committee's stated legislative objectives to justify the disclosure of internal deliberations among a Cabinet-level officer and his senior advisors on important matters of policy and administration.  Revealing communications of this nature on so thin a showing of need as the Committee has made here would undermine the assurance of confidentiality that is essential to sound decision-making at the highest levels of the Executive Branch.  Commerce can therefore offer the Committee no accommodation concerning the remaining priority documents at this time.  Were the Committee to explain in greater detail why it cannot fulfill its legislative responsibilities without access to these documents in particular, then of course, Commerce would be prepared to discuss the matter further.

2.     The D.C. Circuit's decision in *Committee on the Judiciary v. McGahn*, --- F. 3d ----, 2020 WL 5104869 (D.C. Cir. Aug. 31, 2020), *petition for r'hg en banc pending*, makes clear that the Committee is not entitled to the untraditional judicial relief that it seeks in this lawsuit.  In *McGahn*, as here, the plaintiff committee sought to find a cause of action through which it could enforce its subpoenas against the Executive Branch in an amorphous combination of Article I of the Constitution, the federal courts' traditional equity powers, and the Declaratory Judgment Act. *See id.* at *1-4.  *McGahn* squarely rejected that attempt, explaining that "Congress has *declined* to authorize lawsuits like the Committee's twice over," *id.* at *1, and that "Congress itself has precluded us from granting the requested relief to the Committee," *id.* at *2.  Notwithstanding the

House's hope that the D.C. Circuit will agree to take *McGahn* en banc a second time, the panel opinion is binding precedent today, *see, e.g.*, *Ayuda, Inc. v. Thornburgh*, 919 F.2d 153, 154 (D.C. Cir. 1990) (Henderson, J., concurring), and under that precedent this case should be dismissed.

Defendants acknowledge that the Court might instead elect to stay the action pending further guidance from the D.C. Circuit, rather than dismiss it at this time.  Defendants would not object to the Court's staying this case pending further proceedings in *McGahn* provided that any such stay extend through the completion of any Supreme Court proceedings, and not merely the completion of proceedings in the D.C. Circuit.

3.      The Committee's suggestion that Defendants are attempting "to wield the accommodations process as a means of delaying disclosure" of the priority documents is baseless. Following the January 30, 2020 hearing, at the Court's direction, the parties renewed focus on the possibility of accommodation principally with respect to the non-priority documents.  As set out above, both the Department of Justice and the Department of Commerce engaged in that process in good faith, each producing a significant volume of additional documents to the Committee.  In addition, it is undisputed that the Department of Justice produced for Committee staff's in camera review 89 drafts of the Gary Letter, priority documents over which the President had previously made a conclusive assertion of Executive Privilege.  The Committee only withdrew its request for production of those materials on August 26, 2020; in other words, the accommodation process was working *as to the priority documents* as recently as *one day* before the August 27, 2020 hearing. Against that backdrop, the Committee's suggestion that Defendants somehow acted improperly in suggesting that they have been open to the accommodations process throughout this litigation, or that further efforts at accommodation might lead to additional progress, is bewildering.

Following the August 27 hearing, at the Court's direction, Defendants shifted primary focus from the nonpriority documents to the priority documents.  The Committee began that new phase of the accommodations process that evening by requesting either full production or in camera review of all remaining priority documents, without any offer to either narrow its request or provide additional information about legislative need.   Following thorough review with all relevant stakeholders over the intervening two weeks, Defendants determined that they were not willing to offer additional accommodations.  That does not mean that "Defendants never had any genuine intent to accommodate" the Committee's need, or that Defendants made statements that were "not true on August 27."  It instead means that the Defendants did exactly what the Court asked them to do:  focus on the priority documents and decide whether further accommodation was possible.  Were Defendants engaged in the bad-faith scheme of which Plaintiffs accuse them, Defendants would have every incentive to hide the ball.  But that is not what Defendants are doing: Defendants are being forthright with both the Committee and this Court that, based on the articulations of need that the Committee has provided to date, Defendants do not believe that further accommodation is possible with respect to the priority documents.  Such a result cannot possibly come as a shock to the Committee, which (1) has repeatedly asserted over the past six months that the parties are at an impasse, and (2) heard Defendants clearly state at the August 27 status conference that further accommodation might ultimately not be possible.

Against that backdrop, the Committee's request for a status conference "to examine how and why Defendants' positions have changed so conspicuously over time" is meritless.  While the Committee imagines bad faith, there is a far simpler explanation:  the Court asked for a final answer as to the priority documents by September 11, and Defendants worked hard to provide one.  The Committee may not like Defendants' answer, but the fact that the accommodations process has not

concluded with capitulation by the Executive Branch does not mean that the accommodation process was never worth pursuing.  It plainly was:  if nothing else, the number of pages as to which the Court may one day have to rule has dropped from 346 to approximately 50.

Finally, to our utter surprise and disappointment, at the last minute before filing the Committee added to its statement a remark that Defendants' statement now omits an earlier expression of willingness to continue engaging in the accommodation process with respect to the non-priority documents.  The reason for that omission should not be difficult to grasp.  Having once been accused of acting in bad faith and making misrepresentations to the Court, Defendants did not wish to be so accused a second time if the outcome of any further efforts at accommodation over the remaining non-priority documents were not to the Committee's liking.

Ultimately, the Committee's reckless, offensive, and incorrect speculation is a distraction from the fundamental point, which it conspicuously does not address at any meaningful length: it does not have a sufficient need for the subpoenaed priority documents to overcome the President's assertion of executive privilege.  And in any case, so long as the latest *McGahn* decision remains good law, this is a question for the political process, not this Court.

> /s/ Douglas N. Letter
> Douglas N. Letter (DC Bar No. 253492)
>    *General Counsel*
> Todd B. Tatelman (VA Bar No. 66008)
>    *Principal Deputy General Counsel*
> Megan Barbero (MA Bar No. 668854)
>    *Deputy General Counsel*
> Josephine Morse (DC Bar No. 1531317)
>    *Deputy General Counsel*
> Adam A. Grogg (DC Bar No. 1552438)
>    *Associate General Counsel*
>
> OFFICE OF GENERAL COUNSEL
> U.S. HOUSE OF REPRESENTATIVES
> 219 Cannon House Office Building
> Washington, D.C. 20515

Telephone: (202) 225-9700
douglas.letter@mail.house.gov

David A. O'Neil (DC Bar No. 1030615)
Anna A. Moody (DC Bar No. 1047647)
Laura E. O'Neill (DC Bar No. 1033764)
Nathaniel Johnson (DC Bar No. 241433)

DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 383-8000

*Counsel for Plaintiff the Committee on Oversight
    and Reform, U.S. House of Representatives*


JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

DAVID M. MORRELL
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ James J. Gilligan*
JAMES J. GILLIGAN
Special Litigation Counsel

STEVEN A. MYERS (NY Bar No. 4823043)
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O.  Box 883
Washington, D.C.  20044
Telephone: (202) 514-3358
Fax:         (202) 616-8470
E-mail:      james.gilligan@usdoj.gov

*Attorneys for Defendants*

September 11, 2020